UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
--------------------------------------
UNITED STATES OF AMERICA,

        -vs-                12-CR-56S

STEVEN A. KNIGHTON,

          Defendant.
--------------------------------------


            **EXCERPT** of proceedings held before

the Honorable William M. Skretny,

Buffalo Courtroom, Robert H. Jackson

Courthouse, 2 Niagara Square, Buffalo,

New York, on December 4, 2014.


APPEARANCES:

THOMAS S. DUSZKIEWICZ,
Assistant United States Attorney,
Appearing for the United States.

ANGELO MUSITANO, ESQ.,
Appearing for Defendant.

Michelle L. McLaughlin, RPR,
Official Reporter,
U.S.D.C. W.D.N.Y.

1                        I N D E X

2            WITNESS                              PAGE

3        JOSE FIGUEIREDO
     Direct Examination by Mr. Duszkiewicz          4
4    Cross-Examination by Mr. Musitano             36

5        PATRICK DiPIRRO
     Direct Examination by Mr. Duszkiewicz         52
6    Cross-Examination by Mr. Musitano             69

7        RONALD F. YATES
     Direct Examination by Mr. Duszkiewicz         76
8    Cross-Examination by Mr. Musitano             90
     Redirect Examination by Mr. Duszkiewicz       99
9
         WILLIAM VALERIO
10   Direct Examination by Mr. Duszkiewicz        100
     Cross-Examination by Mr. Musitano            163
11

12

13       GOVERNMENT EXHIBITS                       EVD.

14       1.1 through 1.21                          13
                 12                                34
15       7.1 through 7.11                          61
            10A and 10B                           103
16

17

18

19

20

21

22

23

24

25

1            (Excerpt of proceedings.)

2            MR. DUSZKIEWICZ:  Judge, the government

3    would call Jose Figueiredo.

4            THE COURT:  Okay.  If you approach the

5    witness stand, please.  I'll tell you when to stop,

6    and then we'll place you under oath.  Probably a

7    good place right there.

8    J O S E   F I G U E I R E D O, having been duly

9    sworn as a witness, testified as follows:

10           THE COURT:  Good morning.

11           THE WITNESS:  Good morning, sir.

12           THE COURT:  Please make yourself

13   comfortable.  Couple of things you have to do, and

14   just a couple of preliminary instructions.  When

15   you testify, you are here, obviously, to testify

16   for the benefit of the ladies and gentlemen of the

17   jury.  So, if you would direct your answers to

18   them, that would be helpful.  Probably the best way

19   to testify is to speak at the microphone.  You

20   don't have to get right on top of it.  Speak in a

21   conversational tone.  It's friendly, it will pick

22   you up.

23       If you don't understand a question, ask that it

24   be repeated.

25           THE WITNESS:  Yes, sir.

 1          THE COURT:  Try to be as succinct as you

 2     can.  If you can answer a question yes or no,

 3     please try to do it that way.

 4          If there's an objection, wait until I rule on

 5     the objection, and then I will give you

 6     instructions.  I'll tell you start your answer over

 7     again, complete the answer, wait for the next

 8     question, something along those lines, okay?

 9          THE WITNESS:  Yes, sir.

10          THE COURT:  All right.  Let's find out

11     testimonially who you are, spell your last name,

12     state tour full name, please.

13          THE WITNESS:  My name is Jose Figueiredo,

14     F-I-G-U-E-I-R-E-D-O.  I'm a member of the New York

15     State Police assigned to CNET, which is a Community

16     Narcotics Enforcement Team.

17          THE COURT:  Okay.  Thank you.

18          Your witness, Mr. Duszkiewicz.

19     DIRECT EXAMINATION BY MR. DUSZKIEWICZ:

20     Q.  Mr. Figueiredo, how long have you been a member

21     of the New York State Polices?

22     A.  About 27 and a half years.

23     Q.  What is your current rank with the New York

24     State Police?

25     A.  I'm a senior investigator assigned to our unit.

1    Q.   All right.  And does that unit involve itself

2    in narcotics enforcement activities?

3    A.   Yes, it does.

4    Q.   Where is that -- your unit located?

5    A.   We're located in Syracuse, New York.

6    Q.   All right.  And how long have you been assigned

7    to that unit?

8    A.   I've been assigned approximately 20 years in

9    that unit.

10   Q.   All right.  Are there other investigators,

11   senior investigators that are part of that unit?

12   A.   Yes, there is.

13   Q.   Is there also a command structure or other

14   members of the state police or in a supervisory

15   position with respect to that unit?

16   A.   Yes, there is.

17   Q.   And what -- what ranks do they hold?

18   A.   We have a lieutenant who oversees our unit out

19   of the -- out of our Syracuse office, central

20   office.  And then we have our command in Albany.

21   Q.   Okay.  Are there CNET units in places other

22   than Syracuse?

23   A.   Yes, there is.

24   Q.   Where are they located, sir?

25   A.   We have it in the Buffalo area, Albany,

1    Binghamton area, Poughkeepsie.  I believe that's

2    it, five of them.

3    Q.  All right.  And do those units cooperate or

4    communicate one to each other?

5    A.  Yes, we do.

6              THE COURT:  What is a CNET unit?

7              THE WITNESS:  CNET is Community Narcotics

8    Enforcement Team, is the state police version of a

9    narcotics unit.

10             THE COURT:  Thank you.

11   BY MR. DUSZKIEWICZ:

12   Q.  Let me call your attention, sir, to the 13th of

13   March, 2009.  Do you recall that particular day?

14   A.  Yes, I do.

15   Q.  Was that day a Friday?

16   A.  Yes, it was a Friday.

17   Q.  Now, in calling your attention to that

18   particular day, as part of the CNET unit, do you

19   and other investigators assigned to the unit

20   develop information from private citizens?

21   A.  Yes, we did.

22   Q.  Had there been some information that day that

23   quantities of cocaine were going to be come into

24   the Syracuse area from a particular individual?

25             MR. MUSITANO:  Objection.

1                    THE COURT:  Grounds?

2                    MR. MUSITANO:  Hearsay, Judge.

3                    THE COURT:  No, not on that basis.

4      Overruled.

5                    THE WITNESS:  Yes, we did.

6      BY MR. DUSZKIEWICZ:

7      Q.   Okay.  And did you and other members of your

8      CNET team take some steps to intercept that

9      suspected cocaine arrival?

10     A.   Yes, we did.

11     Q.   What steps did you take, sir?

12     A.   We set up a detail in the rest area on the

13     Thruway to intercept it.

14     Q.   All right.  And were there other individuals

15     who were following a vehicle into that rest area as

16     part of the state police?

17     A.   I don't recall if there were people actually

18     following it.  We knew what vehicle to look for.

19     Q.   And, in fact, did a vehicle arrive at the

20     service area?

21     A.   Yes, it did.

22     Q.   What type of vehicle arrived?

23     A.   It was a blue Chevy minivan with Massachusetts

24     plates.

25     Q.   All right.  And did there come a point in time

1    that the individual that was operating that

2    particular vehicle was arrested?

3    A.  Yes, he was.

4    Q.  Do you recall that individual's name?

5    A.  Yes.  Willy -- I'm drawing a blank, I'm sorry,

6    on the -- on the last name.  Valerio.

7              THE COURT:  Hold on one second.

8        Mr. Duszkiewicz, speak in the microphone, keep

9    your voice up, please.

10   BY MR. DUSZKIEWICZ:

11   Q.  I'm sorry, Judge.  The individual that was

12   arrested, did you take part in actually arresting

13   him, or were there other members of the state

14   police who took part in that arrest?

15   A.  I, along with other members.

16   Q.  All right.  And as a result of the arrest, did

17   certain members of the state police attempt to have

18   some conversation with the fellow that was

19   arrested?

20   A.  Yes.

21   Q.  All right.  And did you take part the in that

22   conversation, or did you have some other function?

23   A.  I had another function.

24   Q.  What function did you have, sir?

25   A.  I was to assist in the seizing of any narcotics

1    that we recovered out of the vehicle.

2    Q.   All right.   And did there come a point in time

3    that you were advised that there was narcotics in

4    the vehicle?

5    A.   Yes, I was.

6    Q.   And was that by a law enforcement officer?

7    A.   Yes, it was.

8    Q.   All right.   And did there come a point in time

9    that you or other investigators attempted to remove

10   or locate evidence or cocaine in that particular

11   vehicle?

12   A.   Yes, we did.

13   Q.   All right.   And was, in fact, quantities of

14   suspected cocaine located?

15   A.   Yes, there was.

16   Q.   Where were they located?

17   A.   There was a compartment, if you're on the front

18   dash of the vehicle, passenger side where normally

19   the airbag would be, the compartment there, and the

20   passenger side in the rear where they keep the jack

21   in for changing of the tire.   There is a

22   compartment back there.

23   Q.   The compartment on the dashboard, how was that

24   particular compartment opened?

25   A.   When I arrived it was already opened.

1    Q.   Is that a compartment that generally is

2    available to be opened?

3    A.   No, it's not.

4    Q.   Okay.  The compartment in the back for the

5    spare tire or the jack, is that something that's

6    easily accessible?

7    A.   Yes, that is.

8    Q.   And within -- within those compartments, were

9    there quantities of suspected cocaine located?

10   A.   Yes, there was.

11   Q.   Okay.  Did there come a point in time that some

12   photographs were taken relative to the items of --

13   of suspected cocaine that were contained in that

14   vehicle -- the photographs taken?

15   A.   Yes, there were.

16   Q.   Who was responsible for taking the photographs?

17   A.   I was responsible for taking the photograph.

18   Q.   Did you, in fact, take a series of photographs?

19   A.   Yes, I did.

20           MR. DUSZKIEWICZ:  Judge, may I approach?

21           THE COURT:  Well, we have those on the

22   system, right?

23           MR. DUSZKIEWICZ:  We do, Judge.  But I

24   just want him identify a series of photographs.

25           THE COURT:  All right.  Why don't you put

1    them up on the screen, and work off the screen,

2    please.

3            PARALEGAL:  There are over 20.

4    Photographs.

5            THE COURT:  They're what?

6            PARALEGAL:  There are over 20 photographs.

7            MR. DUSZKIEWICZ:  I just want him to

8    identify the entirety.

9            THE COURT:  Have you seen the photographs,

10   Mr. Musitano?

11           MR. MUSITANO:  Judge, I'll stipulate to

12   them.

13           THE COURT:  All right.  Give us the

14   numbers, and they will be received.  And then you

15   can show them individually as you would like.

16   BY MR. DUSZKIEWICZ:

17   Q.  Investigator Figueiredo, did you take at least

18   21 photographs with respect to the seizure of

19   suspected cocaine from the Massachusetts-plated

20   vehicle?

21   A.  Yes, I did.

22   Q.  Okay.  And have you seen those photographs?

23   A.  Yes, I have.

24   Q.  And are they a fair and accurate representation

25   of photographs that you took on the 13th of March,

1    2009?

2    A.  Yes, they are.

3    Q.  Okay.

4            THE COURT:  What are their numbers?  Give

5    us the numbers.

6            MR. DUSZKIEWICZ:  Well, have they been

7    marked Government's Exhibit 1.1 through 1.21 for

8    purposes of this proceeding?

9            THE WITNESS:  Yes, they have.

10           MR. DUSZKIEWICZ:  Okay.  Your Honor, I

11   would ask first to go to Exhibit 1.1.

12           THE COURT:  Yeah, but you want all of them

13   moved into evidence --

14           MR. DUSZKIEWICZ:  Yes.

15           THE COURT:  -- and received?

16           MR. DUSZKIEWICZ:  Yes, I understood there

17   was going to be a stipulation.

18           THE COURT:  But you have to move them.

19           MR. DUSZKIEWICZ:  Well, Judge, I'm going

20   to move what's marked Government Exhibits 1.1

21   through 1.21 into evidence.

22           THE COURT:  All right.  By stipulation, by

23   agreement they constitute competent evidence for

24   you to consider, ladies and gentlemen, if you

25   choose to do that.  So I will receive them into

1    evidence.  You heard the testimony of the witness

2    that was preliminary to the admission.

3              (Government's Exhibits 1.1 through 1.21

4              were received into evidence.)

5              THE COURT:  Okay.  Next please.

6    BY MR. DUSZKIEWICZ:

7    Q.  May we have 1.1, Miss Prawel?

8        Investigator Figueiredo, do you see what's

9    depicted on the screen as Government's Exhibit 1.1

10   in evidence?

11   A.  Yes, I do.

12   Q.  What is depicted in that particular photograph,

13   sir?

14   A.  A picture of the blue minivan with the

15   Massachusetts license plate that we took the

16   subject out of.

17   Q.  Okay.  And there appear to be two gentlemen in

18   the left-hand side of the photograph.  Do you

19   recognize either of those individuals?

20   A.  Yes.  The one facing us, Investigator Pat

21   DiPirro.  The other one I'm not -- I can't tell

22   exactly who it is.

23   Q.  But this is the vehicle that was stopped at the

24   Warner Service Area?

25   A.  Yes, it was.

1    Q.   May we go to 1.2?

2         Investigator Figueiredo, what's depicted in

3    Government's Exhibit 1.2?

4    A.   Picture of the license plate and of the van.

5    Q.   May we see 1.3?

6         Investigator Figueiredo, what's depicted in

7    Government's Exhibit 1.3?

8    A.   That was the compartment on the front dash that

9    was described earlier.

10   Q.   And there appears to be something sticking into

11   an object there, or an item there?

12   A.   Yes.  That was placed in there when I arrived

13   to the vehicle.  It was open, but it was a

14   hydraulic system.  I was just afraid if it shut for

15   any reason, so I placed that there so it wouldn't.

16             THE COURT:  All right, before you move on,

17   tap with authority your finger the compartment that

18   you're talking about.  You'll get an arrow on the

19   screen, so tap it.

20        Okay.

21   BY MR. DUSZKIEWICZ:

22   Q.   That's what you said was a hydraulic

23   compartment?

24   A.   Yes, sir.

25   Q.   The other item was something that was placed in

1    there to maintain the compartment's open condition?

2    A.   Yes, sir.

3    Q.   May we have Government Exhibit 1.4?

4         What is depicted in Government's Exhibit 1.4?

5    A.   That is the compartment in the back of the

6    vehicle where I stated earlier where the other

7    kilos were located.

8    Q.   And there appears to be an object in white,

9    some sort of cellophane, perhaps several of those,

10   in that compartment?

11   A.   Yes.

12          THE COURT:   Keep your voice up,

13   Mr. Duszkiewicz, please.

14   BY MR. DUSZKIEWICZ:

15   Q.   In fact, is that a compartment that's easily

16   opened?

17   A.   Yes, it is.

18   Q.   Okay.   And the items that are contained within

19   that compartment, were those items that were

20   suspected to be cocaine?

21   A.   Yes, it was.

22   Q.   May we have Government's Exhibit 1.5?

23        What is depicted in Government's Exhibit 1.5?

24   A.   Front picture of the compartment on the dash

25   along with -- where you can see one of the wrapped

1    kilos that we took out.

2    Q.   Okay.   Government's Exhibit 1.6.

3         What is that, sir?

4    A.   Just a front picture of the vehicle's license

5    plate and the vehicle we had.

6    Q.   1.7?

7    A.   Again, a picture of the front of the vehicle,

8    the compartment -- the motor compartment.

9    Q.   Okay.   May we see Government Exhibit 1.8?

10   A.   Again, another picture of the compartment on

11   the dash.

12   Q.   And Government's Exhibit 1.9?

13   A.   Picture again of the compartment in the rear of

14   the vehicle where we located the other kilos.

15   Q.   And 1.10?

16   A.   We removed the kilos out of the compartment in

17   the back, laid them out just to show what was in

18   it.

19   Q.   And these are photographs that you took with

20   respect to processing this particular vehicle for

21   evidence purposes?

22   A.   That is correct.

23   Q.   May we see 1.11?

24        What is in that photograph, sir?

25   A.   Again, the front compartment on the dash with a

1    kilo.

2    Q.   1.12?

3    A.   Just another picture of the front dash.

4    Q.   1.13?

5    A.   Again, another just -- this time it was opened

6    up.

7    Q.   Okay.  And there appears to be something --

8    well, some hinges and something else along the

9    right-hand side of the compartment.  What are those

10   apparatus?

11   A.   That is part of the hydraulic system.

12   Q.   Okay.  Can you tap where you indicated

13   hydraulic system?

14       Okay.  And Government's 1.14?

15   A.   We moved the kilo over so we could get a

16   picture of the whole thing.

17   Q.   Again, that's the front compartment?

18   A.   Front compartment, correct.

19   Q.   Government's 1.15?

20   A.   That is the picture of the 3 kilos we took out

21   of the compartment on the front dash.

22   Q.   As well as 1.16?

23   A.   That is correct.

24   Q.   Government's 1.17.

25       What is that a photograph of, sir?

1   A.   It's a photograph of the radio.  There is a --

2   we were advised by the investigator who was

3   interviewing that subject on how to actually

4   operate the hydraulics.  There is a series of

5   things you're supposed to do to open and shut it.

6   Q.   And Government's Exhibit 1.18?

7   A.   That's another picture of the driver's side

8   window latch, again as part of the series of how to

9   get it open.

10  Q.   All right.  Government's 1.19?

11  A.   That was just a picture of the compartment

12  closed.

13  Q.   And 1.20?

14  A.   That's one of our investigators going

15  through -- a picture of him going through the

16  different details on how to get it open.

17  Q.   And finally, 1.21?

18  A.   That is a picture of the kilos that we took out

19  of the vehicle.

20  Q.   Now, the stop of this individual, this Willy

21  fellow, you indicated occurred on the Thruway?

22  A.   That's correct.

23  Q.   At a rest area on the Thruway?

24  A.   Yes.

25  Q.   Okay.  Some of the photographs appear to be

1    taken at a processing area?

2    A.   Yes.   That vehicle was taken back to SP North

3    Syracuse for processing.

4    Q.   How was it taken to State Police at North

5    Syracuse?

6    A.   I drove that vehicle.

7    Q.   Some of the photographs are taken that appear

8    to be inside a garage, those are the SP North

9    Syracuse facility?

10   A.   That is correct.

11            THE COURT:   All right.   What are you

12   saying, SB?

13            THE WITNESS:   I'm sorry, sir.   State

14   police station out of North Syracuse.

15            THE COURT:   Okay.   Again, Mr. Duszkiewicz,

16   keep your voice up, please.

17            MR. DUSZKIEWICZ:   Judge, I apologize.   I'm

18   sorry again.   Maybe if this could be made longer,

19   it would be easier.

20            THE COURT:   We're going to get you a lapel

21   mike or something, because --

22            MR. DUSZKIEWICZ:   That might be fine,

23   Judge.   Thank you.

24   BY MR. DUSZKIEWICZ:

25   Q.   In any event, Investigator Figueiredo, the

1    items that you describe as seven packages of

2    cocaine, what happened with respect to those seven

3    packages?

4    A.   When I arrived at SP North Syracuse, our state

5    police barracks, I turned it over to Investigator

6    Jack Weinerth.

7    Q.   Did he have a particular role with respect to

8    taking custody of evidence?

9    A.   Yes, he did.

10   Q.   All right.  And did there come a point in time

11   that those exhibits, or at least a part of those

12   exhibits, the cocaine, were submitted to a lab for

13   analysis?

14   A.   Yes, they were.

15   Q.   Okay.  Does the state police maintain

16   laboratories for the analysis of items of

17   controlled substances?

18   A.   Yes, they do.

19   Q.   Are you familiar with a laboratory at Port

20   Crane, New York?

21   A.   Yes, I am.

22   Q.   Where is Port Crane, New York?

23   A.   Just outside Binghamton.

24   Q.   All right.  Is that somewhat contiguous to the

25   Syracuse area?

1    A.   It's about -- about an hour or so south of

2    Syracuse.

3    Q.   Okay.  By way of an interstate?

4    A.   Interstate 81.

5    Q.   All right.  And when items are submitted to the

6    lab for analysis, are there lab reports that were

7    returned to the state police, to the CNET Central

8    Unit, with respect to an analysis that's conducted?

9    A.   Yes, there is.

10   Q.   And do they come back to the lieutenant in

11   charge of the investigation?

12   A.   Yes, they do.

13   Q.   Are you familiar with a Lieutenant Mary Clark?

14   A.   Yes, I am.

15   Q.   Okay.  To the best of your knowledge, did

16   Lieutenant Clark receive a laboratory report with

17   respect to the analysis of at least one of those

18   kilograms?

19   A.   Yes, I believe she would.

20   Q.   Okay.

21           MR. DUSZKIEWICZ:  Judge, if I may, I'd

22   like to read at this point a stipulation.

23           THE COURT:  Certainly.

24           MR. DUSZKIEWICZ:  Reads as follows, Judge,

25   the United States of --

1          THE COURT:  Okay.  Why don't you flip

2     around so you can read it to the jury, please.

3     Thank you.

4          MR. DUSZKIEWICZ:  Stipulation reads as

5     follows:  "The United States of America by and

6     through its attorney, William J. Hochul, Jr.,

7     United States attorney for the Western District of

8     New York, Thomas S. Duszkiewicz, Assistant United

9     States Attorney, of counsel, and the defendant,

10    Steven A. Knighton, through his attorney Angelo

11    Musitano, Esquire, do hereby stipulate as follows:

12         "That multiple kilogram quantities of suspected

13    cocaine were obtained on March 13th, 2009, by the

14    New York State Police and submitted to the New York

15    State Southern Tier Regional Crime Laboratory.

16         "Number 2, if called to testify, Jackalynne M.

17    Vimislik, a Forensic Scientist III at the New York

18    State Police Southern Tier Regional Crime

19    Laboratory, Port Crane, New York, would state that

20    as part of her duties she received one compressed

21    brick of cocaine, which was contained in a sealed

22    condition and submitted as Lab Item 1A and Item 1B

23    containing three compressed bricks.

24         "Number 3, further, that she opened Lab Item 1A

25    and performed an analysis on the substance

1   contained therein.  Based upon her examination of

2   the substance, Miss Vimislik determined that the

3   substance contained within Lab Item 1A was cocaine

4   with a net situate of 1,002 grams.  And thereafter

5   she prepared a laboratory report marked as

6   Government's Exhibit 4 to reflect the results of

7   her analysis which are explained and demonstrated

8   in her case notes, which are marked as Government's

9   Exhibit 4A.

10      "Number 4, upon completion of her analysis,

11  Miss Vimislik resealed Laboratory Item 1A

12  reflecting the contents of the analyzed cocaine and

13  returned Lab Items 1A and 1B to evidence storage.

14  In December 2012, pursuant to the New York State

15  Police Southern Tier Regional Crime Laboratory

16  Evidence Destruction Policy, Lab items 1A and 1B

17  were destroyed.

18      "Paragraph 5, the parties further agree that

19  Government Exhibits 4 and 4A shall be received in

20  evidence."

21      That's signed today by myself, on behalf of the

22  United States, and by Angelo Musitano, as counsel

23  for the defendant Mr. Knighton.

24          THE COURT:  So stipulated, Mr. Musitano?

25          MR. MUSITANO:  So stipulated, Judge.

1          THE COURT:  All right.  Ladies and

2     gentlemen, what that means is that there's an

3     agreement that the stipulation information is

4     competent evidence for you to consider.  And you

5     are to consider not the written document or the

6     reading by the attorney, but you are to view that

7     information as if forensic scientist Jackalynne

8     Vimislik was here personally and testifying and

9     told you what was read to you by Mr. Duszkiewicz,

10    which is the subject of the stipulation.

11    Essentially, what she examined and what the results

12    of her expert analysis was.  That is the competent

13    evidence.  You may give it whatever weight you deem

14    appropriate.

15         THE CLERK:  Judge, I've also marked that

16    as Court Exhibit 1.

17         THE COURT:  Okay.  And it is Court

18    Exhibit 1.

19         MR. DUSZKIEWICZ:  Judge, based on that

20    stipulation, I'm going to offer what's marked

21    Government's Exhibit 4 and Government's Exhibit 4A,

22    which are the subject of the stipulation.

23         THE COURT:  Okay.  That was substituted

24    for 1 and 1A, correct?

25         MR. DUSZKIEWICZ:  Those are the reports,

1    Judge?

2             THE COURT:  I'm sorry?

3             MR. DUSZKIEWICZ:  Those are the reports.

4             THE COURT:  The reports.  No objection to

5    4A and 4B, Mr. Musitano?

6             MR. DUSZKIEWICZ:  4 and 4A.

7             MR. MUSITANO:  I'm sorry?

8             MR. DUSZKIEWICZ:  It's 4 and 4A.

9             MR. MUSITANO:  Judge, I have 4.  I don't

10   have a copy of 4A.

11       I have no objection, Judge.

12            THE COURT:  Okay.  The reports will be

13   received into evidence.  And as documents they will

14   be available to you as well, ladies and gentlemen,

15   when you start your deliberations in the case.

16            (Government's Exhibit 4 and 4A were

17            received into evidence.)

18   BY MR. DUSZKIEWICZ:

19   Q.  Investigator Figueiredo, other than processing

20   the van belonging to this Willy fellow, did you

21   participate in any further investigation on that

22   date, on the 13th of March?

23   A.  Yes, I did.

24   Q.  What did you do, sir?

25   A.  We then left and headed out to a mall here in

1    Buffalo.

2    Q.  Okay.  And when you say "we," who do you mean?

3    A.  I, along with other members of my unit.

4    Q.  Okay.  And the individual that was arrested,

5    this Willy fellow, was he also transported to a

6    mall here in the Buffalo area?

7    A.  I believe he was.

8    Q.  When you say you believe, is that because he

9    was with someone else?

10   A.  Yeah, he was with someone else.  He wasn't with

11   me.

12   Q.  Okay.  Now, did there come a point in time that

13   you arrived in the Buffalo area?

14   A.  Yes, there was.

15   Q.  Where did you go, sir?

16   A.  We went to -- I'm not from the area -- a large

17   mall here just outside -- you could see it from the

18   interstate.

19   Q.  When you say the interstate, you're talking

20   about the New York State Thruway?

21   A.  That's correct.

22   Q.  When you arrived at that location, had you been

23   aware that other members of the New York State

24   Police from the Western CNET operation were in

25   place?

1      A.   Yes.

2      Q.   Okay.   How were you advised of that?

3      A.   Via radio or phone.

4      Q.   Okay.   And had you been advised prior to

5      arrival at this mall area the nature of a vehicle

6      that yourself or other investigators were looking

7      for?

8           MR. MUSITANO:   Judge, I'm going to object

9      to the --

10          THE COURT:   Grounds?

11          MR. MUSITANO:   -- form of the question.

12          THE COURT:   Sustained.

13   BY MR. DUSZKIEWICZ:

14     Q.   What were you looking for?

15     A.   We're looking for a vehicle.

16     Q.   Okay.   What some kind of vehicle?

17     A.   I'm not sure at the time what kind of vehicle.

18     We're just told to head over to the mall, and they

19     were giving us information -- would give us more

20     information as we got there.

21     Q.   All right.   When you got there, what did you

22     do, sir?

23     A.   I mainly was a surveillance and when -- at the

24     area.

25     Q.   Okay.   Did there come a point in time that your

1    attention was drawn to a black Chevrolet Tahoe?

2    A.  Yes.

3         MR. MUSITANO:  Judge, I'm going to object

4    to the leading.

5         THE COURT:  No, I'll permit this over

6    objection.  Objection overruled.

7   BY MR. DUSZKIEWICZ:

8    Q.  What did you observe, sir?

9    A.  When I arrived at the scene, members of the

10   local police department had the vehicle surrounded.

11   Q.  Okay.  And was there an individual that was at

12   some point removed from the vehicle?

13   A.  Yes, there was.

14   Q.  Did you at all take part in removing the

15   individual from the vehicle or having any contact

16   with that individual?

17   A.  No, I did not.

18   Q.  Okay.  Did other -- did there come a point in

19   time that other members of the state police had

20   contact with either the vehicle or the individual

21   that was removed from the vehicle?

22   A.  Yes, there were.

23   Q.  Was the vehicle moved?

24   A.  Yes.  It was moved out of there.

25   Q.  Okay.  Where was it moved to?

1    A.   It was driven to the local police department.

2    Q.   And do you know how it was driven or who drove

3    it?

4    A.   It was driven by Investigator Ronald Yates.

5    Q.   All right.  And did you have occasion to be at

6    the local police agency?

7    A.   Yes, I did.

8    Q.   And what, if anything, occurred in your

9    observation at the --

10            THE COURT:  When you say "local police

11   agency," what are you referring to?

12            THE WITNESS:  Like I said, sir, I'm not

13   from the area.  I wasn't sure the name of -- what

14   department we were at.  But it was a local, I

15   believe, town or village police department.

16            THE COURT:  Okay.  We'll leave it at that,

17   but explore it, Mr. Duszkiewicz.  I think we need

18   more than that.

19   BY MR. DUSZKIEWICZ:

20   Q.   Was that police agency the agency for the town

21   or village wherein the mall was located?

22   A.   It was.

23   Q.   Now, again, what, if anything, happened at that

24   agency?

25   A.   A search of the vehicle was going to be

1    conducted by members who were there from our unit.

2    Q.  Did you have occasion to observe the search of

3    the vehicle?

4    A.  I was standing off to the side, yes.

5    Q.  And who was conducting the search of the

6    vehicle?

7    A.  Investigator Ronald Yates, and I believe

8    investigate -- and no, it was Investigator Pat

9    DiPirro were both at the vehicle.

10   Q.  Okay.  And who is Investigator Pat DiPirro?

11   A.  He's an investigator out of our unit assigned

12   to CNET Central.

13   Q.  He's also from the Syracuse area?

14   A.  Yes, he is.

15   Q.  And did you see what, if anything, was removed

16   from the vehicle?

17   A.  Yes.  It was a package that contained currency.

18   Q.  Did you have anything at that particular point

19   in time to do with the package that contained

20   currency?

21   A.  No, I did not.

22   Q.  Okay.  Did you see what, if anything, happened

23   to it?

24   A.  No, I did not.

25   Q.  Okay.  Well, let me call your attention to the

1    second day of April 2009.  Did you have any contact

2    with the package on that particular day?

3    A.   Yes, I did.

4    Q.   Okay.  And what was the nature of the contact

5    you had with that package on that date, sir?

6    A.   I, along with our seized asset person out of my

7    unit, transported it to the Key Bank.

8    Q.   And what was the purpose for transporting it to

9    the Key Bank?

10   A.   To have it deposited in the seized asset

11   account.

12   Q.   What is the procedure employed by CNET Central

13   with respect to quantities of currency in excess or

14   believed to be in excess of $5,000?

15   A.   We will not count anything over $5,000.  We

16   take it to the bank.

17   Q.   Okay.  The package that you saw as it was being

18   taken to the bank, did it appear to exceed $5,000?

19   A.   Yes, it did.

20   Q.   All right.  And did you and Investigator Smith

21   go to the Key Bank?

22   A.   Yes, we did.

23   Q.   Had you done that previously?

24   A.   Yes, we did.

25   Q.   Tell us the procedure in terms of taking it to

1    the Key Bank.

2    A.   We take it to the bank.  We give it to a

3    teller.  Usually when they see us coming, one of

4    the tellers will go to the side.  He or she will

5    then take possession of it, but it's always -- we

6    always have constant visual on it.  They will take

7    it to counting machine.  They will count it out for

8    us, and then they give us the total, not only how

9    much, but the denominations, how many hundreds,

10   tens, things like that.

11   Q.   Okay.  Is there a form that your agency, that

12   is CNET Central, fills out with respect to the

13   bank's counting a quantity of money?

14   A.   Yes, there is.

15   Q.   Okay.  May we show the witness what's marked

16   Government Exhibit 12?

17        Investigator Figueiredo, do you see what's

18   marked Government Exhibit 12?

19   A.   Yes, I do.

20   Q.   Okay.  And what is depicted there as

21   Government's Exhibit 12?

22   A.   That is the form we utilize when we confiscate

23   any money, any currency.

24   Q.   All right.  There's -- about the middle of the

25   form there is a signature or two signatures on the

1   right-hand side of the form, about maybe two-thirds

2   of the way down the page?

3   A.   Yes.

4   Q.   Okay.  And do you recognize either of those

5   signatures?

6   A.   That is my signature on top and Investigator

7   Smith's below mine.

8   Q.   There's also a printed name along the line to

9   the left of that -- two printed names actually.

10  A.   Yes.

11          THE COURT:  Tap the screen.  Let us know

12  where your signature is, please.

13          THE WITNESS:  My signatures is right here.

14  BY MR. DUSZKIEWICZ:

15  Q.   And are there printed names on the line to the

16  left of your signature?

17  A.   Yes, there is.  This was the teller who

18  assisted us, and then myself, along with

19  Investigator Smith.

20  Q.   Okay.  And is that a particular form that was

21  filled out at the bank on the 2nd of April, 2009?

22  A.   Yes, it was.

23          MR. DUSZKIEWICZ:  Judge, I'm going to

24  offer what's been marked Government's Exhibit 12.

25          THE COURT:  Any objection to 12?

1           MR. MUSITANO:  No, your Honor.

2           THE COURT:  All right.  12 will be

3    received, and it may be published.

4           (Government's Exhibit 12 was received into

5           evidence.)

6    BY MR. DUSZKIEWICZ:

7    Q.   Investigator Figueiredo, with respect to

8    Government's 12 now in evidence, there appears to

9    be a breakdown with respect to the denominations of

10   currency that were taken to the bank and counted at

11   the bank, is that correct?

12   A.   That is correct.

13   Q.   How did those numbers get on the document?

14   A.   Investigator Smith put them on the document.

15   Q.   And where did she, that is, Investigator Smith

16   get the information to place it on the document?

17   A.   From the bank teller.

18   Q.   Okay.  And she contemporaneously wrote those

19   quantities and the total amount of funds adjacent

20   to each of those respective denominations.

21   A.   Yes, she did.

22   Q.   And there's a total with respect to the amount

23   of cash that was contained within that quantity of

24   money?

25   A.   Yes, there was.

1    Q.   What is that total, sir?

2    A.   $41,000.

3    Q.   Exactly $41,000?

4    A.   Yes, sir.

5    Q.   Okay.  Now, after that particular form was

6    prepared, did there come a point in time that

7    that -- those funds were deposited in the account?

8    A.   Yes, there was.

9    Q.   May we see Government's Exhibit 13?

10        Investigator Figueiredo, do you recognize

11   what's marked as Government's Exhibit 13?

12   A.   Yes, I do.

13   Q.   What is Government's Exhibit 13?

14   A.   That is the bank receipt that was given to us

15   by the teller after the deposit.

16   Q.   That reflects a deposit of the funds that were

17   taken to the bank that day?

18   A.   Yes, it does.

19   Q.   It, again, bears a couple of signatures?

20   A.   Yes.  Mine, along with Investigator Smith's.

21        MR. DUSZKIEWICZ:  Judge, I'm also going to

22   offer what's marked Government Exhibit 13.

23        MR. MUSITANO:  No objection.

24        THE COURT:  All right.  13 received, no

25   objection.  It may be published.

1            (Government's Exhibit 13 was received into

2            evidence.)

3    BY MR. DUSZKIEWICZ:

4    Q.   Investigator Figueiredo, with respect to

5    Government's Exhibit 13, again that also reflects

6    the exact amount of currency that was deposited in

7    the bank that particular day?

8    A.   Yes, it does.

9    Q.   And that amount was what, sir?

10   A.   $41,000.

11   Q.   Other than processing the van initially and

12   taking the money that was located in Buffalo to the

13   bank, did you have any other role with respect to

14   the investigation that was conducted on the 13th of

15   March?

16   A.   No, I did not.

17            MR. DUSZKIEWICZ:   Thank you.

18            THE COURT:   Okay.   Mr. Musitano.

19        Thank you, Mr. Duszkiewicz.

20   CROSS-EXAMINATION BY MR. MUSITANO:

21   Q.   Good morning, Investigator.

22   A.   Good morning, sir.

23   Q.   Investigator, you indicated that you left the

24   Syracuse service center, if you will, if I could

25   call it that, and traveled to Buffalo in a vehicle,

1    is that correct?

2    A.   No, sir.

3    Q.   Okay.  After Mr. Valerio was arrested, did you

4    get in a vehicle and drive towards the Buffalo

5    area?

6    A.   I took the vehicle back to our station at North

7    Syracuse, then got in a vehicle and drove out to

8    Buffalo.  I did not leave from the service area.

9    Q.   Okay.  I apologize.  And do you know whether or

10   not other agents left from the service area, or did

11   they also come back to the SP station?

12   A.   I don't recall who came back to the SP station.

13   I know I went to the SP station.

14   Q.   You don't know whether or not Investigator

15   Davis and Investigator Fox came back to the SP

16   station with Mr. Valerio in their vehicle?

17   A.   I would have to guess, so --

18   Q.   Okay.  If you know.

19   A.   No.

20   Q.   Okay.  And then you indicated that you traveled

21   to Buffalo, is that correct?

22   A.   That is correct.

23   Q.   Mr. Valerio was not with you in the vehicle, is

24   that correct?

25   A.   He was not with me in the vehicle, no, sir.

1    Q.   If I could ask you without insulting you, do

2    you speak Spanish, Investigator?

3    A.   No, I do not.

4    Q.   Are there any investigators in your unit that

5    speak Spanish?

6    A.   Yes, we have investigators in our unit that

7    speak Spanish.

8    Q.   Were any of them there that day, either at the

9    SP station or at the service area near Syracuse?

10   A.   I don't recall if we had any Spanish-speaking

11   people there.

12   Q.   Okay.  Nevertheless, they're available, if need

13   be, on a need-to-use basis, if I can use that

14   phrase, is that fair to say?

15   A.   Yes.

16   Q.   So they can be called in by one of your

17   supervisors, is that correct?

18   A.   That is correct.

19   Q.   Okay.  To your knowledge, were any called in

20   that day while you were at the SP station?

21   A.   I'm not aware if any were.

22   Q.   Okay.  Now, if I could please have

23   Government's 1.3, please, up on the screen.

24        Now, Investigator Figueiredo -- am I

25   pronouncing it correctly?

1    A.  Figueiredo.

2    Q.  I apologize.  Investigator Figueiredo, you

3    identified what's depicted in Government's

4    Exhibit 1.3 as a compartment, is that correct?

5    A.  That is correct.

6    Q.  Is that a compartment to conceal controlled

7    substances?

8    A.  That's what it was being used for.

9    Q.  Can you conceal other items in a compartment

10   like that, for example, like cash?

11   A.  I believe you could.

12   Q.  You indicated you've worked for the CNET unit

13   for how long?

14   A.  About 20 years.

15   Q.  Have you seen compartments like this

16   previously?

17   A.  Yes, I have.

18   Q.  Have you seen controlled substances stored in

19   those secret compartments?

20   A.  Yes, I have.

21   Q.  Have you seen currency in there?

22   A.  Yes, I have.

23   Q.  Okay.  Now, the purpose of those compartments,

24   would you agree with me, is to conceal the presence

25   of the controlled substances in a vehicle?

1    A.   Yes.

2    Q.   Okay.  And if I could, please, have

3    Government's 1.4.

4         You described that as the compartment where the

5    jack would be, is that correct?

6    A.   Yes.

7    Q.   And prior to the opening there, it was -- there

8    was a panel that was screwed in, correct?

9    A.   Yes, there was.

10   Q.   And again, screws would have to be removed in

11   order to conceal what's in that compartment, is

12   that fair to say?

13   A.   No.  It was not screwed in.  It was -- it's

14   like a plastic knob.  So it wasn't where I'd have

15   to go out and get a screwdriver to undo it.

16   Q.   I apologize.  There's some type of --

17   A.   There is a locking mechanism.

18   Q.   Okay.  And again, you have to unlock in order

19   to remove and see what's inside, is that correct?

20   A.   That's correct.

21   Q.   And again, that's to conceal controlled

22   substances from anybody that's looking in the

23   vehicle, correct?

24   A.   Correct.

25   Q.   Now you indicated to Mr. Duszkiewicz that when

1    you traveled to Cheektowaga, you ultimately ended

2    up at a local police station, is that correct?

3    A.   That's -- after we went to the mall.

4    Q.   Okay.  After the mall, you then proceeded to a

5    local police station, correct?

6    A.   Correct.

7    Q.   And you observed a vehicle being searched

8    there, correct?

9    A.   Correct.

10   Q.   Chevy Tahoe, if you will?

11   A.   I believe so.

12   Q.   You identified to investigators that were

13   searching that vehicle?

14   A.   Yes, that's correct.

15   Q.   Okay.  Did you see anybody find a compartment

16   in that vehicle?

17   A.   I don't recall seeing anybody finding a

18   compartment in that vehicle.

19   Q.   Okay.  And when I say "compartment," I'm

20   referring to a compartment similar to the one

21   that's depicted in Government's Exhibit 1.3 -- if I

22   can have that up -- the one you described to this

23   honorable jury with hydraulics?

24   A.   That's correct.

25   Q.   You didn't see one of those in that Chevy Tahoe

1   at the local police station in and around the mall

2   area, is that correct?

3   A.   That is correct.

4   Q.   And the currency you indicated that you saw

5   being removed from that black SUV was not in a

6   compartment, isn't that true?

7   A.   I'm sorry.  I don't understand the question.

8   Q.   Sure.  Let me rephrase it.  The currency you

9   indicated to Mr. Duszkiewicz you saw being removed

10  from the SUV, correct?

11  A.   Yes, correct.

12  Q.   You did not see that currency being removed

13  from a concealed compartment like the one depicted

14  in Government's 1.3, correct?

15  A.   That is correct.

16  Q.   Okay.  Now you indicated to Mr. Duszkiewicz

17  that the investigators who executed the arrest of

18  Mr. Valerio at the service area, some of them went

19  into the vehicle and searched it, is that fair to

20  say?

21  A.   I'm not sure who would have gone in and

22  searched.  I don't recall who actually went in and

23  did the actual search.

24  Q.   Okay.  Do you recall seeing investigators in

25  the vehicle searching it at the service area?

1    A.   There were, but I don't know who they were.   I
2    don't recall who they were.
3    Q.   Okay.   Do you recall them taking anything else
4    out other than the cocaine?
5    A.   We're talking about the vehicle at the service
6    area?
7    Q.   At the service area, correct.
8    A.   No.   I just recall -- well, they didn't take
9    anything out.   They pointed it out that it was
10   there.   They called me.   I go in and take a picture
11   of it and take possession or it.
12           THE COURT:   All right.   When you're
13   talking about the service area, are you talking
14   about the minivan, or are you talking about the
15   Tahoe?
16           MR. MUSITANO:   Judge, there is only one
17   service area that I understand, and that's at
18   Syracuse.   The other one was at the mall.   Is that
19   correct?
20           THE WITNESS:   That's correct.   The
21   minivan -- if we're talking about the blue minivan,
22   we're talking about the service area on
23   interstate -- or the Thruway, New York State
24   Thruway.
25   BY MR. MUSITANO:

1    Q.  That's 90, right?

2    A.  I-90, yes.

3    Q.  And the SUV was at the mall?

4    A.  The SUV was at the mall, correct.

5          MR. MUSITANO:  Okay.  Can I use those two

6    distinctions, Judge, or do you want me to use

7    something else?

8          THE COURT:  I don't want you to do

9    anything.  I just want it to be clear, because it

10    gets muddied, frankly.

11  BY MR. MUSITANO:

12    Q.  Okay.  Do you know whether or not Mr. -- strike

13    that.  Mr. Valerio was removed from the van, the

14    blue van, that was parked at the service area on

15    the 90 near Syracuse, is that correct?

16    A.  He was removed from the blue van.

17    Q.  And he was also searched after he was removed,

18    correct?

19    A.  He would have been searched.  Part of our

20    procedure.

21    Q.  And any items of evidence on his person would

22    have been removed also, correct?

23    A.  That is correct.

24    Q.  Okay.  Now you indicated that at some point in

25    time the cocaine that was seized in Mr. Valerio's

1  vehicle would have been placed in a box and

2  shipped, is that correct?

3  A.  I didn't say it was placed in a box.

4  Q.  I apologize.

5  A.  I turned it over to somebody else.

6  Q.  You turned it over to Investigator --

7  A.  Weinerth.

8  Q.  Weinerth, okay.  And ultimately is that cocaine

9  shipped to a laboratory?

10  A.  It is packaged, and then one of our

11  investigators will drive it to the lab.

12  Q.  And who would that investigator be that would

13  drive it to the lab?

14  A.  I would have to look at the evidence form to

15  show who actually did the driving to the lab.  I

16  would believe it would be Investigator Evans, who

17  is our evidence technician.  But without actually

18  looking at the form, I wouldn't be able to confirm

19  it.

20  Q.  To the best of your recollection, it would be

21  Investigator Evans, is that correct?

22  A.  That is correct.

23  Q.  Okay.  Now, after the laboratory conducts their

24  evaluation and analysis, you indicated to Mr.

25  Duszkiewicz that a report would be generated, is

1    that correct?

2    A.   That is correct.

3    Q.   And an analysis report would be sent to an

4    investigator -- or strike that -- a Lieutenant Mary

5    C. Clark -- or sorry, Mary A. Clark, is that

6    correct?

7    A.   That's correct.

8    Q.   And she is the one responsible for receiving

9    communications from the laboratory, is that

10   correct?

11   A.   Yes.  It's mailed to our officer.

12   Q.   And if I could please have Government's 4 in

13   evidence.

14       Now you indicated that the lab analysis report

15   would be sent to Lieutenant Mary A. Clark, is that

16   correct?

17   A.   That is correct.

18   Q.   Is this the type of analysis that would be sent

19   to her?

20   A.   Yes, it is.

21   Q.   And on that form it lists the subject, is that

22   correct?

23   A.   Yes, it does.

24   Q.   And does it list a subject in this case?

25   A.   Yes, it does.

1    Q.   Who does it list?

2    A.   William Valerio.

3    Q.   Okay.  And was Mr. Valerio ultimately charged

4    in and around the Syracuse area?

5    A.   I believe he was.

6    Q.   Okay.

7              MR. MUSITANO:  Judge, if I could just have

8    one moment please?

9    BY MR. MUSITANO:

10   Q.   Now after you deposited the money -- or strike

11   that.  If I could go back to the local police

12   station in the Buffalo area after you left the mall

13   where the black SUV was located.

14   A.   Okay.

15   Q.   You indicated that you saw the currency being

16   removed from the vehicle, correct?

17   A.   That's correct.

18   Q.   Okay.  Did you take any photographs of it?

19   A.   No, I did not.

20   Q.   Okay.  And you indicated that after that

21   process was done, you received the currency on

22   April the 2nd, 2009, and took it to a bank, is that

23   correct?

24   A.   That is correct.

25   Q.   Okay.  And that's the proper procedure,

1    correct?

2    A.   That's correct.

3    Q.   Okay.  And you don't know as you sit there, do

4    you, how long it took to accumulate that amount of

5    money, do you?

6    A.   No, I don't.

7    Q.   You don't know where that amount of money came

8    from, do you?

9    A.   No, I don't.

10   Q.   Okay.

11              THE COURT:  Mr. Duszkiewicz, could we get

12   a stipulation as to which mall we're talking about

13   locally off the Interstate 90?

14              MR. DUSZKIEWICZ:  Judge, I'm willing to

15   stipulate it's the Galleria Mall.

16              MR. MUSITANO:  I'm willing to accept that

17   stipulation that it was the Galleria Mall.

18              THE COURT:  So that will be your point of

19   focus, ladies and gentlemen.  That's competent

20   evidence for you to consider, if you choose to do

21   that, in your deliberations, okay?

22              MR. MUSITANO:  If I could just have a

23   moment, Judge, I think I'm finished.

24              THE COURT:  Sure.

25   BY MR. MUSITANO:

1   Q.  Just a couple more questions, Investigator.

2   Investigator, do you know where the currency went

3   after it was removed from the black SUV at that

4   local police station near the Walden Galleria Mall?

5   A.  It was transported back to our office.

6   Q.  Do you know whether or not any further analysis

7   was done of that money once it was received at your

8   office?

9   A.  Once we packaged it up, no.

10          MR. MUSITANO:  Okay.  I have nothing

11   further, Judge.  Thank you.

12          THE COURT:  Did you say that the money was

13   deposited at the bank?

14          THE WITNESS:  Yes, sir.

15          THE COURT:  And then it was left there, or

16   was it taken back to your office?

17          THE WITNESS:  No.  Once we deposit the

18   money, it was left at the bank.

19          THE COURT:  Thank you.

20      Any questions, Mr. Duszkiewicz?

21          MR. DUSZKIEWICZ:  No, your Honor.  Thank

22   you.

23          THE COURT:  Investigator Figueiredo, you

24   are excused.  Thank you very much.  Everybody okay,

25   ladies and gentlemen?  All right.  Do you want --

1          MR. MUSITANO:  Please.

2          THE COURT:  Five minutes?  Let's do this.

3     We're going to go until about 12:45, and then we'll

4     break for lunch, and we'll resume again at 2:00

5     o'clock.

6        Would you like to take a 15-minute break now?

7     Come back in about 11:45.  We'll go for an hour,

8     break for lunch, get you back here by 2:00.  That

9     would be plenty of time.  It's a beautiful day out

10    there.  If it's warm enough, we'll move out for the

11    afternoon and have everything outside.  But take 15

12    now, okay?

13             (Jury excused from the courtroom.)

14          MR. DUSZKIEWICZ:  Judge, just to clarify

15    each of the rest of my witnesses know that it's the

16    Galleria Mall.

17          THE COURT:  Okay.  But it helps a little

18    bit.  Thank you.  You know, now that picked you up

19    really well.  I don't know -- you're a distance

20    away because you're so tall.  You know, I'm

21    wondering -- here do this.

22             (Short recess was taken.)

23             (Jury seated.)

24          THE COURT:  Okay.  Thank you, welcome

25    back.  Please have a seat.

1          Okay.  The jury has returned, roll call waived.

2     The attorneys and parties are back, present.

3          Your next witness, please, Mr. Duszkiewicz.

4              MR. DUSZKIEWICZ:  Judge, the government

5     would call Patrick DiPirro.

6              THE COURT:  Thank you.  Just step up a

7      little bit, and we'll have you sworn.

8     P A T R I C K   D I P I R R O, having been duly

9     sworn as a witness, testified as follows:

10             THE COURT:  Okay.  Good morning.

11             THE WITNESS:  Good morning.

12             THE COURT:  All right.  Mr. Witness, just

13     a very few preliminary instructions.  You are here

14     to testify for the benefit of the ladies and

15     gentlemen of the jury, so direct your responses or

16     answers to them, please.

17             THE WITNESS:  Yes, sir.

18             THE COURT:  The microphone is pretty good.

19     It's friendly, but you have to speak at it.

20             THE WITNESS:  Okay.

21             THE COURT:  If you speak in a

22     conversational tone, it should pick you up pretty

23     well.  When it comes to the questions, if you don't

24     understand a question, please don't answer it.

25     Just ask that it be repeated, and we will take care

1        of it from there.

2            Try to be as succinct as you can.  If you can

3        answer a question yes or no, please try to do it

4        that way.  If there's an objection, wait with your

5        answer until I rule on the objection, and then I'll

6        tell you what to do, either repeat your answer

7        again, complete it from where you left off, or wait

8        for the next question, something along those lines.

9        Fair enough?

10                   THE WITNESS:  Yes, sir.

11                   THE COURT:  Let us know who you are.

12        State your full name, spell your last name, please.

13                   THE WITNESS:  Investigator Patrick DiPirro

14        D-I-P-I-R-R-O.

15                   THE COURT:  Thank you.

16            Your witness, please, Mr. Duszkiewicz.

17        DIRECT EXAMINATION BY MR. DUSZKIEWICZ:

18        Q.  Mr. DiPirro, how are you employed, sir?

19        A.  I'm employed by the New York State Police.

20        Q.  And how long have you been so employed?

21        A.  Little over 27 years.

22        Q.  All right.  And what is your current assignment

23        with the state police?

24        A.  I'm an investigator assigned to a unit called

25        CNET, which stands for Community Narcotics

1    Enforcement Team.

2    Q.  Where are you located in your assignment?

3    A.  I'm assigned out of the central region, which

4    is located in Syracuse.

5    Q.  How long have you been with that unit?

6    A.  Since 2000, so 14 years.

7    Q.  All right.  And are there other investigators

8    and members of the state police that are part of

9    that unit?

10   A.  Yes, sir.

11   Q.  On the 13th of March, 2009, did you have

12   occasion to be with other members of the state

13   police in attempting to make an arrest along the

14   New York State Thruway?

15   A.  Yes, sir, I was.

16   Q.  And did there come a point in time that an

17   arrest of an individual with a quantity of cocaine

18   was made on that day?

19   A.  Yes, sir, there was.

20   Q.  Okay.  Do you know that individual's name?

21   A.  No, sir, I don't.

22   Q.  All right.  Did you have anything specific to

23   do with respect to the arrest of that individual?

24   A.  No.  I was assigned as a surveillance member.

25              THE COURT:  All right.  Investigator

1    DiPirro, how is it you don't know that person's

2    name?

3                THE WITNESS:  I can't remember right now.

4    I mean --

5                THE COURT:  Did you review your reports

6    before you took the stand?

7                THE WITNESS:  I didn't do any reports,

8    sir.

9                THE COURT:  Okay.  Thank you.

10   BY MR. DUSZKIEWICZ:

11   Q.  The individual was taken into custody by other

12   members of the state police?

13   A.  Yes, sir.

14   Q.  Okay.  Did there come a point in time after

15   that arrest along the New York State Thruway that

16   you had occasion to go any place else that day?

17   A.  Yes, sir, there was.

18   Q.  Where did you go, sir?

19   A.  We're assigned to respond out to Buffalo here

20   to the Galleria Mall.

21   Q.  And are you familiar with the Galleria Mall?

22   A.  Yes, sir, I am.

23   Q.  How are you familiar with the Galleria Mall?

24   A.  I was born and raised in Cheektowaga, Village

25   of Depew out here.

1    Q.   Okay.  And did you, in fact, go to the Galleria

2    Mall?

3    A.   Yes, sir, I did.

4    Q.   What was your purpose in going to the Galleria

5    Mall?

6    A.   I was assigned as a surveillance member, and we

7    were attempting to locate a vehicle on which this

8    other individual was supposed to meet.

9    Q.   Had you been provided with a description of a

10   vehicle that you were looking for?

11   A.   Yes, sir, I was.

12   Q.   Okay.  Is there a CNET unit for the New York

13   State Police in the Buffalo area?

14   A.   Yes, sir.  It's the Western Region.

15   Q.   To the best of your knowledge, were they aware

16   of CNET Central's activity in the Buffalo area?

17   A.   Yes, we were.

18   Q.   Okay.  The individual that was arrested in the

19   Syracuse area, was he being transported to the

20   Buffalo?

21   A.   Yes, sir, he was.

22   Q.   Do you know how he was being transported?

23   A.   I believe a couple other members were bringing

24   him out here in of our vehicles.

25   Q.   And did you arrive in the Buffalo area with any

1   other investigators?

2   A.   I was in my own vehicle, but I was with other

3   members, yes.

4   Q.   Okay.  And where did you go at first when you

5   arrived at the mall location?

6   A.   We went over to the western side of the mall,

7   over kind of near the Thruway, that side of the

8   mall.

9   Q.   All right.  And you indicated that you were

10  looking for a particular vehicle?

11  A.   Yes, sir, we were.

12  Q.   Did there come a point in time that you

13  observed a vehicle?

14  A.   Yes, we did.

15  Q.   What kind of vehicle did you observe?

16  A.   It was a newer at the time Chevrolet Yukon.

17  Q.   All right.  And where was that vehicle?

18  A.   It was in a parking area on the western portion

19  of the mall, not directly in the front.  Kind of in

20  a row.

21  Q.   All right.  And where did you position your

22  vehicle, if you did, in relation to that vehicle?

23  A.   I was what I would call one row to the north of

24  where his row was.

25  Q.   When you say "him," was there an individual

1   inside the vehicle?

2   A.  Yes, sir.  There was a black male in the

3   vehicle that I could see through binoculars.

4   Q.  All right.  And could you see what the

5   individual was doing?

6   A.  He was -- appeared to be just reclined back

7   almost like he was waiting for someone.

8           MR. MUSITANO:  Object to that.

9           THE COURT:  No, overruled.  Go ahead.

10  BY MR. DUSZKIEWICZ:

11  Q.  And how long did you maintain your observation

12  of that vehicle and that individual?

13  A.  I believe it was less than 30 minutes.  It was

14  not a very long time.

15  Q.  All right.  Did the individual in the vehicle

16  move at all, either in the vehicle, or did the

17  vehicle itself move during that period of time?

18  A.  No, sir, it did not.

19  Q.  Did there come a point in time that you

20  received communication from other members of the

21  state police or local police agencies relative to

22  the surveillance that you were in position to

23  maintain?

24  A.  Yes, sir, I did.

25  Q.  What information did you obtain?

1    A.   We received information --

2              MR. MUSITANO:  I'll object, Judge, to

3    conversations.  It's hearsay.

4              THE COURT:  Yeah, at this point,

5    sustained.  Hearsay is what you're arguing.  If

6    there's an exception, I'll listen to you.  But you

7    can reconstruct and proceed from there.

8    BY MR. DUSZKIEWICZ:

9    Q.   Well, based on information that you received,

10   did you take any action?

11   A.   I was just -- my action was to continue my

12   surveillance and wait for further instructions.

13   Q.   Did there come a point in time that individuals

14   approached that vehicle?

15   A.   Yes, sir, there was.

16   Q.   Okay.  And what type of individuals approached

17   the vehicle?

18   A.   Marked law enforcement individuals.

19   Cheektowaga police and other police agencies.

20   Q.   Okay.  Had there been some sort of transmission

21   that preceded that arrival by Cheektowaga police

22   agencies?

23   A.   Yes, sir, there was.

24   Q.   Was that over your radio?

25   A.   Yes, sir, it was.

1    Q.   What was the nature that of the transmission?

2              MR. MUSITANO:  I'll object, Judge.  It's

3    hearsay.

4              THE COURT:  Well, to the form of the

5    question, because the nature -- what was the nature

6    of that conversation, that's not a proper question.

7    As to form, sustained.

8    BY MR. DUSZKIEWICZ:

9    Q.   Did you see what those police officers did, if

10   anything, with respect to either the vehicle or the

11   individual that was inside the vehicle?

12   A.   Yes, sir, I did.

13   Q.   What did they do?

14   A.   They approached the vehicle and took the

15   individual out of the vehicle, and just made sure

16   there was no one else in the vehicle.

17   Q.   All right.  And after the individual was taken

18   out of the vehicle -- by the way, do you know that

19   individual's name?

20   A.   I know it now, sir.  I didn't know it then.

21   Q.   What name do you know now?

22   A.   Mr. Knighton.

23   Q.   And where was Mr. Knighton taken, if anywhere,

24   when he was removed to the vehicle?

25   A.   He was taken to Cheektowaga Police Department.

1    Q.  What happened, if anything, with respect to the

2    vehicle?

3    A.  At that time we went up and we completed an

4    inventory on the vehicle.  We looked at it, and

5    then we transported back to Cheektowaga Police

6    Department.

7    Q.  Okay.  Who transported the vehicle back to

8    Cheektowaga police?

9    A.  Senior Investigator Ronald Yates.

10   Q.  Okay.  Is he part of your CNET unit in

11   Syracuse?

12   A.  Yes, sir, he is.

13   Q.  Did you, along with the vehicle and along with

14   Investigator Yates, also travel to the Cheektowaga

15   Police Department?

16   A.  Yes, sir, we did.

17   Q.  Did you have a purpose in going to the

18   Cheektowaga Police Department?

19   A.  Yes, sir, I did.

20   Q.  What was your purpose in going there?

21   A.  My purpose was I was going to conduct

22   photographs on the vehicle and assist with any

23   search of the vehicle and anything else that would

24   need to be done.

25   Q.  Did you have, in fact, the capacity to take

1    some photographs that day?

2    A.  Yes, sir, I did.

3    Q.  Okay.  Did there come a point in time that

4    Senior Investigator Yates began to examine or

5    search that vehicle?

6    A.  Yes, there was.

7    Q.  And did you photograph the vehicle both prior

8    to and during Investigator Yates's examination?

9    A.  Yes, sir, I did.

10            MR. DUSZKIEWICZ:  Judge, again I'm going

11   to ask Investigator DiPirro to refer to 11

12   different exhibits.  They're marked 7.1 through

13   7.11.  I'm going to ask him to identify those

14   exhibits and hopefully move them into evidence.

15            THE COURT:  Let's see if there's any

16   objection.  Are there?

17            MR. MUSITANO:  Move them in, Judge.

18            THE COURT:  All right.  7.1 through 7.11

19   received into evidence, no objection.

20            (Government's Exhibits 7.1 through 7.11

21            were received into evidence.)

22            MR. DUSZKIEWICZ:  May we have 7.1?

23            THE COURT:  And it may be published.

24   BY MR. DUSZKIEWICZ:

25   Q.  Investigator DiPirro, in front of you is

1    Government's Exhibit 7.1.  Is that one of a series

2    of photographs that you took on the 13th of March,

3    2009 relative to the black SUV vehicle?

4    A.   Yes, sir, it is.

5    Q.   Okay.  And the remaining photographs in that

6    series are also photographs that you took?

7    A.   I believe.  I only see the one photograph.

8    Q.   Had you reviewed the photographs before you

9    testified today?

10   A.   Yes, sir, I did.

11   Q.   Are they, in fact, the series of photographs

12   that you took?

13   A.   Yes, sir, they are.

14   Q.   Do they fairly and accurately reflect the

15   vehicle as it was positioned and examined by Senior

16   Investigator Yates?

17   A.   Yes, sir, it is.

18   Q.   Okay.  What's depicted in 7.1?

19   A.   The back portion of the black Tahoe with the

20   license plate.

21   Q.   All right.  May we see Government Exhibit 7.2?

22   A.   It's the registration and inspection sticker on

23   the black Tahoe.

24   Q.   Okay.  With respect to the registration

25   sticker, that had a particular type of registration

1    sticker?

2    A.   It's a temporary certificate of registration,

3    sir.

4    Q.   What does that mean, sir?

5    A.   It means that the car was recently purchased,

6    and they issue a sticker that's good for 45 days

7    until you get your permanent registration sticker.

8    Q.   Is the date of the issuance of that temporary

9    registration depicted on Government's Exhibit 7.2?

10   A.   Yes, sir, it is.

11   Q.   Where is it shown?

12   A.   It's right there, date issued March 2nd, 2009.

13   Q.   That was about 11 days prior to your encounter

14   and photographing of this vehicle?

15   A.   Yes, sir.

16   Q.   May we see Government Exhibit 7.3?

17        What is depicted in 7.3?

18   A.   It's a front portion of the vehicle, along with

19   the front license plate.

20   Q.   And does that correspond to the same license

21   plate that's depicted on the rear of the vehicle?

22   A.   Yes, sir, it is.

23   Q.   Okay.  May we see Government Exhibit 7.4?

24        What does that photograph depict?

25   A.   It's the view opening up the driver's side

1    front door looking into the vehicle.

2    Q.   Okay.  And on the right-hand side of the

3    photograph, about the middle, there appears to be

4    an image of someone in the picture?

5    A.   It's a reflection of a younger version of me.

6    Q.   And that is taking, in fact, that photograph?

7    A.   Yes, sir.

8    Q.   Okay.  And you say that's the inside

9    compartment of the vehicle?

10   A.   Yes, sir.

11   Q.   Okay.  Are there some indication that there's

12   cellular phones or charging wires for cellular

13   phones depicted in that photograph?

14   A.   Yes, sir, there are.

15   Q.   Where are they depicted, sir?

16   A.   There is a charging device right there in the

17   center console, and then it looks like there are

18   one or two phones up in the center console.

19   Q.   Okay.  That center console is in a closed

20   condition as it's depicted in this particular

21   photograph?

22   A.   Yes, sir, it is.

23   Q.   With the cellular telephone atop that

24   compartment?

25   A.   Yes, sir.  It has like a slot in it almost,

1    like a storage slot.

2    Q.   Okay.   May we see 7.5?

3         What is that a picture of?

4    A.   Just a picture of the back side of the --

5    looking from the driver's side rear door into the

6    vehicle.

7    Q.   You made an indication earlier that the

8    individual in the vehicle appeared to be sort of

9    reclining or laying back?

10   A.   Yes, sir, I did.

11   Q.   And the front seat of that vehicle is in what

12   position, sir?

13   A.   In the recline position.

14   Q.   Okay.   Government's Exhibit -- may we see

15   Government Exhibit 7.6?

16        What is depicted in that photograph, sir?

17   A.   It's the rear view after you open up the hatch

18   area of the Chevrolet.

19   Q.   All right.   And 7.7?

20   A.   From the passenger side rear door looking in.

21   Q.   Okay.   And again, there appears to be some sort

22   of image in the left-hand side middle of the

23   photograph?

24   A.   Yes, sir.   Reflection of myself.

25   Q.   There appears to be two individuals depicted

1    outside of the vehicle adjacent to the driver's

2    door?

3    A.   Yes, sir.

4    Q.   Do you recognize either of those individuals?

5    A.   Both of them, sir.

6    Q.   Who do you recognize them as?

7    A.   One is Senior Investigator Jose Figueiredo, and

8    the other one is Senior Investigator Ronald Yates.

9    Q.   All right.  7.8.

10        What is depicted in Government's Exhibit 7.8?

11   A.   It's the view inside the passenger-side door of

12   the front passenger compartment.

13   Q.   All right.  Government's Exhibit 7.9.  What is

14   depicted in that photograph?

15   A.   This is a picture of the center console in an

16   opened position of the Chevrolet.

17   Q.   Okay.  And there appears to be perhaps a hand

18   and an outer garment going across the top of the

19   photograph and along the right-hand edge of the

20   photograph?

21   A.   Yes, sir.

22   Q.   Do you recognize to whom that garment and hand

23   belong to?

24   A.   Investigator Yates.

25   Q.   All right.  And what is depicted in the --

1    inside the console?

2    A.   There's an orange -- or I'm sorry, a green like

3    a chamois-type cleaning cloth and a plastic bag

4    with money, and also a white container.

5    Q.   Okay.  And in the sort of lower left-hand side

6    of the photograph in the trays in front of the

7    console, there appears to be a silver item on

8    the -- adjacent to what I believe is an Tim

9    Horton's cup.  Do you recognize what that object

10   is?

11   A.   It looks like cell phones.

12   Q.   May we have Government's Exhibit 7.10?

13        What is depicted in Government's Exhibit 7.10?

14   A.   Just a better view of the money and the center

15   console area, storage compartment area.

16   Q.   Okay.  And moving to Government's Exhibit 7.11,

17   what is depicted in that particular photograph?

18   A.   Investigator Yates holding up the plastic bag

19   that contained the money that was in the center

20   console.

21   Q.   Okay.  And the money itself as it's depicted in

22   that photograph appears to be three rows of money

23   with rubber band separations?

24   A.   Yes, sir.

25   Q.   As well as in some sort of plastic container or

1    plastic bag?

2    A.   Like a heat-sealed container.

3    Q.   There's also rubber banding to the outside of

4    that item as well, is that correct?

5    A.   Yes, sir.

6    Q.   Okay.  Did you observe Investigator Yates

7    opening that center console and removing that item

8    that is what you describe as currency?

9    A.   Yes, sir, I did.

10   Q.   Okay.  And did you, yourself, other than

11   photographing the item, have any occasion to

12   examine the item?

13   A.   I just photographed it, sir.

14   Q.   Okay.  During the course of your 27 years with

15   the -- with the state police, have you had occasion

16   to see currency in that particular condition?

17   A.   Yes, sir, I have.

18   Q.   Okay.  Under what circumstances generally?

19   A.   Generally it's drug-related money that they

20   rubber band up in various denominations.

21   Q.   Why would that be done?

22   A.   So that, you know, they're either going to be

23   purchasing an item, and depending what the amount

24   is, they know a thousand-dollars bundles or

25   500-dollar bundles, however they set them up on how

1    much they're going to be paying for stuff.

2    Q.  But this particular package itself was sealed

3    up?

4    A.  Yes, sir.

5    Q.  So someone would have to cut into the package

6    to remove a smaller amount other than the entirety

7    of the currency?

8    A.  Correct.  This was set up for one purchase.

9    Q.  Okay.  Did you have any further investigation

10   at that particular time?

11   A.  No, sir, I did not.

12   Q.  Did you have any contact with the individual

13   Steven Knighton?

14   A.  No, sir, I did not.

15            MR. DUSZKIEWICZ:  I have nothing further.

16            THE COURT:  Okay.  Thank you.

17       Mr. Musitano, your witness.

18            MR. MUSITANO:  Thank you, Judge.

19   CROSS-EXAMINATION BY MR. MUSITANO:

20   Q.  Good morning, Investigator DiPirro.

21   A.  Good afternoon, sir.

22   Q.  I apologize.  You're right.  Do you recall

23   Mr. Duszkiewicz asking you questions about a

24   vehicle that you had under surveillance at the

25   Walden Galleria Mall?

1    A.  Yes, sir.

2    Q.  You indicated that it was a SUV, is that

3    correct?

4    A.  Yes, sir.

5    Q.  Do you recall telling Mr. Duszkiewicz on direct

6    examination that you were surveilling or looking

7    for a Yukon?  Do you remember saying that on your

8    direct?

9    A.  It's the same type of vehicle.  It's just made

10   by GMC.

11   Q.  Now my question was, do you remember saying

12   that on your direct examination, a Yukon?

13   A.  Yes, sir.

14   Q.  Now, you indicated that you participated in

15   this investigation, if I understood you, from

16   Syracuse to the Walden Galleria Mall, right?

17   A.  Yes, sir.

18   Q.  Okay.  And you participated in or were present

19   during the arrest of William Valerio, correct?

20   A.  I was present during the takedown of him, yes,

21   sir.  I had no -- I had nothing to do with the

22   arrest of him.

23   Q.  My question to you was you were present when he

24   was arrested, correct?  You were there?

25   A.  Yes, sir.

1  Q.  You traveled all the way to Buffalo, correct?

2  A.  Yes, sir.

3  Q.  Did you prepare any reports at all?

4  A.  No, sir, I did not.

5  Q.  Did you prepare any reports detailing that you

6  were looking for an Yukon slash like a Tahoe?

7  A.  No, sir, I did not.

8  Q.  Now, you indicated that when you observed the

9  vehicle, you were using binoculars, is that

10  correct?

11  A.  Once I parked, yes, sir.

12  Q.  Okay.  And that was how long -- strike that.

13  Let me back up.  How long did it take you to get

14  from Syracuse to the Walden Galleria?

15  A.  Two hours.

16  Q.  Do you recall what time you left Syracuse?

17  A.  No, sir.

18  Q.  Do you recall what time you arrived at the

19  Walden Galleria?

20  A.  No, sir.

21  Q.  And you indicated that this vehicle you

22  described as a Yukon on your direct was in the

23  western portion of the Walden Galleria parking lot,

24  is that correct?

25  A.  Yes, sir.

1    Q.   And how many other portions are there to that

2    particular parking lot area of the Walden Galleria

3    Mall?

4    A.   I don't understand the question.

5    Q.   Sure.  Let me rephrase it.  Is there an eastern

6    section to that part of the parking lot where you

7    were located?

8    A.   I guess if you broke down the parking lot in

9    north, south, east, and west, yes, sir.

10   Q.   How many entrances and exits are there to that

11   particular location of that Walden Galleria Mall?

12   A.   I don't know, sir.  I haven't been there in 20

13   years.

14   Q.   You don't know when that SUV arrived there, is

15   that correct?

16   A.   That is correct.

17   Q.   You don't know who arrived in that vehicle, is

18   that correct?

19   A.   That's correct.

20   Q.   Now, after you went to the, I believe you said,

21   Cheektowaga police station, is that correct?

22   A.   Yes, sir.

23   Q.   And that's where photographs were taken?

24   A.   Yes, sir.

25   Q.   Did you take any photographs there?

1    A.   I took the photographs at the Cheektowaga

2    police station of the vehicle.

3    Q.   So, for example, if I could I have Government's

4    7.1.

5         Was that picture taken at the Cheektowaga

6    police station?

7    A.   I'm not a hundred percent sure, sir.  I don't

8    know.

9    Q.   How about Government 7.2, was that taken at the

10   Cheektowaga police station?

11   A.   Again, sir, I'm -- I would assume so, yes.  I

12   believe so.

13   Q.   Well, you said you assume or you believe.

14   You're not certain as you sit there, correct?

15   A.   That's correct.

16   Q.   Now you indicated to Mr. Duszkiewicz that

17   currency is packaged in $1,000 amounts when it's

18   used in drug dealing.  Do you recall saying that?

19   A.   I said that they set it up in a denomination,

20   depending on the type of drug dealer they are and

21   type of drugs they sell.  They set it up so they

22   can grab either $50 bundles, $100 bundles,

23   thousand.  I mean, it depends on the amount of

24   drugs you're dealing.

25   Q.   You're not saying that only drug dealers

1    bundled their money up in thousand dollar

2    denomination, are you?

3    A.   I'm saying it's a very common thing in the type

4    of work that I do to see that money is rubber

5    banded in certain denominations and set, so that

6    purchases can be made, yes.

7    Q.   Okay.  So denominations could be of 100, 250,

8    500, five -- 1,000, 5,000?

9    A.   They could be in any amount, sir.

10   Q.   And you're not saying only drug dealers do that

11   with their money, are you?

12   A.   I'm saying that through my training and

13   experience as an investigator within a drug unit,

14   that I see this numerous times.

15   Q.   Okay.  Now, again, let me ask you my question.

16   You're not saying only drug dealers do that, are

17   you?

18   A.   I'm saying through my training and experience

19   that's what I find in our drug industry, yes, sir.

20           MR. MUSITANO:  Thank you.  I have nothing

21   further, Judge.

22           THE COURT:  Anything, Mr. Duszkiewicz?

23           MR. DUSZKIEWICZ:  No, your Honor.  Thank

24   you.

25           THE COURT:  Okay.  Investigator DiPirro,

1    you're excused.  Thank you very much.

2            THE WITNESS:  Thank you.

3    R O N A L D   F.   Y A T E S, having been duly sworn

4    as a witness, testified as follows:

5            THE COURT:  I don't know anybody that

6     moves faster or administers a faster oath than

7     Miss Labuzzetta, ladies and gentlemen.  Good

8     afternoon.

9            THE WITNESS:  Good afternoon.

10            THE COURT:  All right.  Couple of

11    preliminary instructions, please.  You are here to

12    testify for the benefit of the ladies and gentlemen

13    of the jury.  So if you direct your answers and

14    responses to them, that would be helpful, please.

15    The microphone, very friendly if you speak at it.

16    Keep your voice up at a conversational tone.

17    That's all it really takes.

18        If you don't understand a question, please

19    don't answer that.  Just ask the attorney to repeat

20    the question.  Be as concise with your answers as

21    you can.  If you can answer a question yes or no,

22    do that.  Leave it, let the attorney follow up.

23        If there's an objection to a question, hold

24    your answer, or stop where you are, then I'll give

25    you instructions after I rule, and I will tell you

1    start your answer again, complete your answer, wait

2    for the next question, something along those lines,

3    okay?

4            THE WITNESS:  Understood.

5            THE COURT:  Thank you.  Please state your

6    full name, spell your last name.

7            THE WITNESS:  Ronald F. Yates, Y-A-T-E-S.

8            THE COURT:  All right.  Thank you.

9        Your witness, Mr. Duszkiewicz.

10   DIRECT EXAMINATION BY MR. DUSZKIEWICZ:

11   Q.  Mr. Yates, how you are you employed, sir?

12   A.  I'm a senior investigator with the New York

13   State Police.

14   Q.  How long have you been employed by the state

15   police?

16   A.  Twenty-eight years.

17   Q.  Okay.  And what is your current assignment with

18   the state police?

19   A.  I'm currently assigned to CNET Central, and

20   that's a unit within the state police that

21   investigates illegal narcotics.

22   Q.  How long have you been involved with that unit?

23   A.  Twenty years.

24   Q.  Did there come a time on the 13th of March,

25   2009 that your unit had -- the unit you were

1    involved in had occasion to arrest an individual by

2    the name of William Valerio?

3    A.   Yes.

4    Q.   Did you take part in the investigation leading

5    to the arrest of Mr. Valerio?

6    A.   Yes.   I was assigned to assist Investigator

7    Davis on that day.

8    Q.   That would be Investigator Douglas Davis?

9    A.   Yes.

10   Q.   All right.  And with respect to the arrest of

11   Mr.  Valerio, did you do anything specific in that

12   capacity?

13   A.   I was assigned to a surveillance detail at the

14   Thruway rest area, and I was not involved in the

15   takedown.   I was at an observation point some

16   distance from where the takedown actually occurred.

17   Q.   Did there come a point in time that you were

18   advised that after the arrest of Mr. Valerio that

19   there was a need to proceed to the Buffalo area?

20   A.   Yes.

21   Q.   How were you advised of that?

22   A.   There was some meeting or radio transmission.

23   I don't really remember at this point.  But I knew

24   that we were going to go to the Buffalo area where

25   Willy Valerio was supposed to meet another subject

1    to sell cocaine to.

2              THE COURT:  Were the -- where was the

3    Thruway rest area that you were talking about?

4              THE WITNESS:  It was in Warners.

5              THE COURT:  Where is Warners located?

6              THE WITNESS:  Within -- it's in Onondaga

7    County.

8              THE COURT:  Okay.

9    BY MR. DUSZKIEWICZ:

10   Q.  Is that on the westbound lane?

11   A.  It would be westbound.

12   Q.  Westbound lane of the Thruway?

13   A.  Yes.

14   Q.  Okay.  Would that be the first service area

15   beyond Syracuse proper?

16   A.  Yes.

17   Q.  Okay.  Now, you indicated that you were going

18   to proceed to the Buffalo area, is that correct?

19   A.  Yes.

20   Q.  Were you given a location to proceed to in the

21   Buffalo area?

22   A.  It was the Galleria Mall.

23   Q.  Are you familiar with the Galleria Mall?

24   A.  Just -- somewhat familiar with it.

25   Q.  All right.  And in what town or jurisdiction is

1   the Galleria Mall located?

2   A.   Cheektowaga.

3   Q.   Now, did you, in fact, go to that location?

4   A.   Yes, I did.

5   Q.   Did you arrive with any other individuals?

6   A.   There was a group of individuals that went down

7   there.  I think there was about a half dozen people

8   from CNET Central, from the Syracuse area, that

9   went down there.  And there was CNET Western and

10  Cheektowaga police officers in the vicinity of the

11  Galleria Mall when we arrived.

12  Q.   What is the relationship between CNET Central

13  and CNET Western?

14  A.   They are the Buffalo-based unit similar to

15  ours.

16  Q.   All right.  And was some contact made with

17  respect to alerting the CNET Western officers or

18  investigators that people from CNET Central were

19  coming to the Galleria Mall area?

20  A.   Yes.

21  Q.   Okay.  Were you directed to any particular

22  location at the Galleria Mall?

23  A.   It was on the west side of the mall near the

24  Macy's store.

25  Q.   To the best of your knowledge there is a Macy's

1    store at the Galleria Mall?

2    A.   Yes.

3    Q.   Now, with respect to William Valerio, was he

4    being transported to the Galleria Mall?

5    A.   He was in vehicle with Investigator Keith Fox

6    and Investigator Doug Davis.

7    Q.   All right.  And was information being fed to

8    you and to other members of CNET Central concerning

9    either whom you were looking for or what particular

10   type of vehicle you were looking for?

11   A.   Yes.

12   Q.   What information did you receive?

13              MR. MUSITANO:  Objection.

14              THE COURT:  Grounds?

15              MR. MUSITANO:  First of all, it's hearsay,

16   Judge.

17              THE COURT:  Well, depends on from whom,

18   but I think to the form of the question it's not

19   specific enough so that we know source.  Objection

20   sustained.

21   BY MR. DUSZKIEWICZ:

22   Q.   Did you receive a type of vehicle that you were

23   looking for?

24   A.   Yes.

25   Q.   Okay.  And what type of vehicle were you

1    looking for?

2    A.   A black Tahoe, Chevy Tahoe.

3    Q.   Were you provided with other information about

4    who might be responsible for occupying or utilizing

5    that Tahoe?

6    A.   Yes.

7              MR. MUSITANO:  Object to the form, Judge.

8              THE COURT:  Reput the question,

9    Mr. Duszkiewicz.

10   BY MR. DUSZKIEWICZ:

11   Q.   Who was using the Tahoe?

12   A.   Steven Knighton.

13   Q.   Now, did you arrive at the location at the

14   Galleria Mall?

15   A.   Yes, I did.

16   Q.   Okay.  And did you observe whether other

17   investigators either from CNET Central or from CNET

18   Western were at that location?

19   A.   I do know that there were other members there.

20   I don't remember at what positions they were.

21   Q.   All right.  And did there come a point in time

22   when you saw the black Tahoe vehicle?

23   A.   Yes.

24   Q.   Where was the black Tahoe vehicle?

25   A.   It was parked in a parking spot about -- if I

1    recall correctly, about halfway down the row,

2    perpendicular to the mall proper.

3    Q.  All right.  And did you observe any activity in

4    that black Tahoe?

5    A.  I did not.

6    Q.  Okay.  Did there come a point in time that

7    there was some indication to take down the

8    individual in that location?

9    A.  Yes.  There was a radio transmission that the

10   Cheektowaga PD was going to -- or members of the

11   Cheektowaga police were going to interact with that

12   Tahoe.

13   Q.  And did you observe that action?

14   A.  Yes.

15            THE COURT:  What does "taking down" mean

16   to you?

17            THE WITNESS:  I'm sorry.  They were going

18   to have an encounter with the Tahoe and the person

19   who was in the Tahoe.

20   BY MR. DUSZKIEWICZ:

21   Q.  Did you observe that?

22   A.  Yes.

23   Q.  Okay.  And was an individual removed from the

24   Tahoe?

25   A.  Yes.

1    Q.   That individual turn out to be Steven Knighton?

2    A.   Yes.

3    Q.   After the individual was removed, that is

4    Steven Knighton, from the -- from the vehicle, did

5    you have occasion to have any contact yourself with

6    the vehicle?

7    A.   Yes, I did.

8    Q.   And what was the nature of your contact?

9    A.   I was going to take the vehicle from the

10   parking lot at the mall to the Cheektowaga PD,

11   which is just a short distance from that spot, from

12   the mall.

13   Q.   Why to the Cheektowaga Police Department?

14   A.   That's where we were going to stage to further

15   the investigation.  And we wanted to get the car

16   off the set just for a more secure area to search

17   it, and just not to draw attention to ourselves

18   there.

19   Q.   And you, in fact, drove that vehicle to

20   Cheektowaga Police Department?

21   A.   Yes, I did.

22   Q.   Okay.  What, if anything, happened at the

23   Cheektowaga Police Department?

24   A.   At the Cheektowaga Police Department I parked

25   the vehicle in the parking lot.  The vehicle was

1    photographed by one of our other members, and then

2    a search of the inside of the vehicle was

3    commenced.

4    Q.   And have you had occasion to review the

5    photographs with respect to commencing the -- or

6    continuing the investigation by way of searching

7    the vehicle?

8    A.   Yes.

9    Q.   Okay.  May we have Government's Exhibit 7.7?

10             THE CLERK:  In evidence, correct?

11             MR. DUSZKIEWICZ:  Yes, I'm sorry.

12   BY MR. DUSZKIEWICZ:

13   Q.   Investigator Yates, do you see the exhibit,

14   Government's Exhibit 7.7?

15   A.   Yes.

16   Q.   What do you recognize that to be, sir?

17   A.   That is the black Chevy Tahoe, and I see a

18   picture of myself in the background.

19   Q.   Okay.  And are you with any other individuals

20   where you recognize a picture of yourself?

21   A.   That is Senior Investigator Jose Figueiredo

22   standing next to me and Investigator Jack Weinerth

23   in the reflection in the rear window there.

24   Q.   And did you have occasion while or after these

25   photographs were being taken to examine the vehicle

1    itself?

2    A.   Yes.

3    Q.   And what did you do in terms of examining the

4    vehicle?

5    A.   I went through the compartments and the center

6    console of the Tahoe.

7    Q.   May we have 7.5?  In evidence, I'm sorry.

8         Do you recognize what's depicted in

9    Government's Exhibit 7.5?

10   A.   That's the interior of the Tahoe.

11   Q.   Okay.  And you indicated something about a

12   center console?

13   A.   Yes.

14   Q.   Is the center console visible in that

15   photograph?

16   A.   Yes, it is.

17   Q.   Is there anything noticeable with respect to

18   the center console?

19   A.   There's a cell phone on top of the door of the

20   center console.

21             THE COURT:  Point to what you're referring

22   to.  Touch the screen.

23             THE WITNESS:  Okay.  Right there.

24             THE COURT:  All right.

25   BY MR. DUSZKIEWICZ:

1    Q.   May we have Government Exhibit 7.4?

2         Do you recognize what's depicted in

3    Government's Exhibit 7.4?

4    A.   It's the interior of the Tahoe.

5    Q.   Does that also show a view of the console?

6    A.   Yes, it does.

7    Q.   And again, is there a view of a cellular phone

8    as you previously observed?

9    A.   Yes.

10   Q.   Anything else connected to a cellular telephone

11   or to recharging a cellular phone?

12   A.   In the dashboard cigarette lighter there's a

13   cellphone charger, and connected to the cellphone

14   charger, sorry, there's a -- there was another

15   phone.

16            THE COURT:  Tap it.  You'll get an arrow

17   if you tap with authority.

18        That's a wuss.  Give us a little emphasis.

19            THE WITNESS:  I'm hitting it pretty good.

20   You got the touch.

21            THE COURT:  All right.

22   BY MR. DUSZKIEWICZ:

23   Q.   The area that is depicted with the arrow and

24   the three dots, that's a charger connected to an

25   additional cellphone?

1    A.  Yes, it is.

2    Q.  Okay.  Now, did you have occasion yourself to

3    examine the center console?

4    A.  Yes, I did.

5    Q.  And if I may, can we have Government Exhibit

6    7.9?

7        What is depicted, Investigator Yates, in

8    Government's Exhibit 7.9?

9    A.  That's my arm picking up a green cloth rag that

10   was in the center console covering a quantity of

11   U.S. currency that was contained in a plastic

12   heat-sealed, vacuum-sealed bag.

13   Q.  That's within the center console?

14   A.  Yes.

15   Q.  Okay.  You had earlier tapped the screen to

16   show a charger connected to a cellular telephone.

17   Do you see a cellular telephone in a charger

18   connection somewhere in that photograph as well?

19   A.  Yes, I do.

20   Q.  Can you point that out for us?

21   A.  I'm going to hit it hard this time.

22   Q.  Very good.  Thank you.  Did you have occasion

23   to advise -- by the way, did you know who was

24   taking the photographs?

25   A.  Investigator Patrick DiPirro was taking the

1    photographs.

2    Q.   Did you have occasion to have Investigator

3    DiPirro take any additional photographs with

4    respect to what you had located in center console?

5    A.   Yes.   He took two more pictures I believe.

6    Q.   Can we have 7.10?

7         What is depicted in 7.10?

8    A.   There is the center console with the cloth rag

9    tossed aside and the money inside the center

10   console.

11   Q.   All right.   Can we go to 7.11?

12        What is depicted, Investigator Yates, in

13   Government's Exhibit 7.11?

14   A.   I'm holding the U.S. currency that I removed

15   from the center console.

16   Q.   Is there anything distinctive or noticeable

17   about the currency as you removed it from the

18   console?

19   A.   It was wrapped in a vacuum-packed or

20   heat-sealed plastic bag, and it was wrapped in

21   bundles.

22   Q.   Okay.   And how was it wrapped in bundles?

23   A.   Rubber bands around quantities of the currency.

24   Q.   All right.   And you say there was -- was it

25   shrink-wrapped or heat sealed?

1    A.   Yes.

2    Q.   And over the course of your career have you had

3    occasion to see packages prepared in that manner?

4    A.   I have seen that before.

5    Q.   In what context?

6    A.   During execution of search warrants or other

7    similar incidents with vehicle stops where subjects

8    were transporting U.S. currency.

9    Q.   After the currency that's depicted in

10   Government's Exhibit 7.11 was removed by yourself

11   from the center console, what did you do with it?

12   A.   I turned it over to our evidence technician,

13   Investigator Jack Weinerth.

14   Q.   You indicated that Investigator Weinerth was

15   depicted in one of those earlier photographs?

16   A.   Yes.

17   Q.   Okay.  And other than turning that exhibit over

18   to Investigator Weinerth, did you turn over any

19   other items that you retrieved from the vehicle?

20   A.   I handed over the phones that were also in the

21   -- the one that was on the top of the center

22   console and the one that was in the vicinity of the

23   cup holder.

24   Q.   You turned those over to Investigator Weinerth?

25   A.   Yes, I did.

1    Q.  Did you retrieve anything besides the cellular

2    phones and the bundled-up currency?

3    A.  No, I did not.

4    Q.  Did you have any contact with Steven Knighton?

5    A.  I did not.

6    Q.  Did you have anything further to do with

7    respect to the investigation as it occurred in

8    Cheektowaga?

9    A.  I did not.

10            MR. DUSZKIEWICZ:  Thank you.

11            THE COURT:  All right.  Why did you turn

12   over the money and the cellphones to Investigator

13   Weinerth?

14            THE WITNESS:  He is our evidence

15   technician, and he handles most of the evidence

16   that we recover.

17            THE COURT:  Okay.  Thank you.  Your

18   witness, Mr. Musitano.

19            MR. MUSITANO:  Thank you, your Honor.

20   CROSS-EXAMINATION BY MR. MUSITANO:

21   Q.  Good afternoon, Investigator Yates.

22   A.  Good afternoon.

23   Q.  Investigator Yates, if I understood your

24   testimony correctly, you acted as a surveillance

25   officer when CNET Central was at the service area

1    on the 90 near Syracuse, is that correct?

2    A.   Yes.

3    Q.   You were not involved in the William Valerio

4    arrest, correct?

5    A.   Correct.

6    Q.   And then from there did you go back to SP

7    station, or did you go directly to the Walden

8    Galleria Mall?

9    A.   I don't remember.

10   Q.   Okay.  You indicated you don't remember.  Did

11   you take any notes while you were doing your

12   surveillance or when you got to the Walden

13   Galleria?

14   A.   No, I did not.

15   Q.   After you finished your investigation in this

16   case on March the 13th, 2009, did you prepare any

17   reports?

18   A.   No, I did not.

19   Q.   Okay.  So is it fair to say that you're just

20   going on your best recollection and after

21   discussions with your fellow investigators to

22   testify here today?

23   A.   And my review of the pictures.

24   Q.   Okay.  And speaking of pictures, you indicated

25   that you looked at Government's 7.1 through 7.11,

1    is that correct?

2    A.   Yes.

3    Q.   Okay.   When did you see those pictures?   Before

4    your testimony today, I'm sorry.

5    A.   I saw them yesterday.

6    Q.   Okay.   And you reviewed them yesterday with

7    Mr. Duszkiewicz?

8    A.   Yes.

9    Q.   Okay.   And Mr. Duszkiewicz was pointing out

10   pictures and questions he would be asking you,

11   correct?

12   A.   I think it was mostly he was -- he handed me a

13   group of pictures from the Cheektowaga PD and asked

14   me what I saw in the pictures, yes.

15   Q.   Okay.   And for example, he showed you

16   Government's Exhibit 7.5 in evidence.

17        Can I have that up please?

18        And you identified that as one of the

19   photographs that was taken of the vehicle from the

20   rear passenger door looking into the driver's side,

21   is that fair to say?

22   A.   Yes.

23   Q.   And in between the two seats in the rear you

24   see big plastic bags, is that correct?

25   A.   Yes.

1    Q.   You indicated that you looked and searched --

2    or there was a search conducted of the compartments

3    in that vehicle eventually at the Cheektowaga

4    police station, correct?

5    A.   Yes.

6    Q.   Were those white bags searched?

7    A.   I'm sure they were.  Nothing significant would

8    have been found, or they would have been seized.

9    Q.   Could you tell this honorable jury what was in

10   those bags?

11   A.   I don't know.  It was not contraband.

12   Q.   Okay.  It was items that would be purchased in

13   a store?

14   A.   I believe so.

15   Q.   A store are like Macy's?

16   A.   Yes.

17   Q.   Okay.  And I believe you identified for

18   Mr. Duszkiewicz that there was a Macy's in the

19   Walden Galleria Mall?

20   A.   Yes.

21   Q.   Okay.  And, in fact, you were close to

22   the Walden -- strike that -- the Macy's at the

23   Walden Galleria Mall, correct?

24   A.   Yes.

25   Q.   Okay.  Now, you indicated that you were taking

1    photographs, if you will, of the Tahoe at the

2    Cheektowaga police station, is that correct?

3    A.   I wasn't taking them.  I was aware that they

4    were being taken.

5    Q.   I'm sorry.  I apologize.  You were aware that

6    they were being taken at the Cheektowaga police

7    station, correct?

8    A.   Yes.

9    Q.   I believe I heard you say you drove the Tahoe

10   to the Cheektowaga police station, correct?

11   A.   I did.

12   Q.   Okay.  And you see in Government's 7.5 that's

13   still up on the screen that the driver seat is laid

14   back, if you will, or tilted backwards, is that

15   correct?

16   A.   Yes.

17   Q.   Is that the position the seat was in when you

18   drove it there?

19   A.   I believe so.  I don't believe I had moved the

20   seat.  I wouldn't have moved it.

21   Q.   And again, you said you believe, so you're not

22   certain, is that fair say?

23   A.   I'm -- I'm fairly certain I did not move the

24   seat.

25   Q.   And again, you didn't prepare a report saying

1    that you drove the vehicle to the Cheektowaga

2    police station and didn't touch any of the seats in

3    the vehicle, correct?

4    A.   That's correct.

5    Q.   Okay.  And you indicated to Mr. Duszkiewicz --

6    if I can please have Government 7.4 in evidence,

7    please?

8         And in that photograph, in the middle, you said

9    you see a compartment there which is the center

10   console, is that correct?

11   A.   Yes.

12   Q.   Okay.  And you indicated that you were present

13   during the taking of the photographs, and you

14   participated and actually conducted the search of

15   the vehicle, correct?

16   A.   Yes.

17   Q.   Were there any other officers assisting you in

18   conducting the search of that vehicle?

19   A.   I believe Investigator Weinerth was.

20   Q.   That would be -- if we can call Investigator

21   Weinerth the evidence technician?

22   A.   Yes.

23   Q.   So when anybody found evidence, they would pass

24   it to him, correct?

25   A.   Yes.

1    Q.   Okay.  Now, did you find any compartments in

2    that vehicle other than the center console there?

3    A.   I don't believe so.

4    Q.   And I believe you said you've been with the

5    CNET Central for 20 years, Investigator?

6    A.   Yes.

7    Q.   I'm not suggesting you're old, but you've seen

8    and participated in a lot of investigations,

9    correct?

10   A.   Yes.

11   Q.   You've seen a lot of trap -- trap or trap doors

12   in vehicles over your long career?

13   A.   Yes.

14   Q.   Did you find any of those traps or trap doors

15   in what's depicted in Government's 7.4?

16   A.   No.

17   Q.   And is that something you would photograph --

18   or strike that.

19        Is that something you would point out or search

20   for when you're conducting a search of the vehicle?

21   A.   If I found it.

22   Q.   Okay.  You didn't find any in this case?

23   A.   No.

24   Q.   And the center console that you searched as

25   depicted in Government 7.4 in evidence, that's the

1    typical standard equipment you would get when you

2    buy that type of vehicle, is that fair to say?

3    A.   Nothing was unusual to me that I saw there.

4    Q.   For example, can you explain to this honorable

5    jury what would be unusual in a console like that

6    that's not standard, if you will.

7    A.   I don't understand what you mean.

8    Q.   Sure.  If that was a trap or some type of a

9    trap, would you see something like hydraulics?

10   A.   Okay.  I understand.  The center console -- the

11   lid that opens up the center console to me looked

12   like it was a standard feature of that car.

13   Q.   There was nothing hydraulic about that, is that

14   fair to say?

15   A.   There was not any hydraulics.

16   Q.   Now, if I could, please, Trish, have 7.11?

17        Investigator Yates, you indicated that you

18   removed that sealed package of U.S. currency?

19   A.   Yes.

20   Q.   And did you hand that package over to

21   Investigator --

22   A.   Weinerth.

23   Q.   Weinerth?

24   A.   Yes.

25   Q.   The way it was?

1  A.  The way it was.

2  Q.  Did you cut it open?

3  A.  No.

4  Q.  In your presence, did any other officer cut it

5  open?

6  A.  No.

7  Q.  Okay.  So while you're there at Cheektowaga at

8  the police station, that package the way you

9  removed it from the console was given to the

10  evidence technician, correct?

11  A.  Yes.

12  Q.  And is it proper protocol for the evidence

13  technician then to transport that item to central?

14  A.  Well, I mean, depending what the circumstances

15  were.  He could pass it off to someone else as

16  well.

17  Q.  But would that parcel be touched, cut, or open

18  while you were at Cheektowaga?

19  A.  No, it would not be.

20  Q.  Okay.  So you could not tell what type of

21  currency was in that until it was opened up, spread

22  out, and counted, correct?

23  A.  That's correct.

24        MR. MUSITANO:  I have nothing further.

25  Thank you.  Thank you, Investigator.

1          THE COURT:  All right.  Mr. Duszkiewicz,

2     any redirect?

3          MR. DUSZKIEWICZ:  Yes.

4     REDIRECT EXAMINATION BY MR. DUSZKIEWICZ:

5     Q.  Investigator Yates, Mr. Musitano just asked you

6     if you had occasion to open up the compartment --

7     or excuse me, open up the package containing the

8     money, is that correct?

9     A.  Yes.

10    Q.  And you indicated that you had not and did not,

11    is that correct?

12    A.  That's correct.

13    Q.  What's the procedure in the state police for

14    counting money?

15    A.  If it's like currency in excess of $5,000, or

16    what appears to be in excess of $5,000, we bring

17    the package right to the bank, and it's opened at

18    the bank where the teller, in our presence, opens

19    the bag and counts the money.

20    Q.  And the bag would not -- who would be opening

21    the bag at the bank?

22    A.  Well, it would either be the teller or the

23    investigator that brought it there, but it would be

24    at the counter of the -- of the bank.

25    Q.  Okay.  And you also indicated that when

1    Mr. Musitano asked you if you searched any of the

2    other items in the Tahoe, you indicated you hadn't

3    searched the bags or you found no contraband in the

4    bags?

5    A.  Yes.

6    Q.  You indicated earlier that you seized some

7    cellular telephones?

8    A.  Yes.

9    Q.  Let me show, if I may, what's marked Government

10   Exhibit 10A and B.

11          MR. MUSITANO:  Judge, excuse me.  I

12   believe that's beyond the scope of the cross.  I

13   didn't talk about any seizure.  I just talked about

14   searches, Judge.

15          THE COURT:  I think the door's been

16   opened, because we're referencing the scope of the

17   search.  Objection overruled.

18   BY MR. DUSZKIEWICZ:

19   Q.  Investigator Yates, what is Government's

20   Exhibits 10A and 10B?

21   A.  They are two cellphones.

22   Q.  And is there some indication where those

23   cellphones came from?

24          MR. MUSITANO:  Excuse me, Judge.  If he's

25   reading from something, I'm objecting if he doesn't

1    know.

2              THE COURT:  Yeah, sustained.

3              MR. DUSZKIEWICZ:  Do you recognize those

4    cellphones?

5              THE WITNESS:  They appear to be the

6    cellphones.

7              MR. MUSITANO:  Judge, I'm objecting if

8    they appear.

9              THE COURT:  Sustained.

10             MR. DUSZKIEWICZ:  Okay.  Are there any

11   markings on the packaging with respect to those

12   exhibits, that is Government's Exhibits term 10A

13   and 10B?

14             MR. MUSITANO:  Same objection, Judge.

15             THE COURT:  Sustained.

16             MR. DUSZKIEWICZ:  Does your name appear on

17   the packaging material?

18             MR. MUSITANO:  Objection.  He's reading.

19             THE COURT:  No, that's okay, if it does or

20   doesn't.  You may answer that question.

21             THE WITNESS:  It appears on there.

22             MR. DUSZKIEWICZ:  Your name appears?

23             THE WITNESS:  My name.

24             MR. DUSZKIEWICZ:  Okay.  Indicating in

25   what capacity, sir?

1           THE WITNESS:  That I seized these items.

2           MR. MUSITANO:  I'm objecting, Judge.  If

3     he knows based on foundation, first-hand

4     knowledge --

5           THE COURT:  Well --

6           MR. MUSITANO:  He's guessing, Judge.

7           THE COURT:  This is probably refreshing

8     recollection I think under 612.  I'll permit it

9     under that basis.

10   BY MR. DUSZKIEWICZ:

11   Q.  Looking at that -- the packaging material for

12   Government's Exhibit 10A and 10B, does that refresh

13   your recollection as to the circumstances of your

14   acquisition of those items?

15   A.  Looking at this packaging and the evidence tag

16   that's within, these are the phones that I seized

17   on March 13th.

18   Q.  And as you indicated in your direct

19   examination, you turned those over as well as

20   turning over the currency to the evidence

21   technician?

22   A.  Yes.

23           MR. DUSZKIEWICZ:  Judge, just for the

24   record, I'm going to offer what's marked 10A and

25   10B.

1           MR. MUSITANO:  Judge, I have no objection

2     in light of overruling the objection.

3           THE COURT:  Okay.  10A and 10B received.

4           (Government's Exhibits 10A and 10B were

5           received into evidence.)

6           MR. DUSZKIEWICZ:  Thank you.  I have

7     nothing further.

8           THE COURT:  Anything further?

9           MR. MUSITANO:  No, your Honor.

10          THE COURT:  Okay.  Senior Investigator

11    Yates, you are excused.  Thank you very much.

12          THE WITNESS:  Thank you.

13          THE COURT:  All right.  Ladies and

14    gentlemen, I told you we'd break about 12:45.  It's

15    12:43, so we're going to sit here for two minutes

16    and then I'm going to let you go.  I think that's

17    close enough, right?  Don't discuss the case.  Be

18    careful when you're outside.  If you're going to go

19    outside and have lunch, I think you know where the

20    restaurants are.  If not Chris, or somebody can

21    help you.  Enjoy lunch.  Come back.  We'll start at

22    2:00, or as promptly around 2:00 as we can.

23        Don't prejudge.  Don't make up your mind.

24    Don't discuss the case.  Thank you for your

25    assistance, your cooperation.  We'll see you at

1    what time?

2              THE JURY:  2:00.

3              THE COURT:  Thank you.

4              (Jury excused from the courtroom.)

5              THE COURT:  Mr. Duszkiewicz, is Valerio

6    your next witness?

7              MR. DUSZKIEWICZ:  Yes.

8              THE COURT:  Okay.  We'll get him seated,

9    because he's in custody?

10             MR. DUSZKIEWICZ:  Yes, he is.

11             THE COURT:  We can take care of that

12   before the jury gets in.  Thank you.

13             (Lunch recess was taken.)

14             (Jury seated.)

15             THE COURT:  Please have a seat.  It's good

16   to see you again.  All right.  Now if you want to

17   rise -- no.  Okay.

18       We're back on in the case of United States

19   versus Steven Knighton, 12-criminal-056S.  The

20   attorneys and parties are back, present.  All of

21   our ladies and gentlemen, looking well fed after

22   lunch, are back here, roll call waived.

23       We are in the government's case.  It is now

24   calling its fourth witness.  Just some very

25   preliminary instructions to the witness.  Good

1    afternoon.

2            THE WITNESS:  Good afternoon.

3            THE COURT:  Okay.  And I think you're

4    going to carry pretty well.  The microphone's

5    friendly, just so you know, but you have to speak

6    at it.  And you're here to testify for the benefit

7    of the ladies and gentlemen of the jury, so if you

8    could direct your answers, your responses to them,

9    that would be helpful.

10       I give the same instructions to every witness,

11   and that's basically try to keep your voice up at a

12   conversational tone.  If you don't understand a

13   question, ask that it be repeated, and we'll get

14   that all worked out.  But don't give an answer that

15   you don't really know if it pertains to the

16   question.  Try to be as concise as you can.  If you

17   can answer a question yes or no, answer it that

18   way, stop, let the attorneys ask follow-up

19   questions.

20       If there's an objection, wait until I rule on

21   the objection before you answer or complete an

22   answer.  What I'll do is I'll tell you what to do

23   next, either start your answer again, complete the

24   answer, wait for the next question, something along

25   those lines.  Fair enough?

1            THE WITNESS:  Yes, sir.

2            THE COURT:  All right.  And everything you

3     say has to be taken down by my court reporter, so

4     we all have to hear you.  Speak into the

5     microphone, tell us your full name and spell your

6     last name, please.

7            THE WITNESS:  William Valerio.  Last name

8     is V-A-L-E-R-I-O.

9            THE COURT:  Miss Labuzzetta, would you

10    swear the witness, please.

11        Did you say your first name is Will?

12            THE WITNESS:  William.

13            THE COURT:  Thank you.

14    W I L L I A M   V A L E R I O, having been duly

15    sworn as a witness, testified as follows:

16            THE COURT:  Okay.  Thank you.  You carry

17     pretty well.

18        Okay, Mr. Duszkiewicz, your witness.

19            MR. DUSZKIEWICZ:  Thank you.

20    DIRECT EXAMINATION BY MR. DUSZKIEWICZ:

21    Q.  Good afternoon, Mr. Valerio.  How are you

22     today?

23    A.  Good afternoon.  I'm fine.

24    Q.  Okay.  Are you currently in jail?

25    A.  Yes.

1   Q.   Okay.  And in what state are you in jail?

2   A.   Massachusetts.

3   Q.   All right.  And what type of sentence are you

4   serving in Massachusetts?

5   A.   Ten years.

6   Q.   All right.  And in addition to the sentence in

7   Massachusetts, has there been another sentence

8   imposed on you?

9   A.   Yes.

10   Q.   Where was that other sentence imposed on you?

11   A.   Syracuse, New York.

12   Q.   Okay.  And the sentence in Syracuse, New York,

13   did that involve an event that occurred on March

14   the 19th -- excuse me, March 13th of 2009?

15   A.   Yes.

16   Q.   Okay.  You pled guilty to a charge in Syracuse

17   as a result of your being arrested that day?

18   A.   Yes.

19   Q.   And your sentence was ten years?

20   A.   Yes.

21   Q.   Okay.  What happened that day?

22            MR. MUSITANO:  Excuse me, Judge.  What day

23   are we talking about, the 13th or the sentencing

24   date?

25            THE COURT:  All right.  Make it more

1    specific, please.

2   BY MR. DUSZKIEWICZ:

3    Q.  Well, again, you indicated that you're serving

4    a sentence as a result of an event that happened on

5    March the 13th, 2009, is that correct?

6    A.  Yes.

7          THE COURT:  Okay.  Mr. Duszkiewicz, still

8    keep your voice up, please.

9   BY MR. DUSZKIEWICZ:

10   Q.  Someone must have adjusted the microphone.

11   What happened -- again, that's the question -- on

12   March 13th of 2009?

13   A.  I got caught with some drugs on the highway.

14   Q.  Where did that happen?

15   A.  On the service area.

16   Q.  Service area where?

17   A.  I don't know the exact service area, but it was

18   past Syracuse, close to Syracuse.

19   Q.  All right.  And you said you got caught with

20   some drugs?

21   A.  Yes.

22   Q.  Okay.  Had you been in the drug business before

23   that?

24   A.  Yes.

25   Q.  What kind of drugs were you caught with?

1    A.   Cocaine.

2    Q.   How much cocaine?

3    A.   Seven kilos.

4    Q.   All right.  And what police agency caught you

5    with respect to that cocaine?

6    A.   Well, it was state police, and one being Doug

7    Davis.

8    Q.   Okay.  Do you know a state police investigator

9    by the name of Doug Davis?

10   A.   Yes.

11   Q.   Is he in the courtroom today?

12   A.   Yes.

13   Q.   Where is he today?

14   A.   Sitting over there with the blue shirt and

15   glasses on.

16   Q.   Okay.  Is he the fellow that was responsible

17   for arresting you?

18   A.   Yes.

19   Q.   It's his arrest that resulted in your

20   conviction and ten-year sentence?

21   A.   Yes.

22   Q.   Now, you say that you were stopped at a service

23   area.  Did you have cocaine on your person?

24   A.   No.

25   Q.   Where did you have cocaine?

1    A.    Inside the vehicle.   In the concealed

2    compartment.

3    Q.    In a concealed compartment?

4    A.    Yes.

5    Q.    Was there more than one concealed compartment?

6    A.    Well, yes.

7    Q.    How many concealed compartments were there?

8    A.    Two.

9    Q.    Where were the -- where were the sealed

10   compartments?

11   A.    One was in front of the dashboard, and the

12   second one was in the back of the vehicle.

13   Q.    Okay.   And do you recall how much was in either

14   compartment?

15   A.    The front one had three, and the one in the

16   back had four.

17   Q.    Okay.   What kind of vehicle was that?

18   A.    A Chevy Uplander.

19   Q.    All right.   And had you owned that vehicle for

20   a period of time?

21   A.    Yes.

22   Q.    How long had you owned the vehicle?

23   A.    Maybe five, six months.

24   Q.    Okay.   Did you ever own a BMW vehicle?

25   A.    Yes.

1    Q.   Okay.  What kind of BMW vehicle did you own?

2    A.   It was a 525.  1995.

3    Q.   Was there anything particular about that BMW

4    vehicle?

5    A.   Yeah.  It was a vehicle with a trap.

6    Q.   When you say "a trap," what exactly do you

7    mean?

8    A.   Concealed compartment.

9    Q.   Okay.  And did -- the BMW had a concealed

10   compartment?

11   A.   Yes.

12   Q.   And the Chevy Uplander, that also had a

13   concealed compartment?

14   A.   Yes.

15   Q.   Why did these vehicles have concealed

16   compartments?

17   A.   To conceal drugs.

18   Q.   Had you been in the -- in the drug business

19   before March 13th of 2009?

20   A.   Yes.

21   Q.   How long had you been in the drug business?

22   A.   For many years.

23   Q.   Approximately?

24   A.   Probably over two decades.

25   Q.   Okay.  Now, whereabouts are you from, sir,

1    originally?

2    A.   From New York City.

3    Q.   Okay.  Any particular part of New York City?

4    A.   Bronx, New York.

5    Q.   And have you always lived in the Bronx?

6    A.   Yes.

7    Q.   Did there come a point in time that you stayed

8    in the Niagara Falls area?

9    A.   Yes.

10   Q.   When was that?

11   A.   The first time I came to Niagara Falls it was

12   around 1987.

13   Q.   Okay.  And how old were you in 1987?

14            THE COURT:  Mr. Duszkiewicz.

15   BY MR. DUSZKIEWICZ:

16   Q.   How old were you in 1987?

17   A.   Fourteen, fifteen, around there.

18   Q.   Okay.  And why did you come up to Niagara

19   Falls?

20   A.   To make some money.

21   Q.   At 14 or 15 how were you making money?

22   A.   By selling drugs.

23   Q.   All right.  And how long did you stay up in the

24   Niagara Falls area?

25   A.   For a few years.

1   Q.   Okay.  Did you meet anybody up in the Niagara

2   Falls area back in '87 or for those few years?

3   A.   Yes, I met plenty of people.

4   Q.   And did there come a point in time you met a

5   fellow named Steven Knighton?

6   A.   Yes.

7   Q.   Do you know Steven Knighton?

8   A.   Yes.

9   Q.   Is he in the courtroom today?

10  A.   Yes.

11  Q.   Where is he seated and what's he wearing today?

12  A.   He's seated right there.  He's wearing a

13  checkered shirt, black.

14  Q.   What's black?

15  A.   The sweater he got on.

16  Q.   He's wearing a sweater and a checkered shirt?

17  A.   Yes.

18           MR. DUSZKIEWICZ:  Your Honor, can the

19  record reflect Mr. Valerio has an identified the

20  defendant Steven Knighton?

21           THE COURT:  The record will reflect the

22  testimony relating to the defendant.

23           MR. DUSZKIEWICZ:  Thank you.

24  BY MR. DUSZKIEWICZ:

25  Q.   Let me go back to the 13th of March, 2009.

1   Where were you coming from when you were stopped on

2   the New York State Thruway?

3   A.   From New York City.

4   Q.   Okay.  And what, if anything, had you been

5   doing in New York City?

6   A.   My usual, you know, doing transactions and

7   stuff like that.

8   Q.   Okay.  The cocaine that you say was in the --

9   three kilos in the front trap and four kilos in the

10  back compartment, where did those come from?

11  A.   New York.

12  Q.   Okay.  Source of supply in New York?

13  A.   Yes.

14  Q.   What was going to happen, if anything, with

15  those -- with those kilos?

16  A.   They was going to get distributed.

17  Q.   Okay.  Where were they going to get

18  distributed?

19  A.   Syracuse, Buffalo.

20  Q.   Let's center on Syracuse first.  There's seven

21  kilos all together in your vehicle, is that

22  correct?

23  A.   Yes.

24  Q.   Is that good quality cocaine?

25  A.   Yes.

1    Q.   Was any of it going to be distributed in

2    Syracuse area?

3    A.   Yes.

4    Q.   Did you have an individual that you were

5    dealing with in Syracuse?

6    A.   Yes.

7    Q.   How much of those seven kilos were going to the

8    individual in Syracuse?

9    A.   One.

10   Q.   Okay.  Were you able to deliver that kilogram

11   to the individual in Syracuse?

12   A.   No.

13   Q.   What happened?

14   A.   Well, the individual set me up, and that's why

15   I got into the situation on the highway.

16   Q.   What do you mean he set you up?

17   A.   He had me, you know, set up by state police.

18   Q.   You mean you believe he told the state police

19   you were coming?

20   A.   Yes.

21   Q.   Okay.  And did that result, as best you know,

22   in your arrest in Syracuse?

23   A.   Yes.

24   Q.   What was going to happen with the other

25   six kilos?

1    A.   They was going to go to Buffalo.

2    Q.   Okay.  And to whom and where in Buffalo?

3    A.   They was going to go to Lemiel Jones and Steve

4    Knighton.

5    Q.   Was there a particular quantity that was going

6    to this Jones fellow?

7    A.   Yeah, four.

8    Q.   Okay.  And if I do the math, that leaves two.

9    Where were those two going?

10   A.   Steve Knighton.

11   Q.   The fellow that's sitting over here in the

12   courtroom?

13   A.   Yes.

14   Q.   Had you been doing business with Mr. Knighton

15   prior to March the 13th?

16   A.   Yes.

17   Q.   Okay.  How long had you been doing business

18   with him?

19   A.   Maybe a year.  Ten months, a year, around

20   there.

21   Q.   How would you conduct business with him in ten

22   months to a year before the 13th of March?

23   A.   In person, by phone.

24   Q.   Well, I mean, you're in New York City.  I take

25   it the product's in New York City.

1   A.   Um-hum.

2   Q.   How would the product get from New York City to

3   the Buffalo area?

4   A.   Oh, I would either take it up there, or he end

5   up coming down there.

6   Q.   Okay.  How often would you have contact with

7   Steven Knighton?

8   A.   Probably twice a week.

9   Q.   All right.  And in those twice a week -- when I

10  say contact, does that mean face-to-face meeting,

11  or is that some telephone conversation?

12  A.   Usually face to face, but telephone too.

13  Q.   Well, in the -- in the usually two times a week

14  that you had face-to-face meetings, what happened?

15  A.   We would conduct business.

16  Q.   Tell us what you mean by conducting business.

17  A.   We would exchange currency and the drugs.

18  Q.   You would get the drugs in the New York City

19  area?

20  A.   Yes.

21  Q.   Where would the currency come from?

22  A.   From Steven.

23  Q.   Okay.  And in exchange for the currency, would

24  you provide him with the drugs you obtained in New

25  York City?

1    A.   Yes.

2    Q.   When you would meet him over this ten months or

3    a year or whatever it was before March, how many --

4    how large were the transactions or what was the

5    nature of the transaction?

6              THE COURT:  I tried to adjust it upwards,

7    Mr. Duszkiewicz.  So keep your voice up, please.

8              MR. DUSZKIEWICZ:  Judge, I'm trying.

9    BY MR. DUSZKIEWICZ:

10   Q.   What was the -- what was the nature of the

11   transactions?  What was the volume?  How much was

12   involved?

13   A.   Well, when we first started, we only started

14   with like two and a half kilos.

15   Q.   Tell me about when you first started.

16   A.   Well, I met -- we had met -- I had met him

17   in 2007 when I was visiting a friend, and he

18   recognized me in the parking lot, and we exchanged

19   phone numbers.  And eventually I end up calling him

20   and we end up meeting and talking about business.

21   And he had offered me some money, that way I could

22   be able to purchase some stuff and get things

23   started.

24   Q.   When you say -- when you started talking about

25   business, at that particular point in time were you

1    in business -- were you in the drug business?

2    A.   No.

3    Q.   This meeting you had was just a chance meeting?

4    A.   Yeah, because I ain't seen him in years.  I was

5    visiting a friend, and I happened to come out to

6    the parking lot to get in my car, and he was in

7    that parking lot as well, and he recognized me.

8    Q.   Did you recognize him?

9    A.   At first I didn't till he told me who it was.

10   And then -- because I ain't seen him in a long

11   time.

12   Q.   What did you recognize him from?

13   A.   Once he said Steve Knighton, I recognize him

14   then.

15   Q.   Had you been involved with him in any business

16   transactions back in '87 or the two years or so you

17   were up in Niagara Falls?

18   A.   Yes.  You know, nothing major, but it was small

19   dealings and stuff like that, narcotics and stuff

20   like that.

21   Q.   Well, what was the nature of the business?  Who

22   was providing the narcotics?  Who was paying for

23   them?

24   A.   The same way I was doing with it him now.  I

25   would provide the narcotics, and he would pay for

1    them.

2    Q.   All right.  And you see him again in 2007?

3    A.   Right.

4    Q.   And tell me what the conversation was.

5    A.   Now, I just, you know, he asked me what I was

6    doing in town.  I told him I came to visit a

7    friend.  And, you know, he insinuated like that's

8    not all I was there for.  I said, no, serious I

9    just came to see a friend.  And the last thing I

10   remember that he gave me his number, and I told him

11   I had to go back to New York, because I had to go

12   to work.  He told me next time I come up to give

13   him a call, that way we can sit down and talk.

14   Q.   All right.  And did you come back to Niagara

15   Falls?

16   A.   Yeah, I ended upcoming back.

17   Q.   Approximately when?

18   A.   Probably like a month later, a month and a half

19   later after that.

20   Q.   Did you make contact with Steven Knighton?

21   A.   Yes.

22   Q.   What happened when you made contact with him?

23   A.   Well, we met -- we met somewhere on the

24   boulevard, in this restaurant on the boulevard.  I

25   just don't remember the restaurant.  And, you know,

1    I got out of my car, and he told me to get in his

2    car.  We started talking about how we could get

3    drugs up there and start making some money and

4    stuff like that.

5    Q.  Did he do anything in particular when you got

6    in his car?

7    A.  Yes, he put up the radio a little bit, you

8    know, just, you know, I guess he was paranoid or

9    whatever the case may be.

10           MR. MUSITANO:  I'll object what he's

11   guessing for.

12   BY MR. DUSZKIEWICZ:

13   Q.  Well, he turned the radio up.

14   A.  Yes.

15   Q.  Did you have a sense why he turned the radio

16   up?

17   A.  He told me, you know, he was just in case, you

18   never know, it could be bugged, or whatever the

19   case may be.

20   Q.  Did he think you had a wire?

21   A.  Well, I guess that's what he's insinuated.

22           MR. MUSITANO:  Judge, I'll object again if

23   he's guessing.

24           THE COURT:  I'll sustain the objection.

25   BY MR. DUSZKIEWICZ:

1    Q.   Did you continue to have a conversation with

2    him?

3    A.   Yes.

4    Q.   What did you talk about?

5    A.   Well, you know, I told him that I haven't been

6    dealing in the narcotic business for a while, and

7    that I didn't have the money to really, you know,

8    begin anything on consignment and stuff like that.

9    He told me that money wouldn't be the problem.

10   Q.   Let me stop.  What do you mean by "on

11   consignment?"

12   A.   Getting, you know, getting it from the

13   connection without having to pay up front.

14   Q.   Now, you said you told him that you hadn't been

15   involved for a while.

16   A.   Yes.

17   Q.   Why was that?

18   A.   Because I was in prison.

19   Q.   What were you in prison for?

20   A.   Selling drugs.

21   Q.   Okay.  Were you released on parole?

22   A.   Yes.

23   Q.   Were you supposed to be selling drugs again?

24   A.   No.

25   Q.   But you had this conversation with

1  Mr. Knighton?

2  A.  Yes.

3  Q.  What else was said during that conversation?

4  A.  You know, we was talking about prices.  How

5  much, you know, a kilo was costing in Niagara Falls

6  and Buffalo, and how much they cost in New York.

7  Q.  All right.  And after you discussed the prices,

8  what else happened?

9  A.  You know, he told me, you know, how much would

10  I need to get things started.

11  Q.  Okay.  And did you give him an amount?

12  A.  Yeah.

13  Q.  Okay.  What did -- how did he respond to you

14  when you said how much money you would need to get

15  started?

16  A.  He said, "No problem."

17  Q.  How much money were you talking about?

18  A.  Around 65,000.

19  Q.  Did there come a point in time shortly after

20  that that you received $65,000 from Mr. Knighton?

21  A.  Yes.

22  Q.  And what did you do with the $65,000?

23  A.  I took it back to New York City and purchased

24  drugs.

25  Q.  How much did you purchase?

1   A.   Two and a half kilos.

2   Q.   What did you do with the two and a half kilos?

3   A.   Brought them back up to Niagara Falls.

4   Q.   And who did you give them to?

5   A.   Steve Knighton.

6   Q.   Now, how much did the two and a half kilos cost

7   you in New York City?

8   A.   Say around 60,000.

9   Q.   Okay.  So the difference of $5,000, would that

10   be your profit?

11   A.   Yes.

12   Q.   Okay.  Why do you deal drugs?

13   A.   To make money.

14   Q.   Okay.  And were you successful in spending

15   his -- 60 of his $65,000 in New York?

16   A.   Yes.

17   Q.   Were you successful in getting two and a half

18   kilos of cocaine?

19   A.   Yes.

20   Q.   Did you deliver the cocaine to Steven Knighton?

21   A.   Yes.

22   Q.   What happened after that?

23   A.   Like probably two days later, he had called me

24   back up to let me know that he was finished and

25   needed some more work.

1    Q.   You say he was finished.  What does that mean?

2    A.   That he got rid of the kilos.

3    Q.   And he needed more work?

4    A.   Yeah.  Well, we considered that, you know,

5    product, which is cocaine.

6    Q.   So he needed a commodity, he needed something

7    to distribute?

8    A.   Yes.

9    Q.   Okay.  He called you up and said in a couple

10   days that he needed more work?

11   A.   Um-hum.

12   Q.   How was the "more work" going to get paid for?

13   A.   By him providing money.

14   Q.   Okay.  Did he, in fact, provide you money?

15   A.   Yes.

16   Q.   Okay.  How did you arrange to have him give you

17   money?

18   A.   I would have to -- I have to wait till I get

19   out of work on the weekend and go back up there and

20   grab the money.

21   Q.   So you would go back up from New York City back

22   to the Niagara Falls area?

23   A.   Yes.

24   Q.   Okay.  Did Mr. Knighton, by the way, live in

25   Niagara Falls?

1    A.   Excuse me?

2    Q.   Did he live in Niagara Falls?

3    A.   Yeah.  In the beginning he did, yeah.

4    Q.   Did he move?

5    A.   Yes.

6    Q.   Where did he move?

7    A.   Buffalo.

8    Q.   Okay.  And did you know where he lived?

9    A.   Yes.

10   Q.   It was in the Buffalo area, not the city of

11   Niagara Falls?

12   A.   It was in the Buffalo area.

13   Q.   Was there a second transaction that you talked

14   about, the phone call a couple of days later

15   needing more work?

16   A.   Repeat that again.

17   Q.   Was there another transaction?  Did you come to

18   Buffalo again after the phone call where Knighton

19   told you he needed more work?

20   A.   Yes.

21   Q.   Okay.  What happened if you remember?

22   A.   The same thing.  I met up with him.  You know,

23   we counted some money.  And I headed back to New

24   York.

25   Q.   Okay.  When you got back to New York, what did

1  you do with the money?

2  A.  Purchased drugs.

3  Q.  Okay.  Did you make a profit?

4  A.  Yes.

5  Q.  I mean, you obtained the drugs for less than

6  the amount of money Mr. Knighton gave you?

7  A.  Um-hum.

8  Q.  After that transaction -- by the way, how much

9  was it, if you recall?

10  A.  Probably -- probably two.

11        MR. MUSITANO:  Judge, I'll object if he's

12  guessing.

13        THE COURT:  No.  You can cross-examine on

14  that response.

15  BY MR. DUSZKIEWICZ:

16  Q.  When you say "probably two," you're trying to

17  recall?

18  A.  Yes.

19        THE COURT:  He said, "probably two."  You

20  may cross-examine on that.  Objection overruled.

21        MR. MUSITANO:  Again, Judge, we have no

22  duty, correct?

23        THE COURT:  You have no duty.  You may

24  examine though, if you choose to.

25        MR. MUSITANO:  Thank you.

1    BY MR. DUSZKIEWICZ:

2    Q.  After that additional two kilos, did you

3    continue to maintain contact with Steven Knighton?

4    A.  Yes.

5    Q.  How often after that -- those 2 kilos did you

6    again talk to Mr. Knighton?

7    A.  Probably three to four, five days later.

8            MR. MUSITANO:  Again, object to the

9    "probably."

10            THE COURT:  No.  Goes to the matter of

11   weight for the jury in this case.  Overruled.

12   BY MR. DUSZKIEWICZ:

13   Q.  And that conversation five or so days later,

14   what did that involve?

15   A.  Same process.

16   Q.  Okay.  Now, you'd said earlier that you needed

17   $65,000 or thereabouts to get started.

18   A.  Um-hum.

19   Q.  Okay.  What did you mean by "getting started?"

20   A.  You know, getting affiliated with the drug game

21   again.

22   Q.  Okay.  And did that put you in a better

23   position in terms of getting affiliated with the

24   game?

25   A.  Yes.

1   Q.   Okay.  Explain that for us.

2   A.   Well, you know, after -- you know, after some

3   time goes by and you consistently buying product,

4   and they seen that you, you know, you're making

5   money, you know, things either come out more in

6   your favor as far as you being able to request for

7   additional drugs and things of that nature.

8   Q.   Would you get drugs on consignment?

9   A.   Eventually I was.

10  Q.   How long did it take you before you could get

11  drugs on consignment?

12  A.   Probably two to three months later.

13  Q.   Okay.  And in that two to three months, did you

14  maintain your relationship with Steven Knighton?

15  A.   Yes.

16  Q.   Okay.  So, he was part of your getting --

17  getting established.

18  A.   Definitely.

19  Q.   Okay.  When you got established, were you able

20  to get drugs on consignment?

21  A.   Yes.

22  Q.   Would you have to pay for some of the drugs and

23  get a few extra kilos on top of that?

24  A.   Yes.

25  Q.   Is that how the business worked?

1    A.   Yes.

2    Q.   Okay.  Would you still be able to make a profit

3    doing that?

4    A.   Yes.

5    Q.   Okay.  Did that eliminate the need for multiple

6    trips back and forth between New York City and

7    Niagara Falls or Buffalo?

8    A.   Sometimes, yes.

9    Q.   Because you would get stuff on credit?

10   A.   Um-hum.

11   Q.   Now, prior to March 13th -- that was Friday the

12   13th, correct, in 2009?

13   A.   Yes.

14   Q.   Had you seen Mr. Knighton earlier that week?

15   A.   Yes.

16   Q.   And what was the circumstances under which you

17   saw him earlier in the week?

18   A.   Same thing.  Just, you know, dealing with, you

19   know, what we going to do for the week?  What are

20   the projected sales that we might make for the

21   week, stuff like that.

22   Q.   Okay.  I mean, did you transact product with

23   him earlier that same week?

24   A.   Yes.

25   Q.   Okay.  Do you recall how much?

1    A.   I can't at this time.

2    Q.   Okay.  In the -- in the period of time between

3    you getting established with your connections in

4    New York and this -- this week in March of 2009,

5    how often would you see Mr. Knighton?

6    A.   Once or twice a week.

7    Q.   All right.  And were you transacting business

8    those once or twice a week in that period of time?

9    A.   Yes.

10   Q.   What was the volume?  How much business were

11   you doing?

12   A.   It always depends.  It used to be from -- it

13   could be two.  It could be five, six.

14   Q.   Okay.  And how would you know that the product

15   was -- was distributed, that it was time for

16   another shipment?

17   A.   He would just call me.

18   Q.   Okay.  What was the nature of those phone

19   calls?

20   A.   "I'm finished."  You know, "Could you get up

21   here?"

22   Q.   And during what part of the week would you --

23   would you see him?

24   A.   It was usually the weekdays.

25   Q.   Okay.  Would you see him early in the week and

1    late in the week?

2    A.   Yeah.

3    Q.   Okay.  You say that the amounts varied based on

4    what he wanted?

5    A.   Yes.

6    Q.   Okay.  How much business were you doing in a

7    given week?

8    A.   It depends.  One week I could be doing

9    10 kilos, and next week I could be doing 20.

10   Q.   Okay.  Now, you mentioned when I asked you

11   earlier that of the six remaining kilos that were

12   in your vehicle on March 13th that four were going

13   to some fellow by the name of Lemiel Jones?

14   A.   Yes.

15   Q.   Was he also a customer of yours?

16   A.   Yeah.

17   Q.   Where is he from?

18   A.   Buffalo.

19   Q.   Okay.  Does he have some relationship with

20   Steven Knighton?

21   A.   No.

22   Q.   Okay.  When you say "No," what do you mean?

23            MR. MUSITANO:  I'll object to the form of

24   the question, Judge.

25            THE COURT:  Sustained.

1   BY MR. DUSZKIEWICZ:

2   Q.   All right.  Do you know if Mr. Knighton and

3   Mr. Jones know each other?

4   A.   They know each other, yes.

5   Q.   How do you know that?

6   A.   Because they spoke before in my presence.

7   Q.   How would you -- you said that you would

8   communicate with Mr. Knighton by telephone?

9   A.   Yeah.

10  Q.   Any particular type of telephone?

11  A.   Yeah.  It was a beep -- bleep phones.

12  Q.   Bleep phones?

13  A.   Yeah.  Because they're the phones they like

14  walkie-talkies.

15  Q.   You're making a gesture with your thumb and

16  your hand?

17  A.   Yeah.

18  Q.   Is that something special that a phone can do?

19  A.   Yes.  It was almost like a walkie-talkie type

20  of --

21  Q.   How do you -- how do you get ahold of somebody

22  using that walkie-talkie?

23  A.   By hitting the button like if you was really

24  going to -- like if you really had a walkie-talkie,

25  you hit the button and it would alert the person

1     that got the phone that somebody's trying to

2     contact them.

3     Q.   Do you have to put a number into the phone?

4     A.   Yeah.  You got to program a number into the

5     phone.

6     Q.   How do you go about programming a number into

7     the phone?

8     A.   You got to -- it's a -- it's like a memory --

9     when you got the memory card, you type in the

10    number and you put a name on it and that's it, and

11    it's programmed in the phone.

12    Q.   So you had a -- the memory card in your phone

13    had a programmed number for -- for Steven Knighton?

14    A.   Yes.

15    Q.   Have a programmed number for other people?

16    A.   Yes.

17    Q.   Did Mr. Knighton have the same kind of phone

18    that had your number programmed into it?

19            MR. MUSITANO:  Objection.

20            THE COURT:  If he knows, I'll allow him to

21    answer that.

22            THE WITNESS:  Yes.

23    BY MR. DUSZKIEWICZ:

24    Q.   How do you know?

25    A.   Because when I hit -- when I bleep him, he

1  bleeps me back and we start talking.

2  Q.  Did you ever do anything to change that memory

3  card?

4  A.  Yeah.  We changed the memory card very often.

5  Q.  When you say "we," who do you mean?

6  A.  The individuals I did business with.

7  Q.  Okay.  Did that include Steven Knighton?

8  A.  Yes.

9          MR. MUSITANO:  Objection.  How would he

10  know?

11          THE COURT:  You can ask him, but he

12  answered the question.  I'll let it stand.

13  BY MR. DUSZKIEWICZ:

14  Q.  Did you see Mr. Knighton changing his memory

15  card?

16  A.  Yeah.  We did it all at the same time.

17  Q.  You were together?

18  A.  Most of the times, yes.

19  Q.  So he would program your number in, you would

20  program his number in?

21  A.  Yes.

22  Q.  You would do that with other people you were

23  involved with?

24  A.  Yes.

25  Q.  Okay.  Now, we talked earlier about your making

1    a profit from delivering kilos of cocaine up to the

2    Buffalo area, is that correct?

3    A.   Yes.

4    Q.   About how much of a profit were -- were you

5    making?

6    A.   What time period like?

7    Q.   Well, around, let's say, March 13th of 2009.

8           THE COURT:  I'm not -- don't answer that

9    question.  I mean, profit can -- without more

10   definition, can be inclusive of more than what

11   we're talking about here.  So, I'll sustain the

12   objection.  You can start again.

13   BY MR. DUSZKIEWICZ:

14   Q.   Did the prices of cocaine change?

15   A.   Yes.

16   Q.   Why did the prices of cocaine change?

17   A.   There is a lot of reasons.  Mainly is it might

18   be a drought, meaning that there's a shortage of

19   supplies for cocaine, in, you know, New York City

20   or other big areas.

21   Q.   What's the -- what's the least you've ever paid

22   for a kilo of cocaine?

23   A.   Like in 2007 the least I was paying was at

24   probably 24, 26, around there.

25   Q.   All right.  And let's move forward to, let's

1    say, 2009.  What were -- how were the prices

2    in 2009?

3    A.  It had went up significantly from 38 to 40.

4         THE COURT:  Mr. Duszkiewicz, raise your

5    voice again, please.

6    BY MR. DUSZKIEWICZ:

7    Q.  If you were to deliver a single kilogram of

8    cocaine, would you put some points on it?

9    A.  Yes.

10   Q.  When you say "points," what do you mean?

11   A.  Points.

12        MR. MUSITANO:  Objection to the form,

13   Judge.  I think Mr. Duszkiewicz said points, not

14   the witness.

15        THE COURT:  Sustained as to form.

16   BY MR. DUSZKIEWICZ:

17   Q.  How would you price the cocaine?

18   A.  Well, I would start it, you know, with points.

19   And each point is considered a thousand dollars.

20   Q.  Okay.  How many points would you put on a

21   kilogram of cocaine?

22   A.  Anywhere from three to four.

23   Q.  Now, when you were stopped in Syracuse, did you

24   talk to the police officers?

25   A.  Yes.

1    Q.   Did they advise you of your rights?

2    A.   Yes.

3    Q.   And after they did that, did you indicate that

4    you would cooperate with them?

5    A.   Yes.

6    Q.   Did you, in fact, cooperate with them?

7    A.   Yes.

8    Q.   Who did you primarily work with?

9    A.   Doug Davis.

10   Q.   All right.  And did you provide Investigator

11   Davis with the information that -- where those

12   6 kilograms of cocaine were going?

13   A.   Yes.

14   Q.   What information did you provide him with?

15   A.   Well, I told him I was bringing them to

16   Buffalo.

17            MR. MUSITANO:  Objection, Judge.

18            THE COURT:  Grounds?

19            MR. MUSITANO:  Bolstering.

20            THE COURT:  No.  Overruled.  Reput the

21   question though, please, Mr. Duszkiewicz.

22   BY MR. DUSZKIEWICZ:

23   Q.   What did you tell Investigator Davis about

24   those 6 kilograms of cocaine that you say were

25   coming to Buffalo?

1    A.   Well, I told him I was transporting them to

2    Buffalo.

3    Q.   Did you tell him to whom?

4    A.   Yes.

5    Q.   What did you tell him?

6    A.   I told him that I was bringing those drugs to

7    Lemiel Jones and Steve Knighton.

8    Q.   And after you told him who you were taking the

9    drugs to, did you agree to do something else?

10   A.   Repeat that.

11   Q.   After you told him, that is Investigator Davis,

12   who the drugs were destined for, did you agree to

13   do something else?

14   A.   Yes.

15   Q.   What did you agree to do?

16   A.   To take them to the destination.

17   Q.   All right.  And they found -- they found the

18   drugs in your car, is that correct?

19   A.   Yes.

20   Q.   How did they -- you said there was a trap

21   compartment in the dashboard of the car?

22   A.   Yes.

23   Q.   Okay.  How did you get -- how did someone get

24   in the trap compartment?

25   A.   There's switches that you got to use to open it

1    and close it.

2    Q.  Well, did you tell the police about the

3    sequence you'd have to use to open and close the

4    trap?

5    A.  Yes.

6    Q.  Okay.  That's how they were able to remove

7    3 kilos from the dashboard.

8    A.  Yes.

9    Q.  You were providing information to the police

10   officers?

11   A.  Yes.

12   Q.  Other than agreeing to go to Buffalo to try to

13   finish up the transactions, did you provide them

14   any other information?

15   A.  I can't recall.

16   Q.  Well, you told them two names?

17   A.  Yes.

18   Q.  Did you tell them anything else about either of

19   those two individuals?

20   A.  That I was supposed to meet them.

21   Q.  Okay.  Did you tell them that they had the

22   push-to-talk phones?

23   A.  Oh, yes.  Yes.

24        MR. MUSITANO:  Judge, I'm going to object

25   to the leading.

1              THE COURT:  Yes.  But, you know, I'll

2       allow it right now under 611(a).  Watch the leading

3       though.

4    BY MR. DUSZKIEWICZ:

5       Q.  Was any information provided relative to

6       numbers that would access those push-to-talk

7       phones?

8       A.  Yes.

9       Q.  Now, did you, in fact, start going to Buffalo?

10      A.  Yes.

11      Q.  Okay.  Were you operating your minivan?

12      A.  At that point, no.

13      Q.  No?

14      A.  No.

15      Q.  Well, how were you getting to Buffalo?

16      A.  Doug Davis and his partners who was in one of

17      their vehicles.

18      Q.  That was a state police vehicle?

19      A.  Yes.

20      Q.  Okay.  While you were in the vehicle, did you

21      do anything to cooperate or to assist either his

22      partner or Investigator Davis?

23      A.  Yes.

24      Q.  What did you do?

25      A.  I was communicating with Steve Knighton.

1    Q.   How were you doing that?

2    A.   Through the bleep phone.

3    Q.   When you say you were communicating with him,

4    were you arranging a meeting with him?

5    A.   Yes.

6    Q.   Had there been a meeting arranged prior to

7    those phone calls or those bleeps while you were in

8    Investigator Davis's presence?

9    A.   Yes.

10   Q.   So your trip to Buffalo had been already

11   arranged?

12   A.   Yes.

13   Q.   Where would you go when you came to Buffalo --

14   and I'm talking particularly about Steven Knighton.

15   Where would you go to meet Mr. Knighton?

16   A.   Usually we would go to either the gas station

17   or a mall.

18   Q.   Okay.  And what particular mall?

19   A.   The Galleria Mall.

20   Q.   Okay.  Any significance going to the Galleria

21   Mall?

22   A.   It was next to the highway.

23   Q.   How was that important?

24   A.   Well, it's -- for me it was important, because

25   I usually just make a U-turn and head back to New

1    York City right from there, instead of traveling

2    around the local city area.

3    Q.   What about this gas station?  Where was the gas

4    station located?

5    A.   It was also by the Galleria Mall too.

6    Q.   Did that also provide for just a U-turn?

7    A.   Yes.

8    Q.   Okay.  Where had you earlier arranged to meet

9    with -- with Steven Knighton?  When I say earlier,

10   before you started talking with Investigator Davis.

11   A.   In the mall.

12   Q.   How did you refer to the mall?

13   A.   You know, our usual place, you know.

14   Q.   So had you made transactions in a usual space

15   prior to the 13th of March?

16   A.   Yes.

17   Q.   Okay.  And had that usual space been at the

18   Galleria Mall?

19   A.   Yes.

20   Q.   Any particular location at the Galleria Mall?

21   A.   I think like where the Macy's area is at.

22   Q.   And do you know where that is as far as the

23   entire mall is concerned?

24   A.   Not specifically, I can't.  It's been a while.

25   Q.   Okay.  All right.  But that's -- there is a

1  Macy's at the Galleria Mall?

2  A.  Yes.

3  Q.  And was that where you had arranged to meet

4  Mr. Knighton that day, that is, March 13th?

5  A.  Yes.

6  Q.  All right.  Did you tell -- provide that

7  information to Investigator Davis?

8  A.  Yes.

9  Q.  Okay.  Now, I asked you earlier about a BMW

10  vehicle?

11  A.  Yes.

12  Q.  You told me about that vehicle.  Did you have

13  that vehicle on March 13th of 2009?

14  A.  No.

15  Q.  What had happened, if anything, with that

16  vehicle prior to March 13th of 2009?

17  A.  I had sold it to Steve Knighton.

18  Q.  You sold it to Steve Knighton?

19  A.  Yes.

20  Q.  Why did you sell it to Steve Knighton?

21  A.  He needed a vehicle with a trap in it.

22  Q.  When had you sold it to Mr. Knighton?

23  A.  Maybe the fall 2008.

24  Q.  Did Mr. Knighton know about the trap in the

25  vehicle?

1    A.   Yes.

2    Q.   How did he know about it?

3    A.   Because prior to me using the Uplander, that's

4    the one I was using to transport the drugs to

5    Buffalo.

6    Q.   Okay.  And how was the -- how was the trap

7    activated to -- in the -- in the BMW?

8    A.   Usually the same.  There's the console in the

9    middle, some buttons for the windows.  You would

10   use that.  There is a button underneath the

11   steering wheel that you have to click on to that.

12   Q.   Okay.  Had you provided that sequence to

13   Mr. Knighton?

14   A.   Yes.

15   Q.   Did he register that vehicle in his own name?

16          MR. MUSITANO:  Objection.  Basis of

17   knowledge, Judge.

18          THE COURT:  Reput the question.

19   BY MR. DUSZKIEWICZ:

20   Q.   Do you know if he registered that vehicle in

21   his own name?

22   A.   No.

23   Q.   You don't know, or yes or no.

24   A.   No, he didn't register in his own name.

25   Q.   Do you know whose name he registered it in?

1    A.   He told me he was going to register it in his

2    brother's name.

3    Q.   Now, relative to your preplanned meeting with

4    Mr. Knighton on -- on the 13th of March, did you

5    know what vehicle Mr. Knighton was going to be

6    using?

7    A.   Yes.

8    Q.   How did you know what vehicle he would be

9    using?

10   A.   He had just purchased a brand new truck.

11   Q.   Okay.  How did you know he had just purchased a

12   brand new truck?

13   A.   Well, he told me about it.

14   Q.   What kind of truck?

15   A.   It was a Tahoe, black.

16   Q.   Had he had a black truck prior to purchasing

17   the black Tahoe?

18   A.   Yeah, he had a black pickup truck.

19   Q.   Did you provide that information to

20   Investigator Davis?

21   A.   Yes.

22   Q.   Now, you were expecting to deliver 2 kilos of

23   cocaine to Mr. Knighton, correct?

24   A.   Yes.

25   Q.   Had you and Mr. Knighton arranged a price or an

1    amount of money that was necessary to complete that

2    transaction?

3    A.   Yes.

4    Q.   How much money had you arranged with

5    Mr. Knighton?

6    A.   Well, the kilos was at 40 -- at the time I was

7    charging him 41, $42,000.

8    Q.   Okay.  And how much money were you expecting to

9    get from Mr. Knighton on the 13th?

10   A.   Around 41, 42,000.

11   Q.   Did you provide that information also to -- to

12   Investigator Davis?

13   A.   Yes.

14   Q.   Okay.  Now, you indicated that you started

15   riding with Davis and his partner and other police

16   officers, I take it, somewhere near you towards the

17   Buffalo area, is that correct?

18   A.   Yes.

19   Q.   Okay.  Were you doing anything while you were

20   riding from the Syracuse service area to the

21   Buffalo area?

22   A.   Yes.  I was communicating back and forth with

23   Steve.

24   Q.   Okay.  Why were you doing that?

25   A.   So everything would seem normal.

1    Q.   What were you -- what were you -- what were you

2    saying?

3    A.   You know, "I'm running late, lot of traffic,"

4    and stuff -- you know, stuff of that nature.

5    Q.   Okay.  And did you find out in those

6    conversations with Steven that he'd be waiting for

7    you at the same place?

8    A.   Yes.

9    Q.   Okay.  And what exactly did he say, if you

10   recall?

11   A.   What did I say?

12   Q.   What did he say?

13   A.   That he's been waiting for me for a while now.

14   Q.   Okay.  Was he inquiring how long it was going

15   to take for you to get there?

16   A.   Yes.

17   Q.   Were you keeping him updated?

18   A.   Yes.

19   Q.   How many times did you contact him?

20   A.   Like 15, 20 times.

21   Q.   Okay.  Mostly time frame or mostly small talk?

22   A.   Small talk.

23   Q.   While you were communicating with Mr. Knighton,

24   were you communicating with anyone else?

25   A.   Yeah.  People from New York, just talking.

1    Q.   What about this fellow Lemiel Jones?

2    A.   Yeah.  I tried to call him, but he wouldn't

3    pick up.

4    Q.   And how or why were you communicating with

5    people in New York?

6    A.   They was just calling me, so I was just riding,

7    I was just on the phone talking to them.

8    Q.   Okay.  People in New York, are they -- are they

9    Hispanic?

10   A.   Yes.

11   Q.   Okay.  What language did you use when you spoke

12   to the fellows in New York?

13   A.   Spanish.

14   Q.   You speak Spanish?

15   A.   Yes.

16   Q.   Your English is very good.

17   A.   Yes.

18   Q.   Were you born in the United States?

19   A.   Yes.

20   Q.   The people that you were communicating with and

21   speaking in the Spanish language, did they have

22   some connection to the drug business that you were

23   in?

24   A.   Some of them did, yeah.

25   Q.   Okay.  Were you continuing to arrange deals or

1    talk about product with those individuals?

2    A.   Yes, I would talk.

3    Q.   When you were having the conversations either

4    with the Hispanic fellows or with Mr. Knighton,

5    were you conveying the information that you were

6    obtaining from Mr. Knighton to Investigator Davis?

7    A.   Yes.

8    Q.   How were you doing that?

9    A.   By letting him know.  And also I used to put it

10   on speaker too.

11   Q.   So he could -- he could hear not only what

12   you're saying, he could hear parts of what the

13   other individual was saying?

14   A.   Yes.

15   Q.   Were they stopping the vehicle so you could

16   quietly have that conversation, or were you just

17   providing down the Thruway?

18   A.   Proceeding down the Thruway.

19   Q.   Now, did there -- did there come a point that

20   you arrived in the Buffalo area?

21   A.   Yes.

22   Q.   Okay.  And where did you go when you arrived in

23   the Buffalo area?

24   A.   To the Galleria Mall.

25   Q.   Okay.  And that's where you had told the

1  investigators that you were expecting to meet

2  Mr. Knighton?

3  A.   Yes.

4  Q.   When you got there, what happened?

5  A.   We drove by, you know, Steve's truck, and Doug

6  had asked me if that's the truck, and I told him

7  yeah.

8  Q.   So you told the investigators that you were

9  with that was the truck that belonged to

10  Mr. Knighton?

11  A.   Yes.

12  Q.   Okay.  And then what happened?

13  A.   We took another spin around, and they spin me

14  back around by the truck, and by that time they had

15  Steve Knighton on the truck, and asked me if that's

16  Steve, and I said yeah.

17  Q.   Same fellow that's in the courtroom today?

18  A.   Yes.

19  Q.   The actual cocaine that was in your van, did

20  they have that in the car with you when you were

21  driving to from Syracuse to Buffalo?

22  A.   No.

23  Q.   Okay.  Were they actually going to deliver the

24  cocaine to Mr. Knighton?

25          MR. MUSITANO:  I'll object, Judge.

1          THE COURT:  Grounds?

2          MR. MUSITANO:  How does he know what

3     they're going to do?

4          THE COURT:  If he knows.

5          THE WITNESS:  Say that -- repeat the

6     question.

7   BY MR. DUSZKIEWICZ:

8    Q.  Were they going to let you deliver the cocaine

9     to Mr. Knighton?

10   A.  No.

11   Q.  Now, after you pointed out Mr. Knighton's

12    vehicle and you again identified Mr. Knighton after

13    police had pulled him out of the vehicle, what

14    happened with you?

15   A.  They took me to I guess one of the state

16    barracks by Buffalo.

17   Q.  Uh-huh?

18   A.  That's where they interviewed Steve.  That's

19    all I can remember.

20   Q.  After they took you to the state police

21    barracks by Buffalo, did you go any place else?

22   A.  Yeah.  Then they took me back to Syracuse.

23   Q.  What happened in Syracuse?

24   A.  They booked me.

25   Q.  When you say they booked you, what do you mean?

1    A.   I got arrested and charged for the drugs.

2    Q.   And you went to the judge?

3    A.   Yeah.

4    Q.   And he asked you -- did he arraign you on the

5    charges?

6    A.   Yes.

7    Q.   So, those are the charges that you pled guilty

8    to?

9    A.   Yes.

10   Q.   Those are the charges you're doing the ten-year

11   sentence for?

12   A.   Yes.

13   Q.   Can we have -- Miss Prawel, can we have

14   Government's Exhibit 1.16 on the screen?

15          THE CLERK:   In evidence?

16          MR. DUSZKIEWICZ:   Yes, I'm sorry.

17   BY MR. DUSZKIEWICZ:

18   Q.   Mr. Valerio, do you see the image that's

19   depicted on the -- on the screen?

20   A.   Yes.

21   Q.   Okay.  What do you -- what do you recognize

22   that image to be?

23   A.   The three kilos of cocaine.

24   Q.   Okay.  And is it located in relation to

25   anything that you're familiar with?

1    A.   Yes.   The dashboard of the Uplander.

2    Q.   Okay.   And is that the hydraulic trap that you

3    were talking about?

4    A.   Yes.

5    Q.   Okay.   May we have 1.9?

6         Mr. Valerio, do you see what's depicted in that

7    image on the screen?

8    A.   Yes.

9    Q.   And where is that -- the image that's depicted

10   there, where is that in relation to your vehicle?

11   A.   That's the back area of the Uplander.

12   Q.   And that's a little compartment door there?

13   A.   Yes.

14   Q.   Okay.   What's inside the compartment door?

15   A.   Three kilos of cocaine there.

16   Q.   You can see three kilos in the photograph?

17   A.   Yeah.

18   Q.   How many kilos were actually in that

19   compartment?

20   A.   Four.

21   Q.   Now, you indicated that in addition to this

22   Uplander, that you had a BMW that also had a trap?

23   A.   Yes.

24   Q.   Okay.   Have you had occasion to see a video

25   displaying that BMW and its trap compartment?

1  A.   Yes.

2         MR. DUSZKIEWICZ:  Judge, I'm going to

3  offer what's been marked Government's Exhibit 2,

4  and ask if Mr. Valerio can identify what's depicted

5  therein and move it into evidence as well.

6         THE COURT:  Okay.

7         MR. MUSITANO:  I have no objection, Judge.

8         THE COURT:  All right.  To its

9  admissibility?

10        MR. MUSITANO:  Absolutely.

11        THE COURT:  All right.  Two can be

12  received.  You want to play that?

13        MR. DUSZKIEWICZ:  Yes, Judge.  It's about

14  five seconds.

15             (Government's Exhibit 2 was received into

16             evidence.)

17        THE COURT:  While you're doing that, when

18  you refer to an Uplander, is that a minivan or a

19  SUV?

20        THE WITNESS:  It's a minivan.

21        THE COURT:  Thank you.  This is now in

22  evidence.

23             (The above-referenced video recording was

24             played for the jury.)

25  BY MR. DUSZKIEWICZ:

1    Q.   Mr. Valerio, do you recognize what is shown in

2    that particular video?

3    A.   Yes.

4    Q.   What do you recognize that to be?

5    A.   The black BMW.

6    Q.   Okaying.  And the individual that was in the

7    vehicle was making some -- doing some activity with

8    a switch under the console and the switch for the

9    back window?

10    A.   Yes.

11    Q.   Okay.  Is that a sequence that opened that

12    trap?

13    A.   Yes.

14    Q.   Is that the trapped vehicle that you sold to

15    Steven Knighton?

16    A.   Yes.

17    Q.   How much could be held in that particular trap?

18    A.   The most maybe like 10 to 12, depending how the

19    kilograms are packaged.

20    Q.   Okay.  And you'd used that vehicle for a while?

21    A.   Yes.

22    Q.   And Mr. Knighton wanted it from you?

23    A.   Yes.

24    THE COURT:  Now, when you say 10 to 12,

25    you're talking about 10 to 12 kilos?

1          THE WITNESS:  Yes.

2          THE COURT:  How many pounds to a kilo?

3          THE WITNESS:  2.2.

4          THE COURT:  Okay.  Thank you.

5    BY MR. DUSZKIEWICZ:

6    Q.  A kilo is a term of art in the -- in the drug

7    business, is it not?

8    A.  Yes.

9    Q.  It's a metric weight for 2.2 pounds?

10   A.  Yes.

11   Q.  Just to be clear, could we have Government's

12   Exhibit 1.1 on the screen in evidence?

13       Mr. Valerio, do you see the vehicle that's

14   depicted in the middle of that photograph 1.1?

15   A.  Yes.

16   Q.  Do you recognize that vehicle?

17   A.  Yes.

18   Q.  What -- what do you recognize that vehicle to

19   be?

20   A.  The Chevy Uplander.

21   Q.  That's the vehicle you were driving that day,

22   that is, on March the 13th, 2009?

23   A.  Yes.

24   Q.  The sequence that the person in the video used

25   to open the trap compartment in the BMW, did you

1    provide that sequence to anyone?

2    A.   Yes.

3    Q.   Whom did you provide it to?

4    A.   To Clint Calloway.

5    Q.   When did you provide it to him?

6    A.   2012.

7    Q.   Okay.  What were the circumstances under which

8    you provided it to him?

9    A.   I was incarcerated in Massachusetts at the

10   time.

11   Q.   And did you meet with Investigator Calloway?

12   A.   Not that -- not -- not specifically for -- I

13   met him prior to this when -- before he got the

14   BMW.

15   Q.   Okay.  And did you talk to him on the phone?

16   A.   Yes.

17   Q.   Okay.  And in the context of that phone

18   conversation, did you tell him how the trap could

19   be opened?

20   A.   Yes.

21            THE COURT:  Do you remember what the

22   sequence was?

23            THE WITNESS:  Of the BMW?

24            THE COURT:  Yes.

25            THE WITNESS:  Yes.

1          THE COURT:  What was it?

2          THE WITNESS:  Once you go in the car,

3     there is a switch in the bottom of the steering

4     wheel, and it takes some time to really fiddle with

5     your finger unless you know it's there.  In order

6     for the trap to work, you got to hit the switch

7     towards you.  And once you hit the switch towards

8     you, then you use the back window on the left-hand

9     side back window, you hit the button and then it

10    starts coming up.  And if you don't want it to move

11    at all, that's when you go back into the switch and

12    hit the switch towards the windshield, towards the

13    dashboard.  Then the car act normal.  The windows

14    will go up and down like nothing happened.

15         THE COURT:  But it wouldn't affect the

16    back seat?

17         THE WITNESS:  No.

18         THE COURT:  Okay.  Thank you.

19   BY MR. DUSZKIEWICZ:

20   Q.  In addition to the transactions that you were

21   talking about going back or starting sometime after

22   you reacquainted yourself with Mr. Knighton in

23   Niagara Falls, did you see him at other places?

24   A.  Repeat that question, please.

25   Q.  After you reacquainted yourself, when you say

1  he came up to you in a parking lot in 2007, other

2  than these transactions that you were talking

3  about, did you see him anyplace else?

4  A.  As far as to do business or casual time?

5  Q.  Casually or to do business.  Besides you

6  driving up here with product, driving back with

7  money.

8  A.  No, I would go to his house.  We would go out

9  to nightclubs and stuff like that.

10  Q.  Okay.  Was that the quick turnaround that you

11  were talking about the reason you used the mall, or

12  were those trips unrelated?

13  A.  It was both, business and unrelated.

14  Q.  Okay.  Where did you see him for nightclubs, et

15  cetera?

16  A.  He either would come to New York, or I go up to

17  Buffalo.

18  Q.  Ever have any problem with getting the right

19  amount of payment as far as Mr. Knighton is

20  concerned?

21  A.  Periodically it happens.

22  Q.  What happens?

23  A.  Maybe all the money's not there at the time,

24  and I probably got to leave, so I just leave and

25  make sure when I come back he probably has it.

1    Q.   Okay.  This is when you come to pick up a

2    certain amount of money?

3    A.   Yes.

4    Q.   So there wasn't enough money to make up the

5    order?

6    A.   Right.

7    Q.   Okay.  What about when you're being paid.  Is

8    there ever any problems with getting paid?

9    A.   No.

10   Q.   How was the money packaged when you would

11   receive it?

12   A.   Usually would be vacuum sealed.

13   Q.   Okay.  Why would that be?

14   A.   You know, disguise the smell of money and to,

15   you know, to be able to compress it real good, that

16   way I could put it away in the stash -- in the

17   concealment compartments and stuff like that.

18   Q.   So, I mean, it would come to you sort of sealed

19   in a bag?

20   A.   Yes.

21   Q.   Okay.  Was the count always correct?

22   A.   Most of the times.

23   Q.   Were there times that the count wasn't exactly

24   correct?

25   A.   Yes.

1    Q.   What would you do in those circumstances?

2    A.   I just informed him that it was short of money

3    and stuff like that.

4    Q.   And then what would happen?

5    A.   Then he would reimburse me whenever we meet up

6    again.

7    Q.   May I have 7.11?

8            THE CLERK:  In evidence?

9            MR. DUSZKIEWICZ:  Yes, I'm sorry.

10   BY MR. DUSZKIEWICZ:

11   Q.   Mr. Valerio, do you see what's depicted on the

12   screen as Government's Exhibit 7.11?

13   A.   Yes.

14   Q.   What do you see depicted on the screen?

15   A.   The package of money I usually get.

16   Q.   Okay.  Is that the manner in which Mr. Knighton

17   would package up the money as payment for

18   quantities of cocaine?

19   A.   Yes.

20   Q.   I mean, packaged similar to this manner?

21   A.   Yes.

22           MR. DUSZKIEWICZ:  Can I have a moment,

23   Judge?

24           THE COURT:  Certainly.

25           MR. DUSZKIEWICZ:  Thank you, Mr. Valerio.

1    I have nothing further.

2              THE COURT:  I'm not exactly sure what you

3    said, Mr. Duszkiewicz.

4              MR. DUSZKIEWICZ:  I'm sorry.  I said,

5    thank you, Mr. Valerio.  I have nothing further.

6              THE COURT:  Thank you.  Everybody okay?

7    Do you want a short break?  Short break?  Or you're

8    okay?

9              THE JURY:  We're good.

10             THE COURT:  Mr. Musitano,

11   cross-examination.

12       Mr. Valerio, you're doing okay?

13             THE WITNESS:  Yeah.

14             THE COURT:  Okay.

15   CROSS-EXAMINATION BY MR. MUSITANO:

16   Q.  Good afternoon, Mr. Valerio.

17   A.  Good afternoon.

18   Q.  You and I met previously than today, is that

19   correct, Mr. Valerio?

20   A.  Yes.

21   Q.  I came to see you yesterday at the Erie County

22   Holding Center, correct?

23   A.  Yes.

24   Q.  I gave you my business card?

25   A.  Yes.

1    Q.  Asked you if I could speak to you about this

2    case, correct?

3    A.  Yes.

4    Q.  And I also advised you that I had attempted to

5    contact your attorney, Mr. Dolan?

6    A.  Yes.

7    Q.  And he did not get back to me, correct?

8    A.  Yes.

9    Q.  And after I asked you if you would speak to me

10   about this case, you indicated that you would not

11   speak to me, is that correct?

12   A.  Yes.

13   Q.  Now, Mr. Duszkiewicz asked you if you were

14   presently incarcerated, do you remember that?

15   A.  Yes.

16   Q.  And you said you're incarcerated in

17   Massachusetts?

18   A.  Yes.

19   Q.  That's in a state prison there, correct?

20   A.  Yes.

21   Q.  You've been there since approximately August

22   the 21st, 2009, correct?

23   A.  Yes.

24   Q.  Okay.  And that's because you were arrested in

25   Massachusetts on August the 21st, 2009, correct?

1   A.   Yes.

2   Q.   And you were arrested in Massachusetts with

3   three kilograms of cocaine, correct?

4   A.   Yes.

5   Q.   And that was obviously after March 13th, 2009,

6   correct?

7   A.   Yes.

8   Q.   And that day you were arrested with seven kilos

9   of cocaine, is that correct?

10  A.   Yes.

11  Q.   Okay.  So just so that we understand with

12  respect to your sentences -- and we'll get to them

13  a little bit more in depth -- when you were

14  sentenced in Massachusetts, that was imposed on

15  you, or you were sentenced October 26, 2009,

16  correct?

17  A.   Repeat that again.

18  Q.   Sure.  You were first sentenced in

19  Massachusetts on October 26th, 2009, correct?

20  A.   Right.

21  Q.   That was for your arrest in Massachusetts in --

22  or strike that -- in August of 2009, correct?

23  A.   Correct.

24  Q.   And then after that sentence was imposed on you

25  in Massachusetts, you came to New York State,

1    correct?

2    A.   Yes.

3    Q.   And in New York State you were sentenced also

4    to ten years, correct?

5    A.   Yeah.

6    Q.   And that occurred on February the 22nd, 2011,

7    correct?

8    A.   Yes.

9    Q.   And that sentence was run concurrent with your

10   Massachusetts sentence, correct?

11   A.   Correct.

12   Q.   That's even -- even though you committed the

13   New York State crime first, correct?

14   A.   Right.

15   Q.   And then you committed the Massachusetts crime,

16   correct?

17   A.   Yes.

18   Q.   But before you were sentenced in New York State

19   on February 11th -- or strike that -- on

20   February 22nd, 2011, you had met with agents,

21   correct?

22   A.   Repeat that again.

23   Q.   Sure.  Before you were sentenced in February

24   of 2011, you met with agents at your Massachusetts

25   jail in November of 2010, correct?

1    A.   Yeah.  But not the current jail I'm in.

2    Q.   Okay.

3    A.   Okay.

4    Q.   But you met with agents before you were

5    sentenced in New York State, correct?

6    A.   Yes.  Yes.

7    Q.   In fact, one of the those agents you met with

8    is Investigator Calloway, correct?

9    A.   Yes.

10   Q.   He's seated here in the courtroom?

11   A.   Yes.

12   Q.   And you met with him and another agent from the

13   DEA by the name of Gene Nana, do you remember that

14   individual?

15   A.   Yes.

16   Q.   And you gave them information that day,

17   correct?

18   A.   Yes.

19   Q.   They took handwritten notes from you, correct?

20   A.   Yes.

21   Q.   Okay.  And then after that meeting in October,

22   about four -- strike that -- about a year and four

23   months later is when you get sentenced in New York

24   State, correct?

25   A.   Yes.

1    Q.   Okay.  And those sentences are to run

2    concurrent, at the same time, correct?

3    A.   Yes.

4    Q.   You're familiar with New York State law?

5    A.   Yes.

6    Q.   Okay.  And you knew with the A-1 felony

7    conviction that you were facing, you could get up

8    to 24 years, correct?

9    A.   Yes.

10   Q.   And it could also be sentenced and imposed

11   consecutive to your Massachusetts sentence,

12   correct?

13   A.   Yes.

14   Q.   But you didn't get that sentence, correct?

15   A.   Correct.

16   Q.   You got a concurrent sentence?

17   A.   Yes.

18   Q.   Which was imposed after you spoke to agents,

19   right?

20           MR. DUSZKIEWICZ:  Objection to the

21   suggestion the chronology has something to do with

22   it.

23           THE COURT:  Well, that may be your

24   interpretation.  I'm going to let the question

25   stand.  There was no answer to it, so it's just

1    dangling out there.  If you move to strike it, I'll

2    strike it.

3              MR. DUSZKIEWICZ:  I will, Judge.

4              THE COURT:  All right.  Disregard that

5    last question, ladies and gentlemen, because there

6    is not an answer to it.  And the questions are

7    never evidence.  It's just the answers of the

8    witnesses.

9    BY MR. MUSITANO:

10   Q.   So it's fair to say, Mr. Valerio, that you were

11   sentenced in New York State after you met with

12   Agent Calloway?

13   A.   Yes.

14   Q.   Now, you indicated to Mr. Duszkiewicz that

15   after you had traveled to the Walden Galleria

16   Mall -- do you remember that part of your direct

17   examination?

18   A.   Yes.

19   Q.   You traveled to the Walden Galleria Mall with

20   Investigator Davis, correct?

21   A.   Yes.

22   Q.   That's the individual you referred to as Doug,

23   is that correct?

24   A.   Doug Davis, yes.

25   Q.   Okay.  And there was also another investigator

1    in the vehicle?

2    A.   Yes.

3    Q.   By the name of Investigator Fox?

4    A.   I believe so.

5    Q.   And he was the driver, is that correct?

6    A.   I believe so.

7    Q.   Okay.  And Investigator Doug Davis was the

8    passenger sitting in the front, correct?

9    A.   I believe he was -- he might have been next to

10   me or the front.  I can't remember.  I can't

11   recall.

12   Q.   Sure.  Sure.  And then you indicated after you

13   were finished at the Walden Galleria Mall, you were

14   taken back to Syracuse, correct?

15   A.   Yes.

16   Q.   Okay.  And then you appeared in front of a

17   judge?

18   A.   Yes.

19   Q.   That was a town justice by the name of Justice

20   Carey?

21   A.   I believe so.

22   Q.   Okay.  And the judge remanded you in custody,

23   correct?

24   A.   Yes.

25   Q.   Because he couldn't set bail on you, correct?

1    A.   Right.

2    Q.   Because you had more than two prior drug felony

3    convictions, right?

4            MR. DUSZKIEWICZ:   Objection.   Your Honor.

5    That's not the only circumstance.   It's an improper

6    question.

7            MR. MUSITANO:   Judge, it's the

8    jurisdiction of the court.   It's limited by two

9    felony convictions or more.

10           MR. DUSZKIEWICZ:   It is, Judge, but also

11   the nature of the charge, a Class A felony, does

12   not merit bail in a local court.   It's a

13   misstatement, Judge.

14           THE COURT:   Okay.

15           MR. MUSITANO:   Judge, I'll rephrase the

16   question.

17           THE COURT:   Please.

18   BY MR. MUSITANO:

19   Q.   One of the reasons the judge couldn't set bail

20   on you was because you were charged with an A-1

21   felony, correct?

22   A.   I don't recall him telling me that.

23   Q.   Okay.   Another reason is because you did have

24   two felony convictions.   You knew that though,

25   right?

1   A.   He didn't mention that either.

2   Q.   And were you detained for a long period of

3   time?  In Syracuse?

4   A.   As far as?

5   Q.   Well, let me ask you this.  After that first

6   appearance on March the 13th, did you reappear

7   again in court?

8   A.   No.  No, I think my attorney did.  I can't

9   remember.

10  Q.   Did you reappear in court on March 20th, 2009?

11  A.   March 20th.

12  Q.   A week after you were arrested, you appeared in

13  another court in Syracuse, correct?

14  A.   I can't remember that day.

15  Q.   Sure.  And you -- but you remember being

16  released that day, correct?

17  A.   On March 9th?

18  Q.   March 20th.

19  A.   March 20th?

20  Q.   Yes.

21  A.   I guess so, yeah.

22  Q.   Okay.  Because you not only were released, but

23  you were given your Uplander to drive back,

24  correct?

25  A.   Correct.

1    Q.   And you were also given four telephones,

2    correct?

3    A.   Correct.

4    Q.   Okay.   And then you went back to the Bronx,

5    correct?

6    A.   Correct.

7    Q.   And were you living in the Bronx at that point

8    in time, in March of 2009, or were you living in

9    Massachusetts?

10   A.   I was both.

11   Q.   So you were living both in Massachusetts and

12   both in the Bronx, New York?

13   A.   Yes.

14   Q.   And after you left Syracuse on March the 20th,

15   you had met previously with Investigator Davis,

16   correct?

17   A.   Yes.

18   Q.   And you had agreed, you told Mr. Duszkiewicz,

19   to cooperate with him, correct?

20   A.   Yes.

21   Q.   And after you were released on March the 20th,

22   you were still cooperating with Investigator Davis,

23   correct?

24   A.   Correct.

25   Q.   And did Investigator Davis give you permission

1    to continue selling drugs?

2    A.   No.

3    Q.   Did he tell you you had to stop selling drugs?

4    A.   Yes.

5    Q.   Did he tell you you had to lead a law-abiding

6    life?

7    A.   Yes.

8    Q.   Okay.  But you didn't do that, did you?

9    A.   No.

10   Q.   You went right back and continued selling

11   drugs, correct?

12   A.   Yes.

13   Q.   And that's what led to your arrest in

14   Massachusetts, correct?

15   A.   Yes.

16   Q.   Now, while you were up here on March the

17   13th, 2009, you were on parole, is that correct?

18   A.   Yes.

19   Q.   And when you're on parole, that comes at the

20   end of serving a certain amount of time in jail,

21   correct?

22   A.   Yes.

23   Q.   And when you're released on parole, you have to

24   meet -- strike that -- you appear in front of a

25   parole board, correct?

1    A.   Yes.

2    Q.   And at that point in time there is a

3    determination made to release you, correct?

4    A.   Yes.

5    Q.   And prior to being released, you have to go

6    over a whole set of conditions of your release,

7    correct?

8    A.   Yes.

9    Q.   You have to acknowledge receipt of those

10   conditions?

11   A.   Yes.

12   Q.   And you have to agree to abide by those

13   conditions, correct?

14   A.   Yes.

15   Q.   And some of those conditions, for example,

16   would include that if you have any police contact,

17   you have to immediately contact your parole

18   officer, correct?

19   A.   Correct.

20   Q.   And you're not allowed to travel outside the

21   jurisdiction of your area unless you get

22   permission, correct?

23   A.   Correct.

24   Q.   And you're also not allowed to conceal or carry

25   drugs, correct?

1    A.   Correct.

2    Q.   You're not allowed to possess drugs?

3    A.   Correct.

4    Q.   You're not allowed to use drugs?

5    A.   Correct.

6    Q.   You're not allowed to purchase drugs for the

7    purpose of selling drugs?

8    A.   Correct.

9    Q.   Those are also conditions, correct?

10   A.   Yes.

11   Q.   And, for example, you're also not allowed to

12   possess drug paraphernalia, correct?

13   A.   Correct.

14   Q.   And a vehicle with a trap door could be

15   considered drug paraphernalia, correct?

16           MR. DUSZKIEWICZ:  Objection.

17           THE COURT:  I'll permit the question.

18   Overruled.

19           MR. DUSZKIEWICZ:  Judge, it's factually

20   incorrect.  That's not the definition of drug

21   paraphernalia.

22           THE COURT:  It calls for a yes or no.  If

23   you want -- at this point, the question's probably

24   lost.  If there's a motion to strike, I'll strike

25   it.

1          MR. DUSZKIEWICZ:  Yes, Judge.

2          THE COURT:  All right.  Disregard the

3   question, ladies and gentlemen, because it's been

4   lost in translation.

5      Mr. Musitano, go ahead.

6          MR. MUSITANO:  Thank you.

7   BY MR. MUSITANO:

8   Q.  For example, you're not allowed to possess drug

9   paraphernalia, correct, as another condition?

10  A.  Correct.

11  Q.  A vehicle with a trap door or a trap

12  compartment utilized for transporting drugs could

13  be considered drug paraphernalia, correct?

14  A.  I'm not sure.

15  Q.  Okay.  Well, while you were on parole, did you

16  possess your BMW, sir?

17  A.  Did I possess?

18  Q.  Let me rephrase the question.  While you were

19  on parole, you possessed your BMW, correct?

20  A.  If I had a BMW, yes.

21  Q.  The one with the trap?

22  A.  Yes.

23  Q.  Okay.  Did you tell your parole officer that

24  the vehicle you were driving had a trap for

25  transporting cocaine in it?

1    A.   No.

2    Q.   Would that have been a violation of your

3    parole?

4    A.   I'm not sure.

5    Q.   Did you tell him?

6    A.   No.

7    Q.   Why didn't you tell him?

8    A.   I ain't seen no reason to.

9    Q.   You didn't see any reason to conceal -- strike

10   that -- to disclose to your parole officers that

11   you had a vehicle that could be used to transport

12   drugs, right?

13          MR. DUSZKIEWICZ:   Objection, your Honor.

14   He said he doesn't know if that constitutes drug

15   paraphernalia.   That's the preface for these

16   questions.

17          THE COURT:   Well, yeah, but it went beyond

18   that.   I'll let the questions and answers stand.

19   The jury may consider if they choose to do that.

20   BY MR. MUSITANO:

21   Q.   Now, when you were traveling up to Syracuse on

22   March the 13th, 2009, according to your testimony,

23   you indicated that you had just become reacquainted

24   with Mr. Knighton, is that correct?

25   A.   Yes.

1   Q.  And that's because you had been incarcerated,

2   correct?

3   A.  Yes.

4   Q.  You had been incarcerated starting sometime in

5   about October of 1997, correct?

6   A.  Yes.

7   Q.  And that's because you were convicted of

8   transporting eight kilos of cocaine up the New York

9   State Thruway, correct?

10   A.  Yes.

11   Q.  And you were sentenced to 25 years to life,

12   correct?

13   A.  Yes.

14   Q.  And then your sentence was reduced because of

15   the change in the Rockefeller drug laws, correct?

16   A.  Yes.

17   Q.  And you were released earlier, correct?

18   A.  Yes.

19   Q.  And when you were released from -- from prison,

20   you were still on parole, correct?

21   A.  Correct.

22   Q.  And while you were on parole, you continued to

23   deal drugs, is that correct?

24         MR. DUSZKIEWICZ:  Judge, this has all been

25   asked and answered.

1           THE COURT:  Yeah, it has been.  Sustained.

2           MR. DUSZKIEWICZ:  Thank you.

3           MR. MUSITANO:  When you were arrested in

4   March of 2009, one of the conditions of your parole

5   was to notify your parole officer of police

6   contact, right?

7           MR. DUSZKIEWICZ:  Judge, again, this has

8   all been asked and answered.

9           THE COURT:  Where are you going with this,

10  Mr. Musitano?

11          MR. MUSITANO:  Judge, another condition,

12  one of the conditions of --

13          THE COURT:  Well, go right to it.

14          MR. MUSITANO:  I did.  One of your

15  conditions was to report police contact to your

16  parole officer, correct?

17          MR. DUSZKIEWICZ:  Asked and answered,

18  Judge.

19          THE COURT:  Sustained.

20  BY MR. MUSITANO:

21  Q.  When you got back to the Bronx on or about

22  March 20th, 2009, was your parole revoked?

23  A.  No.

24  Q.  Did your parole officer know you were arrested?

25  A.  Yes.

1   Q.   You told him you were arrested?

2   A.   Yes.

3   Q.   Okay.  And he didn't revoke your parole --

4   A.   No.

5   Q.   -- is that your testimony?  Now you indicated

6   to Mr. Duszkiewicz that you originally met

7   Mr. Knighton in 1987, correct?

8   A.   Around that time frame.

9   Q.   And then eventually, you indicated to

10  Mr. Duszkiewicz, that you had a relationship with

11  Mr. Knighton, correct?

12  A.   Yes.

13  Q.   Started sometime in around 1990 or so?

14  A.   Um-hum.

15  Q.   Is that a yes?

16  A.   Yes.

17  Q.   I believe at that time you told Mr. Duszkiewicz

18  you started selling small amounts?

19  A.   Yes.

20  Q.   And again, and that was in 1990?

21  A.   Around -- got to be around that time frame.  I

22  went up there in 1987, so I figured a year or two

23  from there when I started meeting anybody.

24  Q.   And then 1990 was the first time you were

25  arrested for drugs, correct?

1    A.   As a juvenile, I think.

2    Q.   Do you remember in 1991 you were placed on five

3    years' probation?

4    A.   Oh, yes.   Yes.

5    Q.   And again, when you're on probation, like

6    parole, there is conditions of your release,

7    correct?

8    A.   Yes.

9    Q.   Conditions that you had to abide by?

10   A.   Yes.

11   Q.   Conditions like reporting to your probation

12   officer?

13   A.   Yes.

14   Q.   Conditions of leading a law-abiding life?

15   A.   Yes.

16           MR. DUSZKIEWICZ:   Judge, I'm going to

17   stipulate, if I can, that Mr. Valerio went back to

18   the drug business.   He's testified to that.

19           THE COURT:   Yes, a number of times.   Let's

20   move on.

21           MR. MUSITANO:   Sure.

22   BY MR. MUSITANO:

23   Q.   And then that probation sentence was revoked in

24   1991, right?

25   A.   Yes.

1    Q.  Because you sold drugs again?

2          MR. DUSZKIEWICZ:  Judge, again, we're in

3    the asked-and-answered ballpark.  He's indicated he

4    went back to selling drugs, whether on parole or

5    probation.

6          THE COURT:  Sustained.

7    BY MR. MUSITANO:

8    Q.  Well, when you're selling drugs, Mr. Valerio,

9    whether you started in 1990 all the way 2009, do

10   you tell people "I'm a drug dealer"?

11   A.  Repeat that again.

12   Q.  Sure.  When you're selling drugs like

13   Mr. Duszkiewicz just stipulated to, that you're a

14   drug dealer, do you tell people that you sell

15   drugs?

16   A.  Only the associates that I deal with?

17   Q.  Do you tell the public William Valerio has

18   cocaine for sale?

19   A.  No.

20   Q.  Why not?

21   A.  Because some things you just don't do in

22   public.

23   Q.  Because you might get arrested?

24   A.  I don't think you get arrested for saying that.

25   Q.  You get arrested if you sold it?

1    A.   Definitely.

2    Q.   Okay.  So, when you're selling drugs, you have

3    to kind of conceal what you're doing, right?

4    A.   Yes.

5    Q.   Okay.  So, for example, you told

6    Mr. Duszkiewicz you had the Uplander that had a

7    trap, right?

8    A.   Yes.

9    Q.   You're concealing drugs?

10   A.   Yes.

11   Q.   From the public?

12   A.   Yes.

13   Q.   From the police?

14   A.   Yes.

15   Q.   You don't put it in your compartment right

16   beside you, right?

17   A.   No.

18   Q.   Okay.  Or you hide it in the back where your

19   jack is, and you have to unscrew something to put

20   the cocaine in, and then you can cover it to hide

21   it, right?

22   A.   Yes.

23   Q.   Okay.  You also told us that you had that 1995

24   BMW?

25   A.   Yes.

1   Q.   Those are the types of vehicles you use when

2   you buy and sell drugs, correct?

3   A.   Yes.

4   Q.   That's what you were using when you were

5   involved in the drug business over the two decades

6   you were involved, correct?

7   A.   With the BMW?

8   Q.   No.  With vehicles that you were using.  You

9   were using vehicles with traps in them, right?

10  A.   Yes.

11  Q.   Because you don't want anybody to see what

12  you're doing?

13  A.   Right.

14  Q.   You don't want anybody to see what you have?

15  A.   Yes.

16  Q.   Okay.  So do other people that were involved in

17  the drug business have vehicles with traps in them?

18  A.   Yes.

19  Q.   And they use those vehicles with traps in them

20  to conceal drugs?

21       MR. DUSZKIEWICZ:  Judge, I take it we have

22  qualified Mr. Valerio as an expert drug dealer so

23  Mr. Musitano can ask him what the general manner in

24  which drug dealers involved themselves in.  I take

25  it that's where it's going.  I'm going to object to

1     this line of questions.

2              THE COURT:  All right.  Put your next

3     question, Mr. Musitano.

4   BY MR. MUSITANO:

5     Q.  So when people are involved in the drug

6     business, they use these vehicles with trap doors,

7     correct?

8     A.  Yes.

9     Q.  Now, you told Mr. Duszkiewicz you were aware of

10    Mr. Knighton's SUV that he had just purchased, do

11    you remember that?

12    A.  Yes.

13    Q.  Do you remember what kind of an SUV it was?

14    A.  Yeah, Tahoe.

15    Q.  Okay.  Do you know if that Tahoe that you had

16    seen previously, if it had a trap in it?

17    A.  No.

18    Q.  There was no trap in it?

19    A.  Not that I know of.

20    Q.  You said you talked to Mr. Knighton all the

21    time, right?

22    A.  Yeah.

23    Q.  Was there a trap in that vehicle after you had

24    discussions with Mr. Knighton?

25    A.  No.

1    Q.   Just a plain-Jane vehicle, right?

2    A.   He just got it from the dealership.

3    Q.   Okay.  When did he get it from the dealership?

4    A.   Maybe a like a week, you know, a week before I

5    met with him, maybe.  Fairly new.  Hardly a week.

6    I'm not sure.

7    Q.   So he came to meet you on March the 13th, 2009,

8    with a new vehicle and not with a 1995 BMW that had

9    traps in it, is that your testimony?

10   A.   Yes.

11   Q.   Okay.  Now, Mr. Valerio, you were -- as you

12   indicated, you were in prison in New York -- strike

13   that -- in Massachusetts serving your sentence,

14   correct?

15   A.   Yes.

16   Q.   You were brought into the Western District of

17   New York in November of this year, correct?

18   A.   Yes.

19   Q.   And you were originally housed at Niagara

20   County Jail?

21   A.   Yeah, they brought me there, yes.

22   Q.   When you say "they," who brought you there?

23   A.   U.S. Marshals.

24   Q.   Did the U.S. Marshals serve you with a

25   subpoena?

1    A.   Not that I know of.

2    Q.   Did they have a writ to bring you are here into

3    court?

4    A.   Not that I know of.

5    Q.   Did you call them up to come and pick you up so

6    you could come here and testify?

7    A.   No.

8    Q.   So did you know you were coming here on

9    November the 13th, 2014?

10   A.   Well, my lawyer informed me that they had spoke

11   to him.

12   Q.   Okay.  And when you say "they spoke to him," do

13   you know who spoke to him?

14   A.   No.

15   Q.   And that's Mr. Dolan, your lawyer, correct?

16   A.   Yes.

17   Q.   Okay.  And then you came here, and you were at

18   Niagara County from November 13th to the 17th,

19   correct?

20   A.   Yes.

21   Q.   And in that time frame, those four days,

22   November the 13th to November the 17th, did you

23   speak to anyone from law enforcement?

24   A.   Besides the deputies, no.  No law enforcement.

25   Q.   Okay.  Did you, for example, the investigators

1    in the courtroom today?

2    A.   No.

3    Q.   Anybody from DEA?

4    A.   No.

5    Q.   From Mr. Duszkiewicz?

6    A.   No.

7    Q.   From Mr. Duszkiewicz's office?

8    A.   No.

9    Q.   And then you were transported to Niagara --

10   strike that -- to the Erie County Holding Center,

11   correct?

12   A.   Yes.

13   Q.   And that's where you and I met yesterday?

14   A.   Yes.

15   Q.   While you were there, up until yesterday, did

16   anybody come to the jail to visit you?

17   A.   When?

18   Q.   At the Erie County?

19   A.   No.

20   Q.   So from November the 17th until yesterday, no

21   one came to see you at the Erie County Holding

22   Center, either investigators, DEA agents,

23   Mr. Duszkiewicz, or anyone?

24   A.   No.

25   Q.   Okay.  Now, in --

1          MR. MUSITANO:  Judge, may we take a

2     ten-minute break, please?

3          THE COURT:  Sure.  Okay.  We will go for

4     about 15 minutes break-wise, and then we will come

5     back, and we'll go until approximately quarter to

6     five, 5:00 o'clock, right in that vicinity, and

7     we'll get you out.

8        You've been great.  Please don't discuss the

9     case.  Make sure you come back, and we'll see you

10     in about 15 minutes, okay?

11          (Jury excused from the courtroom.)

12          THE COURT:  Okay.  We'll see you in about

13     15.

14          (Short recess was taken.)

15          (Jury seated.)

16          THE COURT:  Welcome back, ladies and

17     gentlemen.  Have a seat, please.

18        Okay.  The attorneys and parties are back,

19     present.  Our is jury is back, of course, roll call

20     waived.  Thank you very much for your efforts.  We

21     really appreciate that.  And again, this is the

22     case of United States versus Steven A. Knighton.

23     And we have on the stand still, for

24     cross-examination purposes, William Valerio.  And

25     he's on cross-examination by Mr. Musitano.

1        Mr. Musitano, you may resume.

2            MR. MUSITANO:  Thank you, Judge.

3    BY MR. MUSITANO:

4    Q.  Mr. Valerio, when we broke I had asked you

5    whether you had been visited by anyone from law

6    enforcement or the United States Attorney's office

7    while you have been housed at the Erie County

8    Holding Center.  Do you remember that question?

9    A.  Yes.

10   Q.  And you've been at the holding center since

11   November the 17th, 2014, up until today, correct?

12   A.  Yes.

13   Q.  Okay.  Now, prior to today, the first time you

14   had contact in this case was March 13th, 2009,

15   correct?

16   A.  Repeat that again.

17   Q.  Sure.  The first time you had contact with law

18   enforcement in this case was in March 2009,

19   correct?

20   A.  Yes.

21   Q.  And that was contact you had with Investigator

22   Doug Davis, correct?

23   A.  Yes.

24   Q.  At that point in time, you told

25   Mr. Duszkiewicz, you provided him with information

1    about this case, correct?

2    A.   Yes.

3    Q.   And did Investigator Doug Davis prepare any

4    statements for you to sign?

5    A.   No.

6    Q.   Okay.  Did he ask you to give a stenographic

7    statement under oath?

8    A.   What?

9    Q.   Did he ask you to give a statement that was

10   prepared by a stenographer --

11   A.   No.

12   Q.   -- like Miss McLaughlin here?

13   A.   No.

14   Q.   Did he ask you to sign any deposition, sworn

15   deposition about your activity in this case?

16   A.   No.

17   Q.   Okay.  So the only thing that you gave

18   Investigator Davis was the words that came out of

19   your mouth.  You didn't give him any writings with

20   the stuff you testified to today, correct?

21   A.   Yes.

22   Q.   Okay.  Is it fair to say that the second time

23   you had contact with law enforcement involved in

24   this case would have been November 9, 2010?

25   A.   November 9th.

1    Q.   2010, while you were being housed at a state

2    facility in Massachusetts?

3    A.   I can't recall.

4    Q.   Okay.  Well, let me ask you.

5             THE COURT:   What was the question again?

6    Is the only what?

7  BY MR. MUSITANO:

8    Q.   My question to him was:  The next time you had

9    contact with law enforcement, either New York State

10   Police or DEA, involving this case was on

11   November 9, 2010, is that correct?

12   A.   I know in 2010.  But I can't give you an exact

13   date.

14   Q.   Let me ask you this:  When you had that second

15   contact in 2010 you were in jail, correct?

16   A.   Yes.

17   Q.   That was in Massachusetts, correct?

18   A.   Yes.

19   Q.   Okay.  Between March 13th, 2009, and

20   November 9th, 2010, did you have contact with

21   either Investigator Doug Davis, Investigator

22   Calloway, Gene Nana from DEA, Mr. Duszkiewicz, or

23   anyone?

24   A.   I believe so.

25   Q.   When was that?

1    A.   In 2010.

2    Q.   Okay.   When -- where was it when you had this

3    other contact in 2010?

4    A.   In the county jail.

5    Q.   In Massachusetts?

6    A.   Yes.

7    Q.   Okay.   Between that contact you said in

8    Massachusetts and the one in Syracuse, did you have

9    any other contact with law enforcement between

10   those two dates, the date of March of 13th, 2009,

11   and the date of November 9, 2010?

12   A.   I don't understand the question.

13   Q.   Did you talk to Investigator Davis between

14   March 2009 and November 2010?

15   A.   Yes.

16   Q.   When did you talk to him?

17   A.   2009 and in 2010.

18   Q.   Okay.   Did you talk to him between those two

19   dates?

20   A.   Yes.

21   Q.   Okay.   How many times did you talk to him?

22   A.   Well, when I was -- when I was out I spoke to

23   him several times.

24   Q.   When you were out meaning when you were out --

25   A.   On bail.

1    Q.   Okay.  On bail from your arrest in Syracuse?

2    A.   Yes.

3    Q.   Okay.  How many times did you talk to

4    Investigator Davis?

5    A.   Maybe once a week.

6    Q.   Okay.  Did you talk to him in person?

7    A.   No.

8    Q.   Did you talk to him on the telephone?

9    A.   Yes.

10   Q.   Okay.  Did you talk about this case?

11   A.   Yes.

12   Q.   Okay.  Did Investigator Davis ever ask you to

13   sign any statements as a result of conversations

14   with you during that time period after you were

15   released on bail until your meeting with him in

16   November of 2010?

17             MR. DUSZKIEWICZ:  Judge, I'm going to

18   object.  It's asked and answered.  He said he's

19   never given a statement, a deposition, a

20   stenographic record, or anything.

21             THE COURT:  Yeah, that's a fair objection.

22   Sustained.

23   BY MR. MUSITANO:

24   Q.   When you were brought into the Western District

25   of New York -- again, we'll use the date of

1     November 13th, 2014 -- were you asked to appear

2     before a federal grand jury to testify?

3     A.   No.

4     Q.   Were you ever asked to appear anywhere to

5     testify?

6     A.   Usually call my lawyer.  I wasn't advised about

7     anything.

8     Q.   Did you appear anywhere other than here today

9     to give testimony about this case?

10    A.   No.

11    Q.   Okay.  Now, when you met with Investigator

12    Davis the day you were arrested, did you see him

13    taking any handwritten notes?

14    A.   Yes.

15    Q.   Okay.  When was he taking those handwritten

16    notes?

17    A.   During the time that we was traveling to

18    Buffalo.

19    Q.   Okay.  So while he's in the vehicle?

20    A.   Yes.

21    Q.   Talking to you?

22    A.   Yes.

23    Q.   You're talking to him, correct?

24    A.   Yes.

25    Q.   Other than that period of time when you're

1    driving from Syracuse to Buffalo, did you see him

2    take any handwritten notes?

3    A.   I can't recall.

4    Q.   After you returned to Syracuse and you were

5    arraigned in front of the judge, did you meet with

6    Investigator Davis then?

7    A.   Yes.

8    Q.   Okay.  Did you see him taking any notes?

9    A.   Yes.

10   Q.   So he took notes that day also?

11   A.   Yes.

12   Q.   Okay.  And you were in the Syracuse area for

13   seven days, correct?

14   A.   Yes.

15   Q.   Did you meet with Investigator Davis during

16   that seven-day period or so?

17   A.   Yes, I believe so.

18   Q.   And when you met with him, you were obviously

19   at the jail, correct?

20   A.   I think it was the day I got out, or I just --

21   I can't recall.  I can't remember exactly if it was

22   at the jail or in front of the jail.

23   Q.   Okay.  When you were in front of the jail, that

24   means you would been released?

25   A.   Yes.

1    Q.   When you met with him when you were released

2    from jail, you met with him in a parking lot?

3    A.   I think it was in front of the -- in front of

4    the facility.

5    Q.   In an office there?

6    A.   No, because we went to the state barracks after

7    that.

8    Q.   So you went to the state barracks from the

9    jail, you met with Investigator Davis, correct?

10   A.   Correct.

11   Q.   When you were talking to Investigator Davis,

12   you were talking about this case?

13   A.   Yes.

14   Q.   Was he taking notes that day?

15   A.   I can't recall.

16   Q.   Okay.  So the only notes you recall him taking

17   were the notes he took in the vehicle, correct?

18   A.   Right.

19   Q.   Did he -- and you didn't see him take any notes

20   after that, correct?

21   A.   I believe so.

22   Q.   You believe that he didn't take them, or you

23   believe he did take notes?

24   A.   I can't recall.  I don't want to answer that

25   question if I'm not a hundred percent sure.

1   Q.  So it's fair to say you don't know whether or

2   not he took any notes other than in the vehicle,

3   correct?

4   A.  Well, when he took me -- when I left Buffalo to

5   Syracuse, you know, I believe that he might have

6   took them, but I'm not sure.

7   Q.  Okay.  But that's on your drive back in the

8   vehicle, correct?

9   A.  Yeah, I believe so.

10   Q.  Okay.  Now, when you talked to Investigator

11   Davis on March the 13th, 2009, he was asking you

12   questions about your relationship with Steve

13   Knighton, correct?

14   A.  Yes.

15   Q.  Okay.  And isn't it true while you were driving

16   to Buffalo and afterwards you told Investigator

17   Davis that you were going to deliver one kilo of

18   cocaine to Steve Knighton?

19   A.  No.

20   Q.  You never said that to Investigator Davis?

21   A.  No.

22   Q.  Okay.  And isn't it true that you told

23   Investigator Davis that you were going to deliver

24   five kilos to Mr. Jones?

25   A.  No.

1    Q.   Okay.  Now you told us, and you told

2    Mr. Duszkiewicz on direct, that your relationship,

3    in essence, with Mr. Knighton was for about eight

4    months, is that correct?

5    A.   Eight, ten months.

6    Q.   Okay.  Now you told this honorable jury that

7    you were meeting with Mr. Knighton twice a week.

8    Do you remember saying that?

9    A.   Yes.

10   Q.   And at the time you were living in New York

11   City, so you would be driving up, correct?

12   A.   Yes.

13   Q.   Okay.  And you would be driving up -- strike

14   that.  While you were driving up, you were working,

15   correct?

16   A.   What you mean?

17   Q.   Sure.  You told Mr. Duszkiewicz that you were

18   working in the Bronx, do you remember saying that?

19   A.   Yes.

20   Q.   Okay.  And that you had to come up and kind of

21   turn around and go back?

22   A.   Right.

23   Q.   And you said you were coming up twice a week,

24   correct?

25   A.   Yes.

1    Q.  Because of work.

2    A.  That was the beginning of business when we

3    first started.

4    Q.  Where were you working?

5    A.  Construction.

6    Q.  Okay.  In 2008 you were working in

7    construction?

8    A.  Yes.

9    Q.  Okay.  And that was at the beginning?

10    A.  I met him in the fall of 2007, but when -- when

11    we started, you know, profiting more, I stopped

12    working, because obviously that's when I started

13    coming twice a week.

14    Q.  Okay.

15    A.  There was no need for me to work anymore.

16    Q.  So you stopped working at the legitimate job,

17    and you start working in this job, correct?

18    A.  Right.

19    Q.  Okay.  Now you also told this honorable jury

20    that after you got out of the business because you

21    were incarcerated, in order to get back in the

22    business, you had to get some money to reestablish

23    your relationship, correct?

24    A.  Yes.

25    Q.  And you told us that you didn't have any money

1    because you were incarcerated, and now you were

2    working in construction, correct?

3    A.   Right.

4    Q.   And you told us that Mr. Knighton gave you

5    $65,000 to get you started again, correct?

6    A.   Yes.

7    Q.   Now, when you talked to Investigator Davis on

8    March the 13th, 2009, did you tell him that?

9    A.   At that point, no.  He was just -- he was

10   focused on getting to Buffalo at that point.

11   Q.   So while you're driving there, you didn't tell

12   him, "The reason I got back in the business was

13   because that man gave me $65,000," you didn't tell

14   him that, right?

15   A.   Not at that point.

16   Q.   Okay.  And then you said that Mr. Knighton

17   would call you whenever you need -- whenever he

18   needed more work or products?

19   A.   Yes.

20   Q.   Okay.  And when he would call you, he would use

21   a telephone?

22   A.   Yes.

23   Q.   And your telephone was within an area code in

24   either New York or Massachusetts, depending where

25   you were living, correct?

1    A.   It wasn't an area code.   It was more like a

2    number code thing.

3    Q.   So he would call your number code, and you

4    would call his number code, correct?

5    A.   Yes.

6    Q.   You said these conversations went on for a

7    period of eight to ten months or so?

8    A.   Yes.

9    Q.   Did you ever see any phone records to confirm

10   those -- that phone contact between you and

11   Mr. Knighton for eight to ten months?

12   A.   Well, we usually don't use that type of phones

13   that they could record phone calls, you know, so --

14   we never used no landline-type phones so for the

15   purposes of not being tracked.

16   Q.   So, cellphones that you used, you have to pay

17   bills on those?

18   A.   No.

19   Q.   You don't pay bills on your cellphones?

20   A.   No.

21   Q.   Okay.   And you had four cellphones, correct?

22   A.   I believe so.

23   Q.   Okay.   Three of them, and then a Verizon phone,

24   correct?

25   A.   Yes.

1    Q.   And where are those phones today?

2    A.   I'm not sure.

3    Q.   Okay.  Well, you took them back with you to the

4    Bronx, correct, when you left Syracuse?

5    A.   Yes.

6    Q.   Because you asked the police to give them back

7    to you, correct?

8    A.   Yes.

9    Q.   They gave them back to you?

10   A.   Yes.

11   Q.   Did they ever dump, or take all the numbers out

12   of your phones, and show you those numbers and say,

13   "Who are these people here?"

14   A.   At one point they did, yeah.

15   Q.   Did you see it on writing, all the numbers that

16   they wrote down?

17   A.   I know talked about some numbers there.

18   Q.   When did he write those numbers down?

19   A.   I can't -- I can't tell you a specific date.

20   I'm not sure.

21   Q.   Well, you told us that he wrote numbers down,

22   correct?

23   A.   Yeah, but to give you a, you know, an actual

24   date from -- it's been a long time.

25   Q.   Sure.  Give this honorable jury an approximate

1    date when it was.

2    A.   March -- maybe March 15th, two days later, or

3    March 13th, I'm not -- it could have been the same

4    exact day that I got arrested or maybe after the

5    weekend, which is that Monday.  That Monday would

6    be the 15th, 16th, around there.

7    Q.   Okay.  Go ahead?

8    A.   That's what I could think of.

9    Q.   He showed you -- showed you a piece of paper

10   with numbers on them?

11   A.   Um-hum.

12   Q.   Is that yes?

13   A.   Yes.

14   Q.   You identified who those numbers were, correct?

15   A.   Yes.

16        MR. MUSITANO:  Judge, I'd ask for a copy

17   of that writing with all the numbers on it because

18   I haven't seen a copy of it.

19        THE COURT:  Okay.

20        MR. DUSZKIEWICZ:  I draw Mr. Musitano's

21   attention to Exhibit 16.  If he thinks he doesn't

22   have it, I'll give him another copy.

23        MR. MUSITANO:  I have 16, Judge.

24        THE COURT:  That's, I guess, what we're

25   talking about.

1          MR. MUSITANO:  Did you see -- if I could

2     just have one moment?

3          THE COURT:  Sure.  When you were talking

4     about phones that didn't have records, are you

5     talking about the beep phone?

6          THE WITNESS:  Yeah.

7          THE COURT:  That's different from a

8     cellphone?

9          THE WITNESS:  Yes.

10          THE COURT:  Okay.

11          MR. MUSITANO:  May I approach, Judge?

12          THE COURT:  Yes.

13   BY MR. MUSITANO:

14   Q.   Mr. Valerio, I'm showing you what's been

15   previously marked as Government Exhibit 16 for

16   identification purposes, and ask you, do you

17   recognize that document?

18   A.   Yes, sir.

19   Q.   What does that document purport to be?

20   A.   The numbers that I was speaking about.

21   Q.   Okay.  Those are -- but those are numbers you

22   provided him, correct?

23   A.   From the phone.  From the bleep phone.

24   Q.   That's the bleep phone you were checking

25   numbers for?

1    A.   Yeah, the ones that I was using for --

2    Q.   But they're not numbers Investigator Davis took

3    out of your phone, correct?

4    A.   Well, he had a -- he had a -- he the one to

5    make sure he looked at them, because I could have

6    been lying.  So he verified that those are the

7    numbers that I was telling him that was on the

8    phone.

9            THE COURT:  All right, Mr. Musitano --

10           MR. MUSITANO:  I apologize, Judge.

11           THE COURT:  Thank you.

12   BY MR. MUSITANO:

13   Q.   It's your testimony that you're giving him

14   numbers, then he took the phone from you and

15   verified the cell numbers, is that correct?

16   A.   Yes.

17   Q.   And this is in the car?

18   A.   I believe so.

19   Q.   Okay.  Now, when you're in the car with him --

20   or strike that -- in the police vehicle with him,

21   and you're having these conversations, you

22   indicated that you had conversations with Steve and

23   other people, correct?

24   A.   Yes.

25   Q.   Okay.  Now, you're telling him who you're

1    talking to, correct?

2    A.   He could hear me, but yeah, I'm telling him who

3    I'm talking to.

4    Q.   My question to you was:  You were telling him

5    who you were talking to, correct?

6    A.   Yes.

7    Q.   Okay.  Now you also told Mr. Duszkiewicz that

8    there were times while you were driving that you

9    would put the speaker on?

10   A.   Yes.

11   Q.   And the bleep phone has a speaker?

12   A.   Yes.

13   Q.   Okay.  And you're sure you would put that on

14   sometimes?

15   A.   Yes.

16   Q.   You never said to Investigator Davis, "I can't

17   put it on or it doesn't work?"

18   A.   I told him like when I was speakings to certain

19   dudes, like in the highway, especially in New York,

20   I usually never put it on speaker.  So not to get

21   them paranoid hear some echoing, every time they

22   used to call, I end up taking the speaker off it.

23   Q.   Every time who would call?

24   A.   Individuals from New York.

25   Q.   You were allowed to carry on conversations with

1    individuals in New York?

2    A.   Yes.

3    Q.   And, in fact, you made calls to individuals in

4    New York, correct?

5    A.   Yes.

6    Q.   You, in fact, made a call to your wife,

7    correct?

8    A.   Yes.

9    Q.   In fact, you asked your wife to call and

10   contact an attorney for you, right?

11   A.   Yeah.

12   Q.   Okay.  Now, when you're talking to these

13   people, you're talking in talking to them in

14   Spanish, correct?

15   A.   Yeah.

16   Q.   When you were talking to these individuals in

17   New York, you were talking to them in Spanish,

18   correct?

19   A.   Yes.

20   Q.   Did Investigator Davis, if you know, did he

21   speak Spanish?

22   A.   No.

23   Q.   Did the other investigators in the vehicle

24   speak Spanish?

25   A.   I know at one point -- I'm not sure if it was

1    when I was coming back or going, they had a

2    Spanish -- Spanish law enforcement agent in the

3    vehicle.  But I'm not sure if it was that -- if it

4    was going or coming, or another time frame.  I just

5    don't remember.  I remember having a Spanish -- or

6    they got him for that reason so they could be able

7    to understand what was coming -- you know, what

8    kind of conversations I was having.

9    Q.  So you don't know if the investigator -- strike

10   that -- the Spanish-speaking investigator was in

11   the vehicle when you were driving to Buffalo?

12   A.  Yeah, I'm not sure.  I'm not sure.

13   Q.  So you don't remember just Investigator Davis

14   and investigator -- and another investigator in the

15   front, and you in the back, and that's all?

16   A.  No, it was -- I believe it was three

17   investigate -- three law enforcement in the

18   vehicle.  I wasn't back there by myself, I know

19   that for sure.  They had somebody back there I

20   guess securing me, maybe they might think I might

21   jump out the car.

22   Q.  Sure.

23   A.  I believe it was three law enforcement agents

24   in there.

25   Q.  But as you sit there, you're not certain?

1    A.   About the three, yeah.  But as far as the

2    Spanish interpreter, I'm not sure.

3    Q.   Okay.  So when you just said that he might have

4    been in there, or that Spanish interpreter might

5    have been in the vehicle, you were guessing?

6    A.   Yeah, I can't recall.  Yeah.

7    Q.   Okay.  Now, Investigator Davis or the other

8    investigator didn't understand Spanish, isn't that

9    true?

10   A.   Yes.

11          MR. DUSZKIEWICZ:  Objection, your Honor.

12          THE COURT:  Grounds?

13          MR. DUSZKIEWICZ:  How would he know?

14          THE COURT:  If he knows.  Do you know?

15          MR. MUSITANO:  You answered yes, correct?

16          THE WITNESS:  Yes.

17          MR. DUSZKIEWICZ:  Again, I object to the

18   question and the answer.

19          THE COURT:  No.  You can inquire.

20          MR. DUSZKIEWICZ:  Thank you.

21          THE COURT:  The answer will stand.

22          MR. MUSITANO:  Now, they didn't understand

23   what you were saying, correct, when you were

24   talking in Spanish?

25          MR. DUSZKIEWICZ:  Objection, your Honor.

1          THE COURT:  Do you know?

2          THE WITNESS:  If they understood, no, I

3      don't know if they understood.

4          THE COURT:  Okay.

5    BY MR. MUSITANO:

6    Q.  Now you indicated to Mr. Duszkiewicz that your

7      phones or these bleep phones have memory cards?

8    A.  Yes.

9    Q.  Okay.  The phone that you were using on

10     March 13th, 2009, did that have a memory card?

11   A.  Yes.

12   Q.  Did -- if you know, did Investigator Davis take

13     your memory card out of the phone?

14   A.  I don't know.

15   Q.  Okay.  Did he give you your phone back?

16   A.  Yes.

17   Q.  Did it have the memory card in it?

18   A.  Yes.

19   Q.  Okay.  Now when you were in the car and you

20     were -- you told us that you were communicating

21     with Steve, you were using the bleep phone,

22     correct?

23   A.  Yes.

24   Q.  Okay.  And you were telling the agents you were

25     talking to Steve, correct?

1  A.  Yes.

2  Q.  You never let the agents hear Steve's

3  conversation, correct?

4  A.  I had it on speaker, so they would hear the

5  conversation.

6  Q.  So every time -- if I understand your

7  testimony, every time you would bleep Steve, you

8  would put it on speaker?

9  A.  Yes.

10  Q.  Okay.  So that they could hear his side of the

11  conversation, correct?

12  A.  Yes.

13  Q.  Okay.  And you told us earlier that you didn't

14  have the speaker on when you were talking to the

15  people in the Bronx, because you didn't want them

16  to think that there was something wrong, correct?

17  A.  Exactly.

18  Q.  So you didn't use it for the people in the

19  Bronx, but you used your speaker for Mr. Knighton?

20  A.  Yes.

21  Q.  Okay.  Now when you spoke to the agents, and

22  that would be Investigator Clinton Calloway, who's

23  in the courtroom today, correct?

24  A.  Yes.

25  Q.  Did you tell him when you were discussing --

1    let me back up for a minute.  When you met with

2    these agents, you also met with your attorney,

3    correct?

4    A.  Yes.

5    Q.  He was there, Mr. Dolan?

6    A.  Yes.

7    Q.  Okay.  And they weren't forcing you to give any

8    answer, correct?

9    A.  No.

10   Q.  They weren't threating you in any way?

11   A.  No.

12   Q.  You were comfortable when you were talking to

13   Investigator Calloway, correct?

14   A.  Yes.

15   Q.  And he was asking you questions about Steven

16   Knighton, correct?

17   A.  Yes.

18   Q.  And you started giving information, correct?

19   A.  Yes.

20   Q.  Okay.  Now, you didn't tell them that Steven

21   Knighton gave you $65,000 to get you started in

22   business, correct?

23   A.  I don't think they asked me that.

24   Q.  Did you offer that information to them?

25   A.  I don't -- I don't think so.  I don't remember.

1   Q.  Okay.  Well, it's a pretty significant event,

2   isn't it?

3          MR. DUSZKIEWICZ:  Objection, your Honor.

4   He says he doesn't recall if anyone asked, and he

5   said he didn't provide the information, regardless

6   of whether significant or not.  I object to the

7   form of the question, Judge.

8          THE COURT:  Are you saying it's

9   irrelevant?

10          MR. DUSZKIEWICZ:  Yes, Judge.

11          THE COURT:  Sustained.

12   BY MR. MUSITANO:

13   Q.  Now when you were testifying earlier, you said

14   that you were charging 38 to $40,000 per kilo,

15   correct?

16   A.  Yes.

17   Q.  Is that a yes?

18   A.  Yes.

19   Q.  Okay.  And you told this honorable jury you

20   were traveling with two kilos for Mr. Knighton,

21   correct?

22   A.  Yes.

23   Q.  You didn't tell them one kilo, like you told

24   Investigator Davis, correct?

25   A.  I told Davis that he had paid -- he had paid

1    for one of the kilos, that's what I told him.

2    Q.  You told Investigator Davis he had paid for one

3    of the kilos.

4    A.  One of the kilos was already being paid for.

5    Q.  I'm sorry, I didn't hear your --

6    A.  One -- out of the two kilos, one of them was

7    paid for.

8    Q.  Okay.  So that was 41,000 for one kilo?

9    A.  Yes.

10   Q.  Okay.  So I thought you said that you were

11   delivering two kilos to Mr. Knighton, and you were

12   going to pick up $41,000.

13   A.  Yeah.

14   Q.  And that's 41,000 for two kilos.

15   A.  No, that was only for one.

16   Q.  Okay.  Well, wasn't it your testimony that he

17   was going to pay 41 for two?

18   A.  No.  I said I was charging for each -- at that

19   point I was charging from 40 to 42, around there.

20   Q.  Okay.  So he was going to get two kilos, but

21   only give you $41,000?

22   A.  Yeah.

23   Q.  Was one kilo for free?

24   A.  No.

25   Q.  Was one kilo going to be paid for later?

1    A.   Yes.

2    Q.   Did you tell Investigator Calloway that one was

3    given to Mr. Knighton free -- to be paid for in the

4    future?

5    A.   I just told him he was getting two kilos.

6    Q.   That's what you told Investigator Davis

7    March 19th?

8    A.   No, I told --

9           MR. DUSZKIEWICZ:   The question was

10   Calloway, Judge.   I'm sorry, did we shift questions

11   here or investigators?

12          THE COURT:   To the form of the question,

13   sustained.   Reput the question, please.

14   BY MR. MUSITANO:

15   Q.   On March 13th, 2009, you told Investigator

16   Davis you were going to deliver two kilos of

17   cocaine to Mr. Knighton, is that your testimony?

18   A.   Yeah, and I told him that Steve Knighton had

19   41,000 for the one kilo that he was going to pay

20   for.

21   Q.   That was while you were driving up there?

22   A.   Yeah.

23   Q.   Okay.   Did you tell him that you were going to

24   front him one kilo?

25   A.   I don't think so.   I don't recall.

1    Q.  Did you tell him you were going to give him one

2    on consignment?

3    A.  I don't recall that neither.

4    Q.  So you were going to give Mr. Knighton an extra

5    free kilo?

6    A.  No.

7    Q.  When did he pay for that other kilo?

8    A.  Well, I got arrested, so he ain't have to pay

9    for it.

10   Q.  So were you going to give him two kilos and

11   only take money for one?

12   A.  Yes.

13   Q.  And then he was going to have a balance?

14   A.  Yes.

15   Q.  Of 41?

16   A.  Yes.

17   Q.  And that's the information you gave to

18   Investigator Davis on March 13th, 2009?  Is it your

19   testimony?

20   A.  What I told Davis was that Steve Knighton was

21   getting two kilos.  And that Steve Knighton have

22   money for the one kilo, you know, so Steve Knighton

23   was going to have money on him.

24   Q.  And you specifically said 41,000?

25   A.  I believe so.  Forty-one, forty-two, you know,

1    around there.

2    Q.   Sure.   And then you indicated you spoke to

3    Investigator Calloway in November of 2010, correct?

4    A.   Yes.

5    Q.   Did you also tell him you were going to give

6    two kilos to Steve Knighton on March 13, 2009?

7    A.   I believe so.

8    Q.   Okay.   Well, when you say you believe, you're

9    not certain?

10   A.   Yeah.   Yeah, two kilos.   I never changed that

11   fact.

12   Q.   Okay.   Now in around September of 2013 you

13   spoke to a lady by the name of Jackie Belakowski,

14   correct?

15   A.   Yes.

16   Q.   I'm sorry?

17   A.   Yes.

18   Q.   And that was while you were in jail, correct?

19   A.   Yes.

20   Q.   And Miss Belakowski was working for a defense

21   attorney at that time, correct?

22   A.   Yes.

23   Q.   Who was representing Mr. Knighton at the time,

24   correct?

25   A.   Yes.

1    Q.  And Miss Belakowski was asking you questions

2    about this incident, isn't that true?

3    A.  Yes.

4    Q.  And isn't it true that you told Miss Belakowski

5    in September of 2013 that the police asked you to

6    put your speaker on your bleep phone?

7                MR. DUSZKIEWICZ:  Judge, I'm going to

8    object if we're trying to cross-examine

9    Mr. Knighton [sic] based on some notes or chicken

10   scratchings from some defendant's investigator.

11   It's clearly not a proper form of

12   cross-examination.  There's no indication that

13   Mr. Valerio has adopted in any way, shape, or form

14   any notes conducted or interview conducted by

15   someone else.  It's not his statement.

16                MR. MUSITANO:  Judge, with all due

17   respect, when a person makes a statement to a third

18   party, and that third party records it or makes

19   note of it, and as long as you provide the person

20   who gave the statement with a notice of the time,

21   place, and date when they gave the statement, and

22   the person denies making a statement, you can call

23   a third party in, Judge.

24                MR. DUSZKIEWICZ:  Judge, that's fine.

25   That's not a statement, Judge.

1          THE COURT:  That's exactly right.

2     Sustained.

3          MR. MUSITANO:  It's an oral statement that

4     comes out of his mouth, Judge.  That's the

5     statement.  Whether it's written or not, adopted or

6     not --

7          MR. DUSZKIEWICZ:  Judge, a statement is

8     defined, and this is not a statement.

9          THE COURT:  All right.  That is not a

10    statement.  I agree with the prosecutor.

11    Sustained.

12         MR. MUSITANO:  I would note my objection,

13    Judge.

14         THE COURT:  Okay.

15         MR. MUSITANO:  Isn't it true that you told

16    her that you couldn't use --

17         MR. DUSZKIEWICZ:  Objection.

18         THE COURT:  No, that -- I don't know --

19    there's not a full question out there, so that's

20    premature.

21         MR. DUSZKIEWICZ:  "Isn't it true you told

22    her" that's going to lead to, I presume, something

23    he's going to claim to have been a statement of

24    Mr. Valerio, yet it's not a statement.

25         THE COURT:  He can admit or deny that he

1  said something.

2          MR. DUSZKIEWICZ:  I'll be moving to strike

3  the question after we get either an affirmance or

4  denial.

5          THE COURT:  That's premature.

6          MR. DUSZKIEWICZ:  I understand, Judge.

7  Thank you.

8          THE COURT:  Overruled.  Okay.

9  BY MR. MUSITANO:

10 Q.  Isn't it true that you told investigator -- or

11 strike that.  Isn't it true that you told Jackie

12 Belakowski that the police asked you to put your

13 speaker on, and you said that you could not do

14 that?

15 A.  At a certain point, yeah.

16         MR. DUSZKIEWICZ:  Judge, I'm going to move

17 to strike that.

18         THE COURT:  On what basis?

19         MR. DUSZKIEWICZ:  Judge, again, we're

20 doing the -- in the context of "isn't it true you

21 told someone else."  It's trying to be -- it's an

22 implication that Mr. Valerio made a statement,

23 something consistent with what's in someone else's

24 notes.

25         THE COURT:  No, that has nothing to do

1    with the notes.  He was asked a question outright,

2    he responds to that.  We'll leave it at that, and

3    we'll move on.

4           MR. MUSITANO:  Isn't it true that you told

5    Jackie Belakowski that your phone did not have a

6    speaker?

7           MR. DUSZKIEWICZ:  Judge, are we going to

8    dance around the same issue, Judge?  This is,

9    again, not his statement.

10           MR. MUSITANO:  Judge, the rules of

11   evidence permit the defendant to call in a witness

12   who got a statement from a government witness at a

13   different time, at a different place.  It's a prior

14   inconsistent statement, not reduced to writing,

15   made through a third party, which you can get into,

16   Judge, once you lay the proper foundation, and I

17   did that.

18           THE COURT:  No, you didn't do that.

19   Because it has to be an adopted statement if you're

20   working off of somebody's notes.  If you're talking

21   about something else in terms of what he said and

22   what statement he made, that's another thing.  But

23   you cannot proceed on the basis that written notes

24   of somebody are his statement if he hasn't adopted

25   those.  They have to be, in substance, his

1     statement.  You cannot cross-examine, under the

2     rules, where there's not that adoption.

3              MR. MUSITANO:  Judge, it's a prior

4     statement inconsistent with what's testified to

5     here.

6              THE COURT:  No.  No.  Not if that is not

7     an adopted statement.  If it's somebody's notes,

8     that does not mean it's his statement or not his

9     statement.

10              MR. MUSITANO:  Judge, whether they're

11     notes or not, as long as he makes a statement to a

12     third party that's inconsistent with his testimony,

13     and I've laid a proper foundation when it was made,

14     where he was, who he made it to, I can bring that

15     third party in and introduce his statement.  I

16     mean, it's fundamental cross-examination, Judge,

17     and introduction of statements through a third

18     party.

19              THE COURT:  Mr. Duszkiewicz.

20              MR. DUSZKIEWICZ:  Judge, let's bring in

21     somebody else.  It's not proper cross-examination

22     for this witness.  It has not been determined that

23     this is his statement.  To suggest that he did it

24     on such and such a date with someone, again, is

25     merely reading from someone's notes.

1           THE COURT:  Ask him what he said.

2           MR. MUSITANO:  I did.  Isn't it true that

3    you told Miss Belakowski that the speaker on your

4    phone does not work?

5           THE WITNESS:  No, I didn't tell her that.

6    BY MR. MUSITANO:

7    Q.  Okay.  Isn't it true that you told her that the

8    officers in the vehicles asked you to turn the

9    speaker on, and you said you can't?

10   A.  I told her because of the Spanish-speaking

11   individuals I wasn't turning on the speaker.

12   Q.  So you just limited it to the Spanish-speaking

13   people and not Steve Knighton?

14           MR. DUSZKIEWICZ:  Judge, now we're going

15   to take it a step farther and talk about an

16   explanation?  Again, he's not advised of a

17   particular -- he's not adopted a particular

18   statement.  Now we're recharacterizing something

19   that isn't properly in evidence in the first place.

20           THE COURT:  No.  That's overruled.

21       Go ahead, Mr. Musitano.

22   BY MR. MUSITANO:

23   Q.  Isn't it true you also told Jackie Belakowski

24   in September of 2013, when she came to visit you at

25   the jail, that you did not know Steve Knighton's

1    truck?

2    A.   That I did not know his truck?

3    Q.   Yes, sir.

4    A.   No, I never told her that.

5    Q.   And isn't it true that you told Miss Belakowski

6    on that date in September while you were at the

7    jail that you did not drive by and identify Steve

8    Knighton?

9    A.   I don't recall me telling her that.

10   Q.   Okay.  Now when you were talking to

11   Mr. Knighton while you're driving from Syracuse to

12   Buffalo --

13   A.   Yes.

14   Q.   -- on your phone, you didn't mention cocaine,

15   is that correct, in your conversation?

16   A.   No.  We never talked like that.

17   Q.   Okay.  And you never mentioned $41,000,

18   correct?

19   A.   No.  We never talk like that on the phone.

20   Q.   Mr. Duszkiewicz asked you while you were

21   driving in the car talking to Steve Knighton, if

22   you would tell Investigator Davis what you were

23   talking about.  Do you remember being asked that

24   question?

25   A.   Repeat that, please.

1    Q.   Sure.  Let me rephrase it and I'll back up.

2    You indicated to Mr. Duszkiewicz on your direct

3    examination that as you were speaking to either

4    Steve or the people in the Bronx or other people

5    while you're traveling, that you would then tell

6    Investigator Davis what the other person said.  Do

7    you remember saying that?

8    A.   I believe so.

9    Q.   Okay.  When Mr. Duszkiewicz was asking you

10   questions, you remember that?

11   A.   I'm not sure.

12   Q.   Okay.  Now, Mr. Valerio, earlier before the

13   break I asked you if between that period of

14   November 13th and December 4th you had met with law

15   enforcement and the government, and you said "No,"

16   do you remember that?

17   A.   November, yeah.

18   Q.   Okay.  And then I asked you, "Isn't it true

19   that I came to see you yesterday?"  Correct?

20   A.   Yes.

21   Q.   And you didn't want to speak to me, correct?

22   A.   Yes.

23   Q.   Now yesterday you met with the government, is

24   that correct?

25   A.   Yes.

1  Q.  And you met with agents?

2  A.  Yes.

3  Q.  Okay.  And you met with them from the morning,

4  correct?

5  A.  Yes.

6  Q.  And you met with them until the afternoon,

7  correct?

8  A.  Yes.

9  Q.  And you met with Agent Davis, correct?

10  A.  Yes.

11  Q.  Agent Calloway?

12  A.  Yes.

13  Q.  The two gentlemen that were in the courtroom

14  today?

15  A.  Yes.

16  Q.  You also met with Mr. Duszkiewicz?

17  A.  Yes.

18  Q.  Did you meet with any other agents?

19  A.  There was other people in the room, but I don't

20  know if they were agents.

21  Q.  Okay.  Were any of those people taking notes?

22  A.  I can't recall.  I can't recall.

23  Q.  Okay.  Now, isn't it true that after that

24  meeting with them yesterday, today was the first

25  time that you said Mr. Knighton gave you $65,000 to

1    get you started back in the business?

2    A.   Today?

3    Q.   Yes, sir.

4    A.   No, sir.

5    Q.   Today's not the first time you said that?

6    A.   No.

7    Q.   Was yesterday the first time you said that?

8    A.   I don't think so.  I think it was prior to

9    that.

10   Q.   Tell this honorable jury when it was prior to

11   that.

12   A.   Maybe a week or -- probably like a week from

13   today.

14   Q.   Okay.  So a week ago today?

15   A.   Yes.

16   Q.   When I asked you earlier if you had met with

17   anybody from November to December, you said, "No."

18   A.   You asked me if they came to visit me in Erie

19   County jail.  I said, "No."

20   Q.   Okay.  Did they come visit you at Niagara

21   County Jail?

22   A.   No.

23   Q.   Did they bring you to their office?

24   A.   Yes.

25   Q.   So you met with them more than just today?

1    A.   One time.

2    Q.   When was that?

3         MR. DUSZKIEWICZ:  I'm sorry, there was no

4    meeting today that I'm aware of.  What are we

5    talking about?

6         MR. MUSITANO:  I apologize.  I'll rephrase

7    the question.

8    BY MR. MUSITANO:

9    Q.   You met with him yesterday, correct?

10   A.   Yes.

11   Q.   That was the second meeting?

12   A.   Yes.

13   Q.   When was the first meeting?

14   A.   A week prior to that.

15   Q.   So the end of November?

16   A.   I believe so.

17   Q.   Where did you meet?

18   A.   In the -- I guess the federal building.

19   Q.   Mr. Duszkiewicz's office?

20   A.   A conference room somewhere.

21   Q.   And who was that meeting?

22   A.   Clint, and I think his partner.

23   Q.   What about Doug?

24   A.   No, I don't think so.

25   Q.   What about Mr. Duszkiewicz?

1    A.   Yes.

2    Q.   And again you were reviewing your testimony for

3    today's appearance, correct?

4    A.   Well, he was asking me -- you know, he wanted

5    me, you know, to give him the chain of events.  And

6    then he asked me additional questions, and, you

7    know, that's when he asked me how did I get back

8    started again.  And I gave him my story.

9    Q.   So that was a week before yesterday?

10   A.   Yes.

11   Q.   And --

12   A.   I believe -- yeah.  Yeah, a week.

13   Q.   Sure.  So it's your testimony that it was

14   Investigator Calloway that you said that to?

15   A.   To --

16   Q.   How you got started back in the business after

17   you had been out of business.

18   A.   Well, he was in the room at the time.  He was

19   listening, so --

20   Q.   Were they taking notes while they were

21   listening to you a week ago?

22   A.   I'm not sure.

23   Q.   And Investigator Calloway is the same

24   Investigator Calloway you met in 2010, correct?

25   A.   Yes.

1    Q.   Okay.  And he was asking you questions about

2    your relationship with Steve Knighton, isn't that

3    true?

4    A.   Yes.

5    Q.   Okay.  And that point in time, would you agree

6    with me that your memory of the events of 2009

7    would be better then than in 2014?

8    A.   I can't agree with you.  It's still a long time

9    from now.  That's four years.

10   Q.   Okay.  Would you agree with me that your memory

11   of what happens in 2009 and in 2008 is better

12   in 2010 than 2014?

13   A.   It depends.  You know, because somethings in

14   2009 might be more significant than some thing that

15   happened in 2010, you know?  Because I can remember

16   exactly what happened in 2009.  The 13th, which was

17   a Friday.  Everybody know Friday the 13th is not a

18   really good day, you know.  So I definitely

19   remember what happened that day.

20   Q.   Sure, because you got caught with seven kilos

21   of cocaine in your vehicle?

22   A.   Exactly.

23   Q.   You were arrested and --

24   A.   Yes.

25   Q.   -- charged with criminal possession of a

1    controlled substance first degree?

2    A.   Yes.

3    Q.   Facing over 24 years in prison, correct?

4    A.   Twenty-four years, yes.

5    Q.   You remember that's significant, isn't it?

6    A.   Exactly.

7              MR. DUSZKIEWICZ:  Judge, I'm sorry, my

8    understanding of the state law doesn't equate to 24

9    years in jail.

10             THE COURT:  Well, what your understanding

11   is probably is not relevant to that line of

12   inquiry.

13             MR. DUSZKIEWICZ:  Judge, Mr. Musitano is

14   stating it as a fact, you're going to get 24 years

15   for that charge.

16             THE COURT:  If the witness said he didn't

17   know, that would be one thing.  He said "Yes," so

18   if there's a way you want to clarify that, you can

19   do that through examination or proposing judicial

20   notice of sentencing exposure statutes.  You can do

21   whatever you choose to do in that regard.

22        Mr. Musitano, you may continue.

23             MR. MUSITANO:  Thank you.

24   BY MR. MUSITANO:

25   Q.   Okay.  So, that was a significant event,

1    correct?

2    A.   Yes.

3    Q.   But then you managed to get out of that event,

4    correct?

5    A.   Yes.

6    Q.   You were released?

7    A.   Yes.

8    Q.   Tell this honorable jury if you were charged

9    with conspiracy that day.

10   A.   If I was charged with conspiracy?

11   Q.   Yes, sir.

12   A.   I didn't know what my actual charge was.  My

13   lawyer was handling all that.  So I didn't know

14   what actually I was charged with.

15   Q.   Well, you know you appeared in a town court?

16   A.   Yes.

17   Q.   You know that you were charged with criminal

18   possession of a controlled substance, first degree,

19   right?

20   A.   Yes.

21   Q.   They gave you a paper that says that charge,

22   right?

23   A.   Yeah.  It was like three in the morning I

24   think.  I was pretty out of it already by that

25   time.

1    Q.   Sure.  But then you left?

2    A.   Right.

3    Q.   Okay.  Then you went to your cell?

4    A.   Right.

5    Q.   You left the jail a week later?

6    A.   Right.

7    Q.   You knew you were looking at an A-1 felony,

8    correct?

9    A.   Correct.

10   Q.   And you're familiar at that point in time in

11   your life with New York State Penal Law, correct?

12   A.   Yeah.

13   Q.   Okay.  But you weren't charged with conspiracy

14   involving Mr. Knighton, correct?

15   A.   I can't say yes to that, because I'm not sure

16   about that.

17   Q.   Okay.  Did you ever appear in this building

18   charged with a conspiracy involving Mr. Knighton?

19   A.   No.

20   Q.   Did you ever appear in Syracuse in a federal

21   building charged with Mr. Knighton?

22   A.   No.

23   Q.   Okay.  Now, how long was your meeting with

24   Investigator Calloway about a week ago?

25   A.   Maybe half an hour, 40 minutes maybe.

1    Q.   Okay.

2    A.   I didn't have a watch or anything.

3    Q.   Sure.  I understand.  And your meeting

4    yesterday with the government and the agents was

5    how long?

6    A.   Around the same time I believe.

7    Q.   Okay.  So you were out of Erie County from the

8    morning until mid-afternoon, correct?

9    A.   Well, I was in Erie County all morning.  They

10   ain't come to get me till-- if I'm right, like

11   noontime or 1:00 o'clock.  I was stuck in the

12   bullpen all morning.

13   Q.   Okay.  So you didn't leave Erie County until

14   12, 1:00 o'clock?

15   A.   Yeah, like 12 noontime, or 1:00 o'clock, around

16   there.

17   Q.   And the sentence in Massachusetts, did you have

18   a lawyer for that sentence?

19   A.   Yes.

20   Q.   And what was the maximum sentence you could

21   have received in that case?

22   A.   Fifteen years.

23   Q.   Fifteen years?

24   A.   Yeah, mandatory.

25   Q.   So it's 15 years mandatory, but you didn't get

1  the mandatory?

2  A.   No, because I pled guilty.  I copped out.

3  Q.   And you pled guilty in New York too, right?

4  A.   Yes.

5  Q.   And in neither place did you plead guilty to a

6  drug conspiracy involving Steve Knighton, correct?

7  A.   Correct.

8  Q.   Or Mr. Jones, correct?

9  A.   Correct.

10  Q.   So it's fair to say, isn't it, Mr. Valerio, you

11  received immunity for this charge here, correct?

12          MR. DUSZKIEWICZ:  Objection.

13          THE COURT:  Grounds?

14          MR. DUSZKIEWICZ:  "Is it fair to say for

15  this charge here," there is no charge here.

16          THE COURT:  Okay.

17          MR. MUSITANO:  Let me rephrase the

18  question.

19          THE COURT:  Form of the question,

20  sustained.

21          MR. MUSITANO:  Isn't it true that you were

22  never charged with a drug conspiracy involving

23  Mr. Knighton?

24          MR. DUSZKIEWICZ:  Asked and answered.

25          THE COURT:  No.  I'll permit that.

1    Overruled.

2            THE WITNESS:  Repeat the question.

3    BY MR. MUSITANO:

4    Q.  Sure.  Isn't it true that you were never

5    charged with a drug conspiracy involving

6    Mr. Knighton?

7    A.  I don't -- I don't think so.  I don't believe

8    so.

9    Q.  Isn't it true you were not charged with

10   agreeing to possess cocaine with Mr. Knighton?

11           MR. DUSZKIEWICZ:  Objection, your Honor.

12   Now we're going to define a conspiracy?

13           THE COURT:  No.

14           MR. DUSZKIEWICZ:  He says he was never

15   charged.

16           THE COURT:  Overruled.

17           THE WITNESS:  Repeat the question.

18   BY MR. MUSITANO:

19   Q.  Isn't it true you were never charged with

20   agreeing to possess cocaine with Mr. Knighton?

21   A.  No.

22   Q.  You were never charged, correct?

23   A.  I was never charged for that.

24   Q.  Isn't it true you were never charged with

25   Mr. Knighton to conspire to possess cocaine with

1    the intent to distribute it?

2            MR. DUSZKIEWICZ:  Objection, your Honor.

3            THE COURT:  Sustained.

4            MR. MUSITANO:  Judge, if I could just have

5    one moment?

6            THE COURT:  Sure.  Our jury doing okay?

7    Okay, good.

8    BY MR. MUSITANO:

9    Q.  Now, finally you indicated to this honorable

10   jury that you sold your 1995 BMW to Mr. Knighton,

11   correct?

12   A.  Yes, sir.

13   Q.  When did you sell that to him?

14   A.  Probably maybe like after the summer of 2008,

15   around that time frame.

16   Q.  So sometime between the summer and fall

17   of 2008?

18   A.  Yeah, around there.

19   Q.  It wasn't just recently before your arrest in

20   March, correct?

21   A.  No, it wasn't right before my arrest in March.

22   It had to be maybe -- the latest I could think

23   about, maybe October I believe.  I don't know.

24   Q.  October of 2008?

25   A.  September, October.

1    Q.  Did you give Mr. Knighton your ownership for

2    that vehicle?

3    A.  What you mean?

4    Q.  Did you give him a piece of paper to

5    Mr. Knighton that said William Valerio owns this

6    1995 750 BMW that he would need to transfer the

7    title?

8              MR. DUSZKIEWICZ:  Judge, I remember a five

9    series, not 700.

10             THE COURT:  It was a five series by

11   testimony.  Sustained.

12             MR. MUSITANO:  I apologize.

13   BY MR. MUSITANO:

14   Q.  Your five series BMW, did you give him a piece

15   of paper that showed you own it and gave it to him?

16   A.  I gave him the title of it, yes.

17   Q.  Did you ever see a copy of that title again

18   prior to your testimony today?

19   A.  No.

20   Q.  Did somebody show you a copy of the title as

21   the vehicles's owned -- or was owned then?

22   A.  Yeah.

23   Q.  When did you see that title?

24   A.  Well, re -- re -- I mean, say the question over

25   again.

1    Q.   Sure.  When did you see the title that it was

2    transferred to Mr. Knighton or somebody else?

3    A.   That, no, no.  I thought you was talking about

4    when I registered the vehicle.  No, I never seen --

5    after I gave him the title, I never saw the title

6    ever again.

7    Q.   Okay.  Now how many times did you see that

8    vehicle being driven by Mr. Knighton?

9    A.   After I gave him the title?

10   Q.   Yes, sir.

11   A.   I never saw him driving it.

12   Q.   Okay.  So you told Mr. Duszkiewicz that he

13   wanted that vehicle?

14   A.   Yeah.

15   Q.   You told Mr. Duszkiewicz, and this honorable

16   jury saw a video that it had a trap?  Is that a

17   yes?

18   A.   Yes.

19   Q.   You told this honorable jury you had met Steven

20   Knighton, God knows how many times at the Walden

21   Galleria?

22   A.   Yes.

23   Q.   And you never saw him driving that BMW,

24   correct?

25   A.   Well, the purpose -- the purpose of the BMW

1  wasn't for him to use it with me.  It was for him

2  to do his local business with it.  That's what that

3  was for.

4  Q.  Oh, I see.  So when he's picking up volumes and

5  volumes that you told this honorable jury, he

6  doesn't use the BMW?

7  A.  He never did.

8  Q.  He never did, right?

9  A.  Yeah.

10  Q.  He never used that car with the trap, correct?

11  A.  Correct.

12  Q.  That could hold, you told this honorable judge,

13  10 to 12 kilos?

14  A.  Yes.

15  Q.  He never used that one?

16  A.  No.

17  Q.  He would use the vehicle that he would drive

18  every day of his life?

19  A.  Yeah.  The same vehicles when we first started

20  dealing.

21  Q.  And that if I understood your testimony

22  correctly, those compartments could also be used to

23  conceal currency, right?

24  A.  Yes.

25  Q.  Money?

1    A.   Yes.

2    Q.   You used it to conceal money, correct?

3    A.   Yes.

4    Q.   Now, when you delivered all this cocaine to

5    Mr. Knighton at the Walden Galleria, and you told

6    us that he didn't use the BMW with a trap door,

7    correct?

8    A.   Yes.

9    Q.   And is it your testimony that he didn't use

10   that same BMW to transport currency to pay you?

11   A.   To where, to New York?

12   Q.   No, sir.  We're talking the Walden Galleria.

13   A.   Repeat the question again.

14   Q.   Sure.  Is it your testimony that when

15   Mr. Knighton would drive to meet you at the Walden

16   Galleria to pick up all this cocaine, you told this

17   honorable jury he was buying from you --

18   A.   Yeah.

19   Q.   -- he didn't use the BMW, correct?

20   A.   No, he never used it.

21   Q.   So when he drove to the Walden Galleria with

22   all this money in his vehicle, he didn't use that

23   BMW, is that your testimony?

24   A.   Yeah.  He had the truck.

25   Q.   Okay.  And you're saying which truck?

1    A.   The Tahoe.

2    Q.   Well, he didn't have the Tahoe for eight

3    months, correct?

4    A.   No, no.  He had other vehicles.

5    Q.   He had other vehicles?

6    A.   Yeah.  He had -- before that he had a pickup

7    truck.

8    Q.   Okay.  Let me stop you there.  I think you

9    already described it for Mr. Duszkiewicz as a black

10   pickup truck?

11   A.   Yes.

12   Q.   Okay.  Did that have a trap in it?

13   A.   I don't think so.

14   Q.   Well, let me ask you this:  Did you ever see a

15   trap in that black pickup truck?

16   A.   No.

17   Q.   Okay.  Prior to the black pickup truck, did

18   Mr. Knighton come to the Walden Galleria in another

19   vehicle?

20   A.   Yes.

21   Q.   What was the other vehicle?

22   A.   Chevy Malibu I think.

23   Q.   I'm sorry?

24   A.   A Chevy Malibu.

25   Q.   And that Chevy Malibu didn't have a trap door,

1    right?

2    A.   I'm not sure.   I was never really in the

3    vehicle.

4    Q.   Did you ever see him open a trap and give you

5    $60,000 cash?

6    A.   No.

7    Q.   Did you ever see him open a trap and put two

8    kilos in it?

9    A.   No.

10   Q.   Now you told Mr. Duszkiewicz that sometimes you

11   would talk to Mr. Knighton twice a week?

12   A.   No.   We would talk all the time.

13   Q.   Okay.

14   A.   Face-to-face usually twice a week.

15   Q.   Okay.   And more than that actually, so you

16   would talk face-to-face twice a week, and then

17   there would be phone conversations, correct?

18   A.   Yes.

19   Q.   Did you ever see any cell site records for any

20   telephone that puts you and Mr. Knighton together?

21   A.   No.

22              MR. MUSITANO:   If I could just have one

23   moment?

24              THE COURT:   Yes.

25   BY MR. MUSITANO:

1    Q.   Now, Mr. Valerio, you indicated that when you

2    were arrested in March 2009 that you were also on

3    parole, correct?

4    A.   State that again.

5    Q.   Sure.  On March 13th, 2009 --

6    A.   Yes.

7    Q.   Black Friday, you were arrested?

8    A.   Yes.

9    Q.   Okay.  You were on parole at that time,

10   correct?

11   A.   Yes.

12   Q.   Your parole officer was Parole Officer Hayes

13   from the Bronx office, correct?

14   A.   Yes.

15   Q.   Okay.  And when you were arrested in

16   Massachusetts, was your parole violated?

17   A.   I'm not sure.

18   Q.   Well, you were on parole for a long time,

19   right?

20   A.   Yeah.

21   Q.   For life?

22   A.   No, no.  I was only on parole for five years.

23   Q.   From the date of your release from prison?

24   A.   Yeah.

25   Q.   And do you know if you went back to jail just

1    because of a parole violation for selling and

2    getting arrested for drugs in Massachusetts and

3    drugs in New York?

4    A.   If -- if you could get go back to jail for

5    that?

6    Q.   Yes.

7    A.   Yes.

8    Q.   So you could get violated?

9    A.   Yes.

10   Q.   Did you get violated?

11   A.   No.

12           MR. MUSITANO:  If I could just have a

13   moment, Judge.  Thank you.

14       Thank you, Mr. Valerio.

15       I have nothing further, Judge.

16           THE COURT:  Any questions,

17   Mr. Duszkiewicz?

18           MR. DUSZKIEWICZ:  Yes, Judge, but

19   consistent with your promise to the jury that we're

20   going to break about 5:00 o'clock, I don't know

21   that I'm going to finish.  If the Court wants me to

22   start, I certainly can, but I think we're going to

23   have to come back.

24           THE COURT:  Ready to go home?

25           THE JURY:  Yes.

1          THE COURT:  Okay.  All right.  We will

2     break at this point.  We'll start tomorrow at --

3     we're going to try to start at 9:15 tomorrow.

4          MR. MUSITANO:  Judge -- sorry.  Can we

5     approach?

6          THE COURT:  Sure.

7          (Off the record discussion.)

8          THE COURT:  I guess I'm going for a

9     hearing aid.  This is just getting me down here.

10    Okay.  What?

11         (Off the record discussion.)

12         THE COURT:  Okay.  I'm sorry to take your

13    time, but we're trying to work out scheduling

14    and -- how would you like to start at 8:30 tomorrow

15    instead of 9:00, and then we'll -- because of some

16    conflicts, we'd break as close to noon as we can,

17    and we'd call it a day at that point, so you'd have

18    a little longer weekend?  Does that work from

19    everybody's standpoint?

20       Okay.  All right.  And then we would resume

21    again on Monday.  It's nice to make people happy.

22    All right.  But that's the way we'll try.  From the

23    marshal's standpoint can we be ready at 8:30?

24         DEPUTY MARSHAL:  Yes.

25         THE COURT:  Okay.  That's what we'll do.

1  I mean, you've been terrific today.  Thank you.  I

2  mean, you know, we have wrinkles, and it takes a

3  while sometimes to get a rhythm, and sometimes we

4  don't get a rhythm until after the case is over,

5  but we're going to try to get a rhythm before this

6  case is over.  We'll see everybody tomorrow at what

7  time?

8            THE JURY:  8:30.

9            THE COURT:  Please, no social or Internet

10  access today.  Don't do any investigating.  Don't

11  do any research.  Just try to, as best you can,

12  recall for yourselves what took place today, but

13  don't talk about it amongst yourselves, because you

14  have to not pass judgment until you get through

15  your deliberations.  Don't discuss the case with

16  anybody at home.

17     Be safe on your return home.  I've arranged for

18  a nice day weather-wise tomorrow, especially around

19  those 7:00 to 8:30 hours in the morning.  We'll see

20  you tomorrow at 8:30.  Thank you very much.

21  Appreciate it.

22            (Jurors excused from the courtroom.)

23            THE COURT:  All right.  Thank you very

24  much.  Mr. Valerio, we'll see you tomorrow, okay,

25  8:30.  Thank you very much.

1              MR. MUSITANO:  Thank you, Judge.

2              *      *      *      *      *      *

1                          CERTIFICATION

2

3              I certify that the foregoing is a

4        Correct transcription of the proceedings

5        Recorded by me in this matter.

6

7

8                              s/Michelle L. McLaughlin
                               Michelle L. McLaughlin, RPR
9                                  Official Reporter
                                   U.S.D.C., W.D.N.Y.
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25