UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
--------------------------------------
UNITED STATES OF AMERICA,

             -vs-                         12-CR-56S

STEVEN A. KNIGHTON,

               Defendant.
--------------------------------------


          **EXCERPT** of proceedings held before

    the Honorable William M. Skretny,

    Buffalo Courtroom, Robert H. Jackson

    Courthouse, 2 Niagara Square, Buffalo,

    New York, on December 5, 2014.


    APPEARANCES:

    THOMAS S. DUSZKIEWICZ,
    Assistant United States Attorney,
    Appearing for the United States.

    ANGELO MUSITANO, ESQ.,
    Appearing for Defendant.

    Michelle L. McLaughlin, RPR,
    Official Reporter,
    U.S.D.C. W.D.N.Y.

1                    I N D E X

2          WITNESS                                  PAGE

3       WILLIAM VALERIO

Redirect Examination by Mr. Duszkiewicz          4
4    Recross-Examination by Mr. Musitano             15
     Further Redirect Examination by Mr. Duszkiewicz 19

5
        DOUGLAS P. DAVIS
6    Direct Examination by Mr. Duszkiewicz           21
     Cross-Examination by Mr. Musitano              44
7    Redirect Examination by Mr. Duszkiewicz        64
     Recross-Examination by Mr. Musitano            72

8
        CLINTON CALLOWAY
9    Direct Examination by Mr. Duszkiewicz           95
     Cross-Examination by Mr. Musitano             102
10   Redirect Examination by Mr. Duszkiewicz       105
     Recross-Examination by Mr. Musitano           106

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1              (Excerpt of proceedings.)

 2              THE COURT:  Are there any preliminary

 3      matters?

 4              MR. DUSZKIEWICZ:  Not from the government,

 5      Judge.  Thank you.

 6              MR. MUSITANO:  Not from the defense.

 7              THE COURT:  Okay.  Can we get Mr. Valerio

 8      on the stand?  As soon as he's on the stand, we'll

 9      bring the jury in.

10              COURT SECURITY OFFICER:  Yes, sir.

11              THE COURT:  Good morning.

12              THE WITNESS:  Good morning.

13              THE COURT:  Okay.  Ready?  All right.

14      Chris, if you would, please.

15              COURT SECURITY OFFICER:  Yes, sir.

16              (Jury seated.)

17              THE COURT:  Good morning, ladies and

18      gentlemen.  Have a seat.

19              THE JURY:  Good morning.

20              THE COURT:  It's good to see everybody

21      this morning.  Thank you for being here on time.

22      Actually, we were all assembled, but we had one

23      administrative matter to get resolved.  We're all

24      set to go I think, as you can tell.  Again, we

25      appreciate the fact that you were here timely toed,

1    and that you've given us your efforts on this case.

2    We appreciate that.

3        The attorneys and parties are back, present.

4    This is the case of United States versus Steven

5    Knighton.  The jury is here for record purposes,

6    roll call waived.

7        On the stand is William Valerio.  You remember

8    him I think from yesterday.  He remains under oath.

9    I think, Mr. Duszkiewicz is going to start the

10   questioning.  It's his witness.  Only the

11   government has the burden of proof.  Mr. Knighton

12   is presumed innocent until and if you find

13   otherwise after all of the evidence is in.  This is

14   what's called redirect examination.  And then we'll

15   see if there's any recross, and then we'll move on

16   to other witnesses.

17       All right.  Mr. Duszkiewicz, you may begin.

18   W I L L I A M   V A L E R I O, having been

19   previously duly sworn as a witness, testified

20   further as follows:

21   REDIRECT EXAMINATION BY MR. DUSZKIEWICZ:

22   Q.  Good morning, Mr. Valerio.  How are you?

23   A.  Fine.  Good morning.

24   Q.  You were asked a number of questions yesterday

25   by Mr. Musitano.  Do you recall generally those

1   questions that were asked yesterday?

2   A.  Yes.

3   Q.  Okay.  I'm just going to clarify a couple of

4   points.  You indicated that in addition to a pickup

5   truck and the black Tahoe that we saw in the

6   pictures, that you saw Mr. Knighton driving a

7   Malibu?

8   A.  Yes.

9   Q.  Okay.  Whose Malibu was that, do you know?

10  A.  I believe it was his wife's.

11        MR. MUSITANO:  Objection if he's

12  believing.

13        THE COURT:  No.  Overruled.

14  BY MR. DUSZKIEWICZ:

15  Q.  Did you see him in other vehicles besides what

16  you believe to be his wife's Malibu?

17  A.  I can't recall.  I can't recall.

18        THE COURT:  All right.  Keep your voices

19  up, please, both of you.

20  BY MR. DUSZKIEWICZ:

21  Q.  You also indicated that Mr. Knighton would use

22  the BMW, that is the trapped vehicle, for his local

23  business.  What did you mean when you told

24  Mr. Musitano that?

25  A.  They -- you know, he would use it I guess for

1    transactions that he did locally.

2            MR. MUSITANO:  Objection.  If he's

3    guessing, Judge, I'm objecting.  He said "I guess."

4            THE COURT:  The jury heard that, so reput

5    the question, please.

6    BY MR. DUSZKIEWICZ:

7    Q.  What did you mean when you said he used it for

8    his local business?

9    A.  Well, he would use it for Niagara Falls/Buffalo

10   area.

11   Q.  When you say "business," you're talking about

12   drug transactions?

13   A.  Yes.

14   Q.  Now, you indicated that you had conversations

15   with Mr. Knighton while you were in the vehicle

16   with Investigator Davis and his partner driving

17   from Syracuse to Buffalo.

18   A.  Yes.

19   Q.  Okay.  In those conversations, did you mention

20   the word "cocaine"?

21   A.  In the conversations?

22   Q.  Yeah.

23   A.  No.

24   Q.  Okay.  Did you -- did you mention $41,000?

25   A.  No.

1    Q.   Why not?

2    A.   Because we talk in codes.  We don't -- those

3    are not things we talk about through the phone.

4    Q.   When you say you talk in code, what do you

5    mean?

6    A.   You know, we don't -- we don't express that

7    literally, like say cocaine or money or anything

8    like that.  We don't talk about currency or

9    anything like that on the phone.

10   Q.   Why not?

11   A.   Because we might be afraid we might be getting

12   tapped or incriminating ourselves.

13   Q.   Well, when you were having these conversations

14   with Mr. Knighton and Investigator Davis and his

15   partner were in the vehicle with you, what were you

16   trying to do in terms of your conversations to him

17   or with him?

18   A.   Well, trying to -- you know, he was getting

19   frustrated, because I was taking a long time to get

20   there.  So I was just having, you know, casual

21   conversation with him and letting him know that I

22   will be there soon.

23   Q.   I mean, were you actually late?

24   A.   Yeah.  Probably a few -- you know, probably a

25   half hour late.

1    Q.   Okay.   That was because of the arrest?

2    A.   Yes.

3    Q.   Now, you were talking to Mr. Musitano about the

4    $41,000 that Mr. Knighton had for you, and you

5    indicated that you were going to be providing him

6    with two of those kilos that were in your vehicle

7    when you were stopped in Syracuse, is that correct?

8    A.   Yes.

9    Q.   What's the definition of fronting?

10   A.   Fronting is when you don't have all the money

11   at that point, and you would give it back at a

12   later date.

13   Q.   Was that the arrangement that you had with

14   Mr. Knighton?

15   A.   Yes.

16   Q.   Okay.   That means basically you get something

17   on credit?

18   A.   Yes.

19   Q.   Were you able to do that with the sources of

20   supply in New York City yourself?

21   A.   Yes.

22   Q.   So there's not always all the money paid at one

23   time?

24   A.   No.   As long as the trust is built, that's not

25   an issue.

1    Q.   Well, did you trust Mr. Knighton?

2    A.   Yes.

3    Q.   And your fellows in New York, did they trust

4    you?

5    A.   Yes.

6    Q.   Because you had been doing it for a long time?

7    A.   Yes.

8    Q.   Now, Mr. Musitano also asked you some questions

9    about your telephone, the telephone that you had,

10   the telephone that you were talking to Mr. Knighton

11   about -- or with.  Do you recall those questions?

12   A.   Yes.

13   Q.   Do you have to use an area code to contact

14   Mr. Knighton?

15   A.   No.

16   Q.   Okay.  Is there a sequence or series of numbers

17   that you say you had programmed into your phone?

18   A.   Yes.

19   Q.   Okay.  And that same series is when you changed

20   the chips every -- periodically?

21   A.   Yes.

22   Q.   Now, Mr. Musitano also asked you whether you

23   ever looked at phone records for your particular

24   phone, for example?

25   A.   Yes.

1  Q.  And you recall him asking you those questions?

2  A.  Yes.

3  Q.  How did you -- did you get phone bills, or were

4  these prepaid phones?

5  A.  No.  These were just prepaid phones.  You don't

6  have to have no contract or anything.

7  Q.  Tell us exactly what a prepaid phone is.

8  A.  You just go to the local, I guess store,

9  wherever they sell them at.  You buy them, and you

10  just put a chip in it.  And after you finish -- the

11  chip has certain amount of minutes.  After it's

12  finished, you just throw the chip out and buy

13  another one.

14  Q.  And is there a phone bill that you get that

15  says you used 100 minutes or you made 50 phone

16  calls?

17  A.  No.

18  Q.  Okay.  Is that the same type of phone

19  Mr. Knighton had?

20  A.  Yes.

21  Q.  Now, the particular BMW that we're talking

22  about that you saw on the video that you sold to

23  Mr. Knighton, why did you sell him that vehicle?

24  A.  For his business purposes in regards to dealing

25  with drugs.

1    Q.   I mean, who -- did you want to sell it to him,

2    or did he want to buy it?

3    A.   Well, he needed one, so I was getting rid of

4    mine's, and I end up selling it to him.

5    Q.   All right.  How long does it take to build a

6    trap in a vehicle?

7             MR. MUSITANO:  Excuse me, Judge.  Is there

8    some relevance to this?

9             THE COURT:  If it's a relevancy objection,

10   sustained.

11            MR. DUSZKIEWICZ:  Judge, there was inquiry

12   about the fact that Mr. Knighton's vehicle did not

13   have a trap in it.  I guess my question follows up

14   from those asked by Mr. Musitano.

15            THE COURT:  No.  Sustained.

16   BY MR. DUSZKIEWICZ:

17   Q.   Why did you start again dealing drugs with

18   Mr. Knighton?

19   A.   Why, because I wanted to make some money.

20   Q.   Okay.  Who solicited who to start you making

21   money?

22            MR. MUSITANO:  Objection.  I think we did

23   this on direct, Judge.

24            MR. DUSZKIEWICZ:  And cross, Judge, so

25   it's a valid redirect.

1        THE COURT:  I'm sorry?  What did you say?

2        MR. DUSZKIEWICZ:  And on cross, makes it a

3    valid area for redirect.

4        THE COURT:  Not if you've gone through it

5    on direct examination.  Sustained.

6    BY MR. DUSZKIEWICZ:

7    Q.  Mr. Musitano also went over the fact that you

8    were on parole at various times in your life.  Do

9    you recall him asking you those questions?

10   A.  Yes.

11   Q.  And you were on parole for a case out of Seneca

12   County when you began again dealing drugs with

13   Mr. Knighton?

14   A.  Yes.

15   Q.  Did you have a co-defendant on that case?

16   A.  Seneca County?

17   Q.  Yes.

18   A.  Yes.

19   Q.  Who was that?

20   A.  Maurie Cox.

21   Q.  And who arranged for your lawyer?

22       MR. MUSITANO:  Objection.  Is there some

23   relevance to this, Judge?

24       THE COURT:  I'm going to sustain it unless

25   there is a showing otherwise, with respect to

1    relevancy.

2              MR. DUSZKIEWICZ:  Judge, it involves some

3    of the same individuals mentioned as far as this

4    case is concerned.

5              MR. MUSITANO:  There's only one person on

6    trial, Judge, and that's Mr. Knighton.

7              THE COURT:  So how is it relevant,

8    Mr. Duszkiewicz?

9              MR. DUSZKIEWICZ:  It involves people that

10   were mentioned and examined by Mr. Musitano as far

11   as this case is concerned.  That's the relevance.

12             THE COURT:  Sustained.

13   BY MR. DUSZKIEWICZ:

14   Q.  Now, Mr. Valerio, when you were arrested in

15   Syracuse -- and when I'm talking about arrested,

16   that's after you make the trip here to Buffalo.

17   A.  Yes.

18   Q.  Were you released on bail?

19   A.  Yes.

20   Q.  And did you remain in contact with Investigator

21   Davis?

22   A.  Yes.

23   Q.  Okay.  By the way, you had a lawyer, didn't

24   you?

25   A.  Yes.

1   Q.   Okay.  And who's that lawyer?

2   A.   Charles Dolan.

3   Q.   Had you contacted Mr. Dolan on March 13th,

4   2009?

5   A.   No.

6   Q.   Okay.  Did you have someone else contact

7   Mr. Dolan?

8   A.   Yes.

9   Q.   Who contacted Mr. Dolan?

10  A.   My wife.

11  Q.   Okay.  Do you know whether Mr. Dolan had

12  contact with the law enforcement officers?

13  A.   I believe so.

14  Q.   When you were talking with Mr. Knighton while

15  you were on the trip from Syracuse to Buffalo on

16  the 13th of March, what was the nature of your

17  conversation?

18  A.   We just --

19          MR. MUSITANO:  Excuse me, Judge.  Excuse

20  me.  I think we've been through the conversation

21  and the purpose of it.

22          THE COURT:  Well, I'm going to allow this

23  preliminarily, and if it is redundant, then I'll

24  sustain your objection.

25          MR. MUSITANO:  Thank you.

1            THE WITNESS:  Well, we would talk about

2     vehicles.  Sometime we refer to, you know, as far

3     as money's concerned, we might mention women, talk

4     about women and stuff like that in general.

5     BY MR. DUSZKIEWICZ:

6     Q.  General conversation?

7     A.  Yeah.

8     Q.  Did you want Mr. Knighton to know something was

9     wrong?

10    A.  No.

11            MR. DUSZKIEWICZ:  Thank you.

12            THE COURT:  Okay.  Anything?

13            MR. MUSITANO:  Just a couple questions,

14    Judge.

15    RECROSS-EXAMINATION BY MR. MUSITANO:

16    BY MR. MUSITANO:

17    Q.  Good morning, Mr. Valerio.

18    A.  Good morning.

19    Q.  I believe you told Mr. Duszkiewicz that you

20    sold Mr. Knighton the BMW because he wanted it and

21    you were trying to sell it, correct?

22    A.  Yes.

23    Q.  Okay.  And you told this honorable jury that

24    Mr. Knighton used the BMW for his local business,

25    correct?

1    A.   Yes.

2    Q.   And you described the local business in Niagara

3    Falls and Buffalo, correct?

4    A.   Correct.

5    Q.   Were you with Mr. Knighton when he was doing

6    this business in Niagara Falls and Buffalo?

7    A.   No.

8    Q.   Okay.  So you never saw him using that vehicle

9    in Niagara Falls and Buffalo yourself, correct?

10    A.   No.  Myself, no.

11    Q.   And you indicated that the Walden Galleria is

12    kind of like close to Buffalo, correct?

13    A.   Yes.

14    Q.   It's right near the Thruway?

15    A.   Yes.

16    Q.   Did you see him bringing that BMW after you

17    sold it to him in October to pick up keys from you?

18    A.   No.

19    Q.   So he didn't use it in Buffalo while he was

20    picking keys from you, correct?

21    A.   Yes.  From me, no.

22    Q.   Now you just told Mr. Duszkiewicz that the one

23    key that you were going to sell to Mr. Knighton was

24    on credit or you were going to front it, is that

25    correct?

1    A.   Yes.

2    Q.   Okay.  And you also -- strike that.  And

3    Mr. Duszkiewicz asked you about getting cocaine

4    from your source of supply, correct?

5    A.   Yes.

6    Q.   And you said you got that on the front,

7    correct?

8    A.   Yes.

9    Q.   That's the source of supply you had in the

10   Bronx?

11   A.   Yes.

12   Q.   You also had a source of supply in Manhattan,

13   didn't you, your uncle?

14   A.   Yes.

15   Q.   Okay.  Now, did you set up your uncle and the

16   sources of supply in the Bronx and in Manhattan for

17   Investigator Davis?

18   A.   No.

19   Q.   Now you said to Mr. Duszkiewicz that when you

20   were on the phone while you were traveling from

21   Syracuse to Buffalo that you talked about women,

22   correct?

23   A.   Yes.

24   Q.   Which was a code word you said for money,

25   correct?

1    A.   It could be money.   It could be cocaine.

2    Q.   Well, what was it used for that day when you

3    were talking to Mr. Knighton on March 13?   Was it

4    cocaine?   Was it money?   What was it in reference

5    to?

6    A.   It might have been both.

7    Q.   It might have been both?

8    A.   Yeah.

9    Q.   Could it have been something else too?

10   A.   It depends.

11   Q.   Okay.   While you were having these

12   conversations with Mr. Knighton, you had your

13   speaker on so that Investigator Davis could hear

14   them, right?

15   A.   Yes.

16   Q.   And how many conversations did you have with

17   Mr. Knighton on that trip from Syracuse to Buffalo

18   where you referenced women or other code words?

19   A.   Several times.

20   Q.   I'm sorry?

21   A.   Several times.

22   Q.   About 15 or 20?

23   A.   When we spoke about 15 or 20 times.

24   Q.   Of those 15 our 20 conversations, how many

25   times did you have the speaker on?

1  A.   Probably majority of the time.

2  Q.   When you say "probably the majority," are we

3  talking about 10 or 15 times you had the speaker

4  phone on?

5  A.   Yes.

6  Q.   And Investigator Davis was able to hear

7  Mr. Knighton talk, right?

8  A.   Yes.

9  Q.   Okay.

10         MR. MUSITANO:  Thank you, Judge.

11         THE COURT:  Okay.

12     Very limited, Mr. Duszkiewicz.

13         MR. DUSZKIEWICZ:  Thank you, Judge.

14  FURTHER REDIRECT EXAMINATION BY MR. DUSZKIEWICZ:

15  Q.   Mr. Valerio, when you agreed with Mr. Musitano

16  that you may have talked to Mr. Knighton 10 or 15

17  times, do you have a clear recollection of it being

18  that many?

19  A.   No.

20  Q.   Okay.  Mr. Musitano also asked you about seeing

21  Mr. Knighton in the BMW doing his local business.

22  Do you recall him asking you that question?

23  A.   Yes.

24  Q.   How did you know that he used the BMW for his

25  local business?

1    A.   Well, he told me that was the purpose why he

2    wanted the BMW.

3    Q.   He told you?

4    A.   Yes.

5         MR. DUSZKIEWICZ:  Thank you.

6         THE COURT:  Okay.  Thank you.

7    Mr. Valerio, thank you.  You are excused.

8    Do you have a next witness?

9         MR. DUSZKIEWICZ:  Yes, Judge.  We call

10   Douglas Davis.

11        THE COURT:  Mr. Davis, you can stay right

12   there, please.

13   D O U G L A S   P.   D A V I S, having been duly

14   sworn as a witness, testified as follows:

15        THE COURT:  Okay.  Just very briefly,

16   you've heard the instructions I've given to all the

17   witnesses so far, I take it, correct?

18        THE WITNESS:  Yes, I have.

19        THE COURT:  All right.  They are the same

20   for you.  Basically keep your voice up at a

21   conversational tone level.  Speak at the

22   microphone.  Your responses to the members of the

23   jury would be appreciated, if you would answer in

24   that direction.  If you don't understand a

25   question, please don't answer it.  Just ask the

1    attorneys to repeat the question.  Be as succinct

2    as you can.  If you can answer a question yes or

3    no, please try to do that.

4        If there's an objection, wait until I rule on

5    the objection, then I will give you instructions.

6    I will tell you whether to complete an answer,

7    start it again, wait for the next question.  Do you

8    understand those instructions?

9              THE WITNESS:  Yes, sir.

10             THE COURT:  Okay.  Thank you.  You are

11   under oath.  Please state your full name, spell

12   your last.

13             THE WITNESS:  My name is Douglas P. Davis,

14   D-A-V-I-S.

15             THE COURT:  Thank you.  Your witness.

16   DIRECT EXAMINATION BY MR. DUSZKIEWICZ:

17   Q.  Mr. Davis, how are you employed, sir?

18   A.  Employed by the New York State Police.  My

19   current assignment is TI Task Force with the DEA.

20   Q.  Let me go back just a bit.  How long have you

21   been with the state police?

22   A.  I've been with the state police for about a

23   little over -- well, 27 and a half years, little

24   more.

25   Q.  And with respect to the state police, what was

1    your -- how long have you been with the DEA?  Let

2    me ask you that question.

3    A.  Past 20 months.

4    Q.  And while you were -- prior to that assignment

5    with the DEA, what was your assignment with the New

6    York State Police?

7    A.  I originally started in uniform.  Then I was

8    promoted to investigator, and I was in CNET Central

9    since 1996.

10   Q.  Okay.  And CNET Central operates out of the

11   Syracuse, New York, area?

12   A.  That's correct.

13   Q.  With respect to this case, on March the 18th --

14   excuse me, March 13th of 2009 did you have occasion

15   to come in contact with a fellow by the name of

16   William Valerio?

17   A.  Yes, I did.

18   Q.  Briefly can you tell us how you happened to

19   come in contact with Mr. Valerio?

20   A.  I had an informant in a case that gave me

21   information that his supplier was William Valerio.

22   He gave me some background information, where he

23   lived, and, you know, what he would deliver to him,

24   and he had told me he would order up --

25              MR. MUSITANO:  Judge, I'm going to object

1    to conversations.

2              THE COURT:  On what grounds?

3              MR. MUSITANO:  Well, hearsay and

4    foundational, Judge.

5              THE COURT:  All right.  As far as the

6    informant is concerned?

7              MR. MUSITANO:  Yes, Judge.

8              THE COURT:  Sustained.

9              MR. DUSZKIEWICZ:  Judge, this is just

10   background in terms of how we get to --

11             THE COURT:  No.

12             MR. MUSITANO:  -- meeting Mr. Valerio.

13             THE COURT:  That doesn't take it out of

14   the hearsay exception.

15   BY MR. DUSZKIEWICZ:

16   Q.  Very well.  Did you have a detail assisting you

17   in an attempt to arrest William Valerio?

18   A.  Yes, we did.

19   Q.  What did you have set up?

20   A.  We had set up a takedown detail at the Warners

21   rest area on the westbound of the Thruway.

22   Q.  Okay.  And did there come a point in time that

23   a vehicle was observed arriving at that location?

24   A.  Yes, there was.

25   Q.  And can you tell us what, if anything, happened

1   when the vehicle arrived?

2   A.   Well, we had put a vehicle that Mr. Valerio was

3   familiar with at that location.  When he arrived,

4   he pulled up next to the vehicle that we had there.

5   We had information that he had a trap in that

6   vehicle, and he would take a minute to open that

7   trap in order to get the drugs out.  So we let him

8   have that minute.  He started to back out shortly

9   thereafter.  That's when we moved in to arrest him.

10  Q.   Okay.  When you arrested him, did you find, in

11  fact, that there was a trap in that vehicle?

12  A.   Yes, there was.

13  Q.   And was there any contraband in that trap?

14  A.   Yes, there was.

15  Q.   What type of contraband?

16  A.   In the trap was three kilos of cocaine.

17  Q.   All right.  And did you later determine there

18  was an additional compartment in that vehicle?

19  A.   Yes.  Mr. Valerio actually told us there was

20  additional cocaine in another compartment in the

21  vehicle.

22  Q.   Well, you had occasion to talk to Mr. Valerio?

23  A.   Yes, I did.

24  Q.   Tell us the circumstances under which you

25  talked to Mr. Valerio.

1    A.   When we had pulled him -- stopped him and

2    pulled him out, we read him his rights.  He had

3    told us, "Hey, you got me."

4              MR. MUSITANO:  Objection to the hearsay.

5              THE COURT:  Valerio?

6              MR. MUSITANO:  Yes, Judge.

7              MR. DUSZKIEWICZ:  Judge, we're not

8    offering it for the truth of the matter asserted.

9    We're offering it for what happened.  He's

10   describing an event.

11             THE COURT:  Yeah, I'll allow it from that

12   standpoint.  That makes it non-hearsay, and

13   overruled.

14   BY MR. DUSZKIEWICZ:

15   Q.   Can you continue that answer, sir?

16   A.   So he did tell us that there was an additional

17   four kilos of cocaine in the back compartment of

18   the van where they keep the jack to raise the car.

19   Q.   And were those kilos also recovered?

20   A.   Yes, they were.

21   Q.   In the context of that conversation, did you

22   take Mr. Valerio to any locations beyond that

23   Warner service area?

24   A.   Yes.  He was transported to our state police

25   station in North Syracuse.

1    Q.  All right.  At that location did you continue

2    to have some conversation with him?

3    A.  Yes, I did.

4    Q.  Okay.  And did you acquire some information

5    from him?

6    A.  Yes, I did.

7    Q.  Was he allowed to speak with family or

8    relatives?

9    A.  Yes.  He called his wife.

10   Q.  Okay.  And did anyone else contact you in

11   relation to the arrest of Mr. Valerio?

12   A.  His attorney called me.

13   Q.  And in the context of having spoken to his

14   attorney, did you continue to have conversations

15   with Valerio?

16   A.  Yes, I did.

17   Q.  Did he agree to cooperate?

18   A.  Yes, he did.

19   Q.  All right.  Tell us what happened.

20   A.  He had expressed to us that he had -- I asked

21   him about the seven kilos --

22            MR. MUSITANO:  Objection, Judge.  It's

23   hearsay.

24            THE COURT:  Sustained.

25   BY MR. DUSZKIEWICZ:

1    Q.   How did -- when you say -- you said he agreed

2    to cooperate, is that correct?

3    A.   That's correct.

4    Q.   Did you ask him to explain what was going on

5    with respect to the seven kilos?

6    A.   Yes, I did.

7    Q.   And did you receive some information from him

8    relative to what was going on or what was happening

9    with the seven kilos?

10   A.   Yes, I did.

11   Q.   As a result of the information that he provided

12   you, what did you do?

13   A.   We put -- myself and Investigator Fox took

14   Mr. Valerio on a road trip on the Thruway to the

15   Buffalo area.

16   Q.   Did you make arrangements with other members of

17   the state police relative to that trip to Buffalo?

18   A.   Yes, I did.

19   Q.   Were you given specific information by

20   Mr. Valerio in terms of the location to arrive at

21   in Buffalo?

22   A.   Yes, sir.

23   Q.   Okay.  And were you given the name of a

24   specific individual with whom to meet in the

25   Buffalo area?

1   A.   I was given two different people that he would

2   meet in Buffalo area.

3   Q.   All right.  And were you given information

4   about a quantity of money that would be

5   transactioned with this individual in Buffalo?

6   A.   With one of them, yes.

7   Q.   Were you given a description of the -- you said

8   you were provided with a location relative to where

9   this person was intending to meet.  Were you given

10  a description of a vehicle that the individual was

11  expected to be arriving in?

12  A.   Yes, sir.

13  Q.   Did you convey those -- that information to

14  other members of law enforcement?

15  A.   Yes, I did.

16  Q.   How did you do that?

17  A.   Partially by cellular telephone and partially

18  by -- via police radio.

19  Q.   All right.  Did other members of the CNET unit

20  from Central also travel to Buffalo?

21  A.   Yes, they did.

22  Q.   Okay.  And did you make some contact with CNET

23  officers here in the Western District of New York?

24  A.   Yes, sir.

25  Q.   Okay.  And were they asked to assist you in

1   going to this location that was provided to you by

2   Mr. Valerio?

3   A.   Yes, it was mostly taken care of by our senior

4   investigators.

5   Q.   All right.  And local police agencies, were

6   they also contacted?

7   A.   Yes, they were.

8   Q.   Okay.  Now, while -- you indicated that you and

9   an Investigator Fox traveled with Mr. Valerio to

10  the Buffalo area, is that correct?

11  A.   That's correct.

12  Q.   Was Mr. Valerio allowed to make contact with

13  the individuals that he had advised you he expected

14  to meet in Buffalo?

15  A.   Yes, sir.

16  Q.   How was he allowed to do that?

17  A.   With his cellular telephone.

18  Q.   Okay.  Were you in a position to monitor what

19  he was doing with respect to a cellular telephone?

20  A.   I was in the front passenger seat.  He was in

21  the back seat.  I could pretty much hear bits and

22  pieces if not, you know, sometimes all of the

23  conversation.

24  Q.   Were there more than one conversation?

25  A.   There was many conversations with multiple

1    people.

2    Q.   In the course of those conversations, were

3    you -- in addition to hearing parts or bits and

4    pieces of the conversation, were you being advised

5    with whom the conversation was occurring and what

6    the nature of the conversation was?

7    A.   Yes, I was.

8    Q.   And did you make some contemporaneous notes?

9    A.   I did.

10   Q.   Okay.  When you say it was with several people,

11   were you -- excuse me, did Mr. Valerio advise you

12   whom those several people were?

13   A.   Yes, he did.

14   Q.   Okay.  And with whom were the majority of those

15   conversations?

16   A.   The majority I would say was with Steven

17   Knighton.  There was conversations with Hispanics

18   in New York City.  There was an attempted

19   conversation with Lemiel Jones.

20   Q.   Had Mr. Valerio provided the name Steven

21   Knighton and Lemiel Jones?

22   A.   Pardon me?

23   Q.   Had Mr. Valerio provided you with the names

24   Steven Knighton and Lemiel Jones?

25   A.   Yes, he did.

1   Q.   And those individuals, according to the

2   information you received, resided where?

3   A.   Pardon me?

4   Q.   Where did Steven Knighton and Lemiel Jones

5   reside?

6   A.   Oh.   In the Buffalo area.

7   Q.   Now, did there come a point in time that you

8   were arrived in the Buffalo area?

9   A.   Yes, sir.

10  Q.   Where did you go?

11  A.   Well, first we had stopped on the Thruway

12  waiting for our guys to get in place.  We had

13  information that the meet location was going to be

14  at the Macy's parking lot at the Galleria Mall.

15  After everybody was in place, our surveillance had

16  told us it was -- it was told to me that they had

17  located the vehicle  in question, then we proceeded

18  to come into the parking lot of the Macy's.

19  Q.   When you say "the vehicle in question," was

20  that -- the information about that vehicle was

21  provided to you by Mr. Valerio?

22  A.   That's correct.

23  Q.   And when you say you stopped, that is, you

24  waited before you actually pulled into the Macy's

25  parking lot?

1  A.   Yes.

2  Q.   And when you arrived at the parking lot, what,

3  if anything, happened?

4  A.   We arrived.  We had been told what location

5  this vehicle was at.  Been told what location, the

6  vehicle in the parking lot, where it was parked.

7  Myself, Investigator Fox, and Mr. Valerio went two

8  rows past the location.  We asked Mr. Valerio if

9  that was the vehicle in question, and he told us it

10 was.  At that point I had advised our surveillance

11 of that.  And they had moved in, took custody of

12 Mr. Knighton.

13 Q.   Okay.  Were you in a position to see the

14 surveillance take custody of Mr. Knighton?

15 A.   Yes, we were.

16 Q.   Had you seen Mr. Knighton before the

17 surveillance units moved in on him?

18 A.   No, sir.

19 Q.   Okay.  After the surveillance units moved in,

20 what, if anything, did you do, sir?

21 A.   Well, they had handcuffed him and stood him in

22 the back of his vehicle.  Investigator Fox and

23 myself, along with Mr. Valerio drove by at close

24 quarters, and Mr. Valerio identified Mr. Knighton

25 as the Steven Knighton that was coming to meet to

1    deliver the cocaine to.

2    Q.   Had you given Mr. Valerio any instructions when

3    you drove by the location where Mr. Knighton was

4    standing outside the vehicle?

5    A.   Just told him to crouch down so he wouldn't be

6    seen.

7    Q.   All right.  Did he do that?

8    A.   Pardon me?

9    Q.   Did he do that?

10   A.   Yes, he did.

11   Q.   And by the way, the fellow that Mr. Valerio

12   identified, do you see him in the courtroom today?

13   A.   Yes, I do.

14   Q.   Where is he seated, and what's he wearing

15   today, sir?

16   A.   He's seated at the desk here in a white shirt.

17   Q.   Now, after Mr. Valerio identified the fellow

18   sitting in the courtroom as the person he was

19   intending to meet, did you have occasion to have a

20   conversation with Steven Knighton?

21   A.   Yes, I did.

22   Q.   Okay.  Prior to your having a conversation with

23   him, what happened?

24   A.   Mr. Fox and myself took Mr. Valerio over to the

25   local police department, keeping him out of sight.

1    The PD actually brought him over to the police

2    department.  After that I, you know, walked into

3    the building and had a short conversation with

4    Mr. Knighton.

5    Q.  When you say you had a short conversation with

6    Mr. Knighton, did you advise him of anything?

7    A.  Yes, I did.

8    Q.  What do you advise him of?

9    A.  I advised him of his Miranda rights.

10   Q.  Generally what does that mean, sir?

11   A.  That means he had the right to remain silent.

12   He had the right to an attorney.  Right to not

13   answer any questions if he didn't want to.

14   Q.  Well, after you provided him with those rights,

15   did he acknowledge that he understood them?

16   A.  Yes, sir.

17   Q.  And afternoon acknowledging that he understood

18   them, did you have a conversation with him?

19   A.  Yes, I did.

20   Q.  Okay.  Were you aware of whether any items were

21   found within his vehicle prior to having this

22   conversation with him?

23   A.  Yes, sir.

24   Q.  How were you made aware of that?

25   A.  Investigators told me they had located U.S.

1  currency in the console of the Chevy.

2  Q.  All right.  And what was the nature of the

3  conversation that you had with Mr. Knighton?

4  A.  Well, just started out with general like name,

5  date of birth.  The basic, where do you live.  I

6  asked him if he worked for a living.  He told me

7  no.  Told me -- I asked him about the money that

8  was found in his car, and he told me it was

9  $41,000.  And that he didn't believe in banks.  He

10  told me that he was on disability, and collected

11  $1400 a month in disability.  He also told me that

12  he had due cause for the money.  That was pretty

13  much the extent.  He said he wanted an attorney, so

14  I quit talking to him.

15  Q.  He said he had due cause for the money?

16  A.  That's correct.

17  Q.  Did you have a chance to ask him what that

18  meant?

19  A.  No.

20  Q.  You say he asked for an attorney?

21  A.  Yes, he did.

22  Q.  When someone asks for an attorney, what

23  happens?

24  A.  We quit talking to him without an attorney.

25  Q.  Did you, in fact, quit talking to him?

1    A.   Pardon me?

2    Q.   Did you, in fact, quit talking to him?

3    A.   Yes, I did.

4    Q.   Now he had indicated to you that the money

5    amounted to $41,000?

6    A.   That's correct.

7    Q.   Out of the $1,400 disability payment?

8    A.   I didn't ask him how he got it.  He just told

9    me how much it was.

10   Q.   Was that the -- that was an entire extent of

11   your conversation with Mr. Knighton at that point

12   in time, correct?

13   A.   That's correct.

14   Q.   Now you, did there -- excuse me.  The vehicle

15   that Mr. Knighton was driving, what kind of vehicle

16   was that?

17   A.   It was a Chevy SUV four-door, black.

18   Q.   All right.  And where was that vehicle, to the

19   best of your knowledge, while you were having this

20   conversation with Mr. Knighton?

21   A.   I believe it was right there at the PD.

22   Q.   Were other officers or investigators having

23   some contact with the vehicle at the police

24   department?

25   A.   Yes.  They were -- people that were searching

1    the vehicle, taking pictures, et cetera.

2    Q.   In addition to a quantity of currency you say

3    was recovered from the vehicle, was anything else

4    taken from the vehicle?

5    A.   Yes.   There were two cellular telephones.

6    Q.   All right.   And with respect to those cellular

7    telephones, were they retained by you, by the state

8    police?

9    A.   Yes, they were.

10   Q.   Okay.   What about the currency?

11   A.   The currency was also retained by state police.

12   Q.   Did you give Mr. Knighton a receipt indicating

13   that on behalf of the state police you were

14   retaining the currency and his two cellular phones?

15   A.   Yes, I did.

16   Q.   What happened?   Was that -- did that involve a

17   conversation or merely providing him with a form?

18   A.   I told him -- I mean, I didn't really have a

19   conversation.   I just explained to him that I was

20   giving him a receipt for the money, the phones, and

21   that I was returning his vehicle to him on that

22   same receipt.

23   Q.   Okay.   And was he, in fact, allowed to keep his

24   vehicle?

25   A.   Yes, he was.

1    Q.   Other than that, did you have any further

2    contact with Mr. Knighton?

3    A.   No, I did not.

4    Q.   Okay.  With respect to the amount of currency

5    that was located in his vehicle, you indicated

6    Mr. Knighton told you it was $41,000?

7    A.   That's correct.

8    Q.   Did there come a time that -- that currency

9    was, in fact, counted?

10   A.   Yes, it was.

11   Q.   What's the procedure for having it counted?

12   A.   Asset forfeiture person, along with the senior

13   investigator, would take that money to the bank.

14   You know, package would be opened.  We take it from

15   whoever we take it from, then we seal it in another

16   one of our evidence bags with an evidence label.

17   That goes to the bank, they open it at the bank,

18   count it, and furnish us with a receipt of

19   denominations of how many hundreds, how many 50s

20   and the total amount that was taken.

21   Q.   And in that particular context, what was the

22   amount?

23   A.   The amount was $41,000.

24   Q.   Exactly?

25   A.   Pardon me?

1    Q.   Exactly?

2    A.   Exactly $41,000.

3    Q.   Had Mr. Valerio provided you with an amount of

4    money in expectation that he would be receiving

5    from the individual in Buffalo?

6    A.   Yes, sir.

7    Q.   Did that amount of money match the amount of

8    money that was located and seized from

9    Mr. Knighton?

10   A.   Yes, it did.

11   Q.   Exactly?

12   A.   Exactly.

13   Q.   Okay.  Now, you indicated when you started your

14   testimony that you went to North Syracuse.  Is that

15   a substation?

16   A.   That's a regular state police station.

17   Q.   And the cocaine that was located in

18   Mr. Valerio's vehicle, was that submitted to a lab

19   for analysis?

20   A.   Yes, it was.

21   Q.   Okay.  Did that -- did that substance test

22   positive for cocaine?

23   A.   Yes, it did.

24   Q.   And your indication is that there was seven

25   kilos?

1    A.   That's correct.

2    Q.   Other than that initial information that you

3    were provided by Mr. Valerio that occasioned the

4    trip to Buffalo, did Mr. Valerio provide you with

5    additional information about Steven Knighton?

6    A.   Very little.  He just told me that, you know,

7    his working relationship with him, how long he's

8    known him, and how often he did business with him.

9              MR. MUSITANO:  Judge, this is all hearsay.

10             THE COURT:  It is.  Sustained.

11   BY MR. DUSZKIEWICZ:

12   Q.   Now did there come a point in time that --

13   well, again, approximately what time of day was it

14   that you arrived in Buffalo?

15   A.   It was almost 4:00 o'clock in the afternoon.

16   Q.   All right.  And after these conversations that

17   you had with Mr. Knighton, did you have occasion to

18   return to Syracuse?

19   A.   Yes, sir.

20   Q.   Who did you return with?

21   A.   With Investigator Fox and William Valerio.

22   Q.   All right.  And when you arrived in Syracuse,

23   what, if anything, did you do?

24   A.   I filled out an information, and we arrested

25   Mr. Valerio for possession of the seven kilos of

1  cocaine.

2  Q.  When you say you filled out an information,

3  what do you mean?

4  A.  I filed a court paper charging him with the

5  charge of possession of controlled substances in

6  the first degree.

7  Q.  Okay.  Is that a -- is that a certain level of

8  felony under New York State law?

9  A.  Yes.  It's an A felony.

10  Q.  The highest grade of felony, correct?

11  A.  That's correct.

12  Q.  That was what he was charged with or what he

13  had possession of, is that correct?

14  A.  That's correct.

15  Q.  What happened to him, if anything, that is,

16  Mr. Valerio that day?

17  A.  Well, he was turned over to Trooper Ryan, and

18  Mr. Ryan -- Trooper Ryan ended up arraigning him in

19  front of town Judge Carey, and he was placed in

20  jail without bail at that point.

21  Q.  All right.  Did there come a time that he was

22  bailed out?

23  A.  Yes, he was.

24  Q.  Okay.  And were any -- well, were you present

25  when he was bailed out?

1    A.   I met with him after he was bailed out.

2    Q.   Did he have a lawyer?

3    A.   Pardon me?

4    Q.   Did he have a lawyer?

5    A.   Yes, he did.

6    Q.   Same lawyer that you spoke with on March 13th?

7    A.   Yes, Charles Nolan.  Dolan.  I'm not sure.

8    Nolan or Dolan.

9    Q.   All right.  And did you have anything to do

10   with him getting bailed out?

11   A.   Yes, I did.

12   Q.   What did you have to do with him?

13   A.   I requested he get bailed out to further other

14   investigations.

15   Q.   And did he assist you in other investigations?

16   A.   Yes, he did.

17   Q.   Now, as a result of the charges that you placed

18   against him in Syracuse, was he convicted of those

19   charges?

20   A.   He pled guilty to those charges.

21   Q.   And who sentenced him?

22   A.   He was sentenced both in Massachusetts and New

23   York, but he was sentenced in New York by Senior

24   ADA Frontac (phonetic), I believe, was the attorney

25   for the state.  I don't recall who the judge was.

1    Q.   Well, it's the judge that imposes the sentence?

2    A.   That's correct.

3    Q.   So it's the judge that chooses, for example, a

4    ten-year sentence?

5    A.   Right.  It would have been a county court

6    judge.

7    Q.   I presume the same procedure in Massachusetts?

8    A.   I would assume.

9    Q.   Did you have anything to do with influencing

10   the judge for a ten-year sentence, at least as far

11   as your case is concerned?

12   A.   No.

13          MR. DUSZKIEWICZ:  Can I have a moment,

14   Judge?

15          THE COURT:  Yes.

16   BY MR. DUSZKIEWICZ:

17   Q.   Just one final question, Investigator Davis.

18   The information that was initially provided to you

19   by Mr. Valerio --

20   A.   Yes, sir.

21   Q.   -- was that right on the mark?

22          MR. MUSITANO:  Objection.

23          THE COURT:  Sustained.

24          MR. DUSZKIEWICZ:  Well, Mr. Valerio

25   provided you with a sum of money or an amount that

```
1    was expected?
2              MR. MUSITANO:  It's been asked and
3    answered, Judge.
4              THE COURT:  Sustained.
5              MR. DUSZKIEWICZ:  Mr. Valerio provided you
6    with a name of an individual he was meeting?
7              MR. MUSITANO:  Asked and answered, Judge.
8              THE WITNESS:  Sustained.  That's it,
9    Mr. Duszkiewicz.
10        Okay.  Cross-examination, please.
11             MR. MUSITANO:  Thank you, Judge.
12   CROSS-EXAMINATION BY MR. MUSITANO:
13   Q.  Good morning, Investigator.
14   A.  Good morning, sir.
15   Q.  How are you?
16   A.  I'm fine.
17   Q.  Investigator, near the end of your direct
18   examination you talked about the incident at the
19   Walden Galleria?
20   A.  Yes, sir.
21   Q.  Where Mr. Knighton was identified sitting in a
22   vehicle?
23   A.  I don't recall saying he was identified sitting
24   in a vehicle, no.
25   Q.  Okay.  Did there come a point in time when an
```

1    individual was removed from a black SUV that you

2    observed?

3    A.   Yes, sir.

4    Q.   Okay.  And when he was removed from the SUV,

5    this individual, was it this Steven Knighton here?

6    A.   Yes, it was.

7    Q.   Was he removed from the vehicles at gunpoint?

8    A.   Yes, he was.

9    Q.   By several officers?

10   A.   Yes, sir.

11   Q.   Placed on the ground?

12   A.   I believe so.

13   Q.   Cuffed?

14   A.   Yes, sir.

15   Q.   And placed near the vehicle so that you could

16   do a drive-by with Mr. Valerio, correct?

17   A.   That's correct.

18   Q.   And after that, he was taken to -- Mr. Knighton

19   was taken to the police station?

20   A.   Yes, sir.

21   Q.   And that's where you had your conversation with

22   Mr. Knighton, correct?

23   A.   That is correct.

24   Q.   A conversation that you did not record on a

25   recording device, correct?

1    A.  Yes, sir.

2    Q.  You did record it?

3    A.  No, I did not.

4    Q.  Okay.  And you took notes of that conversation,

5    correct?

6    A.  Just briefly.

7    Q.  I'm sorry?

8    A.  I made a couple notations.

9    Q.  Okay.  In those notations -- strike that.

10   After those notations were taken, did you give them

11   to Mr. Knighton and say "Review these, make sure

12   they're accurate, and sign it?"

13   A.  No, I did not.

14   Q.  Okay.  So the statement you took from

15   Mr. Knighton is what you wrote down on a piece of

16   paper without Mr. Knighton approving it, is that

17   fair to say?

18   A.  I would not call it a statement.  I would call

19   it my notes of my conversation with Mr. Knighton.

20   Q.  Okay.  As you interpreted the conversation,

21   correct?

22   A.  Yes, sir.

23   Q.  Okay.  Now, how long was Mr. Knighton at the --

24   was it the Cheektowaga police station or Amherst

25   police station?

1    A.   Cheektowaga, I believe.

2    Q.   How long was he at the Cheektowaga police

3    station?

4    A.   From the time he was taken into custody to the

5    time we let him go, I believe it was just a hair

6    over 30 minutes.

7    Q.   Okay.  And at the end of the 30 minutes, I

8    thought I heard you say he left.

9    A.   To the best of my knowledge.  We left.

10   Q.   Did you let Mr. Knighton go?

11   A.   Yes, sir.

12   Q.   Did you place him under arrest for a conspiracy

13   charge?

14   A.   No, sir.

15   Q.   Did you place him under arrest for a criminal

16   possession of a controlled substance in the first

17   degree charge?

18   A.   He was not arrested for anything.

19   Q.   He was let go, correct?

20   A.   That is correct.

21   Q.   In addition, you returned his vehicle, correct?

22   A.   That's correct.

23   Q.   And could you tell this honorable jury if the

24   vehicle was leased?

25   A.   I believe it was.

1    Q.   Okay.  Now, you told Mr. Duszkiewicz that

2    Mr. Knighton told you he was on a disability and

3    collecting about $1,400 a month, correct?

4    A.   That's correct.

5    Q.   Can you tell this honorable jury how much

6    investigation you did with respect to

7    Mr. Knighton's finances before that date?

8    A.   Absolutely none.

9    Q.   Do you know whether or not he received a

10   settlement?

11   A.   I have no idea.

12   Q.   Do you know whether or not he won money at a

13   casino?

14   A.   No, I don't.

15   Q.   Okay.  And that day, March 13th, 2009,

16   Mr. Knighton was released after being taken down at

17   gunpoint, given his vehicle, and let -- allowed to

18   leave, correct?

19   A.   That's correct.

20   Q.   Was Mr. Valerio charged that day, on March the

21   13th, with a conspiracy charge?

22   A.   No.  He was just charged with the possession.

23   Q.   The criminal possession of a controlled

24   substance, first degree, correct?

25   A.   That's correct.

1    Q.   Now, you indicated to Mr. Duszkiewicz after the

2    takedown of Mr. Valerio at the Warner service area

3    that you went to the station, the CNET Central

4    station, if I can call it that?

5    A.   No.   Actually it was a uniformed station, SP

6    North Syracuse.

7    Q.   I apologize, SP?

8    A.   State Police North Syracuse.

9    Q.   From there you left and went to Buffalo,

10   correct?

11   A.   That's correct.

12   Q.   Now during the trip, Mr. Valerio was sitting in

13   the back seat, correct?

14   A.   Yes, sir.

15   Q.   There was no investigator sitting beside him?

16   A.   No.

17   Q.   No Spanish-speaking investigator sitting beside

18   him?

19   A.   No.

20   Q.   And he was allowed to use his telephone,

21   correct?

22   A.   Yes, sir.

23   Q.   By the way, do you have his telephone so we can

24   show this honorable jury the phone?

25   A.   His phones were returned to him.

1    Q.   The same phones he used to call Mr. Knighton,

2    correct?

3    A.   That's correct.

4    Q.   And during the ride from the station to Buffalo

5    or to Walden Galleria Mall, how long of a ride was

6    it?

7    A.   Approximately two hours.

8    Q.   Okay.  And I take it you were traveling pretty

9    quickly, correct?

10   A.   I really didn't pay attention.

11   Q.   Okay.  Because you were taking notes, correct?

12   A.   Pardon me?

13   Q.   You were the one taking notes in the vehicle?

14   A.   I was handling multiple phone calls and jotting

15   down notes as we went if I could, yes.

16   Q.   Also monitoring phone calls that Mr. Valerio

17   was making, correct?

18   A.   As best I could, yes.

19   Q.   Well, you indicated that Mr. Valerio made

20   several phone calls to Steven Knighton, correct?

21   A.   They were push-to-talk.

22   Q.   Conversations via push-to talk, correct?

23   A.   That's correct.

24   Q.   Can you tell this honorable jury how many times

25   you heard Steven Knighton's voice?

1    A.   I don't really recall hearing Steven Knighton's

2    voice, to tell you the truth.   I was far enough

3    away I could hear Willy Valerio's side of the

4    conversation.   I know I could hear a voice on the

5    phone, but I couldn't identify it personally as

6    Steven Knighton or anybody else at that point.

7    Q.   So you didn't know who Mr. Valerio was talking

8    to, right?

9    A.   Other than him telling me it was Steven

10   Knighton, and on his phone he had Steven listed

11   with that push-to-talk number, no.

12   Q.   Tell this honorable jury when you saw that

13   phone.

14   A.   Pardon me?

15   Q.   Can you tell this honorable jury when you saw

16   the phone with the name Steven on it?

17   A.   It was Steve, actually.   On the way in between

18   Syracuse and Buffalo, he had showed me his phone,

19   along with Steve.   He had three or four listed that

20   I wrote down in my notes, wrote down the

21   push-to-talk numbers.

22   Q.   Okay.   And in addition you also saw other

23   names, I believe?

24   A.   Yes, sir.

25   Q.   Okay.   Now, did you ask Mr. Valerio to use his

1   speaker phone?

2   A.  No, I did not.

3   Q.  Okay.  So is it fair to say that whether he was

4   talking to this Steven Knighton, as you sit here

5   today, you don't know?

6   A.  No, I don't.

7   Q.  Okay.  Now you indicated to Mr. Duszkiewicz

8   that he made several phone calls in Spanish, is

9   that correct?

10  A.  Yes, he did.  He received phone calls.  They

11  were talking in Spanish.

12  Q.  Do you understand Spanish?

13  A.  No, I don't.

14  Q.  Do you know whether or not Investigator Fox

15  does?

16  A.  No idea.

17  Q.  Okay.  And is it fair to say whatever

18  Mr. Valerio was saying to these people in Spanish,

19  you have no idea?

20  A.  That's correct.

21  Q.  You have no idea if he asked somebody to call a

22  Steven Knighton at this number to meet him at the

23  Walden Galleria, is that fair to say?

24  A.  As I said, I have no idea what he said.  He

25  could have been ordering a pizza for all I know.

1   Q.   Pardon me?

2   A.   I said I had no idea what he said in Spanish.

3   Q.   Now -- and then you -- could you tell us

4   approximately how many phone calls were made

5   between William Valerio and this person at the

6   other end named Steve or Steven?

7   A.   There was numerous.  Couldn't give you an exact

8   number.  Most of them were just to keep him

9   comfortable until we got there.

10  Q.   Can you tell this honorable jury when before

11  March 13th, 2009, you had met William Valerio?

12  A.   I never met him before that day.

13  Q.   Had you ever worked with William Valerio?

14  A.   No, I did not.

15  Q.   Did you have any idea about his reliability?

16  A.   No, I did not.

17  Q.   You knew he had an extensive criminal record,

18  correct?

19  A.   I had run his criminal record prior to meeting

20  him, yes.

21  Q.   I'm sorry?

22  A.   I said I had run his criminal history prior to

23  meeting him, yes.

24  Q.   You saw his criminal record and all the

25  convictions on it?

1    A.   Yes, sir.

2    Q.   You knew Mr. Valerio was on parole, correct?

3    A.   Yes, sir.

4    Q.   Did you contact his parole officer and tell him

5    he had police contact?

6    A.   Personally, no.

7    Q.   Now you told Mr. Duszkiewicz that Mr. Valerio

8    was traveling with you and Investigator Fox to make

9    an attempt or a controlled delivery, is that fair

10   to say?

11   A.   We had no intention of delivering anything.

12   Q.   You were going to go through the stages of

13   doing that, correct?

14   A.   That's correct.

15   Q.   Okay.  And you were going there with the notion

16   that Mr. Valerio going to deliver one kilo of

17   cocaine to Steven Knighton, isn't that true?

18   A.   Mr. Valerio told me that he owed him for one

19   kilo of cocaine.  I asked him where the rest were

20   going, and he told me they were going to Lemiel

21   Jones.  I assumed that it was one kilo going to

22   Mr. Knighton and five going to Mr. Jones.

23   Q.   Well, you testified in front of the grand jury

24   in this matter on February 15th, 2012, correct?

25   A.   That's correct.

1   Q.   And you remember telling the -- strike that.

2   When you testified in the grand jury you were under

3   oath, correct?

4   A.   Yes, sir.

5   Q.   You were being asked questions?   By

6   Mr. Duszkiewicz?

7   A.   Sure.

8   Q.   This Mr. Duszkiewicz sitting behind me,

9   correct?

10  A.   Yes, it is.

11  Q.   Isn't it true that you were asked questions

12  about where the keys were going, and you said five

13  were going to Mr. Jones and one was going to

14  Mr. Knighton?

15  A.   That was my perception of it, yes.

16  Q.   Okay.  And that was based on your conversation

17  with Mr. Valerio, correct?

18  A.   Yes, sir.

19  Q.   Now, when you got into the vehicle with

20  Mr. Valerio and Investigator Fox to leave for

21  Syracuse, did you make -- strike that.  When you

22  and Investigator Fox left Syracuse with

23  Mr. Valerio, did you know you were going to make

24  conversations or allow Mr. Valerio to have

25  conversations with this Steve?

1    A.   Yes, sir.

2    Q.   Did you make any attempt to get a recording

3    device to record those conversations?

4    A.   No, sir.

5    Q.   You knew Mr. Valerio spoke Spanish, correct?

6    A.   I knew he was Hispanic, yes.

7    Q.   You knew that when you left Syracuse and headed

8    to Buffalo, correct?

9    A.   Yes, sir.

10   Q.   Did you make any efforts to contact a local law

11   enforcement agent that worked with you that was

12   Spanish-speaking to sit with Mr. Valerio to

13   overhear any conversations?

14   A.   At that time we had no reason to believe there

15   would have been Spanish speaking, because

16   Mr. Valerio told us that the two people he may meet

17   in Buffalo both spoke English.  Mr. Valerio spoke

18   very good English.  So, no.  The answer would be

19   no.

20   Q.   Did you want Mr. Valerio to contact his sources

21   of supply?

22   A.   The source of supply contacted Mr. Valerio when

23   we were in transit, and he continued to have

24   dialogue with the sources at that point.

25   Q.   How many times did the sources contact

1    Mr. Valerio?

2    A.   There's a few anyway.  I mean, there was

3    probably four or five I guess.  I'd have to --

4    Q.   Okay.  I'm sorry?

5    A.   And then he would relay what his interpretation

6    in Spanish back to English to me, what was said in

7    those conversations.

8    Q.   And when were those sources of supply arrested

9    by a CNET unit close to New York City?

10   A.   The CNET unit never arrested any of them.

11   Q.   Now you indicated to Mr. Duszkiewicz as these

12   phone calls were taking place on the ride from

13   Syracuse to Walden Galleria, that Mr. Valerio was

14   advising you of who he was speaking to, correct?

15   A.   That's correct, and he would show me the

16   push-to-talk numbers.

17   Q.   Okay.  Did you have any way of confirming

18   whether or not he was giving you accurate

19   information as to who he was speaking to?

20   A.   Other than looking at his phone, no.

21   Q.   Now, you indicated to Mr. Duszkiewicz that

22   after you finished -- strike that.  After you

23   finished at the local police station in the Buffalo

24   area, that you returned with Mr. Valerio to

25   Syracuse?

1    A.   That's correct.

2    Q.   And you indicated to Mr. Duszkiewicz he was

3    arraigned in front of a town judge?

4    A.   That's correct.

5    Q.   And then he was remanded?

6    A.   Yes, sir.

7    Q.   And prior to going through that procedure, you

8    had talked, and you indicated, engaged him in

9    cooperating with you, correct?

10   A.   Yes, sir.

11   Q.   And he was released a week later when he

12   appeared before another judge?

13   A.   I believe so, yes.

14   Q.   And you met with him after that?

15   A.   Yes, I did.

16   Q.   Okay.  And after that he -- he left the

17   Syracuse area with his vehicle and telephones,

18   correct?

19   A.   Yes, sir.

20   Q.   And he agreed to continue cooperating with you,

21   correct?

22   A.   That is correct.

23   Q.   Okay.  And did you have conversations with him

24   after he left the Syracuse area?

25   A.   Yes, I did.

1  Q.  And how many times did you have conversations

2  with him?

3  A.  Probably once a week.

4  Q.  Did you make any notes of those conversations?

5  A.  No, sir.

6  Q.  Okay.  And he was released about March 20th,

7  2009, correct?

8      Would you agree with that, about a week after

9  he was arrested?

10  A.  Yes, sir.

11  Q.  And you indicated that you had phone

12  conversations with him once a week?

13  A.  Yes, sir.

14  Q.  And when you assisted Mr. Valerio in getting

15  out on bail, did you tell him that he had to lead a

16  law-abiding life if he was going to cooperate with

17  you?

18  A.  Yes, sir.

19  Q.  Did you tell him that he could not violate the

20  law anymore?

21  A.  Yes, I did.

22  Q.  Did you tell him that he couldn't sell drugs?

23  A.  Yes, I did.

24  Q.  And he told you that he wouldn't, right?

25  A.  He agreed.

1   Q.  He told you he wouldn't sell drugs, and he'd

2   get out of the drug business, correct?

3   A.  He didn't tell me he would get out of the drug

4   business, because he was going to further

5   investigations for us.  But he did tell us that he

6   would not do criminal activity without us being

7   present, either myself or the DEA.

8   Q.  Because you don't give persons permission to go

9   violate the law, correct?

10  A.  If they're working for us, we do.  If they're

11  working with us at the time, yes.  If they're on

12  their own, no.

13  Q.  Okay.  Because you don't have that authority,

14  correct, to allow somebody to violate the law when

15  they're not working with you?

16  A.  That's correct.

17  Q.  Okay.  So when Mr. Valerio left, you became

18  aware that in August, five months later, four

19  months later, whatever it was, he was caught with

20  three kilos of cocaine?

21  A.  I was aware of that, yes.

22  Q.  Okay.  And that was in direct contradiction to

23  what he had told you, correct?

24  A.  He was told he wasn't supposed to do that,

25  that's correct.

1    Q.  And he told you that he wasn't?

2    A.  Yes, sir.

3    Q.  He lied to you, correct?

4    A.  Apparently so.

5    Q.  Okay.  And he lied all along to get himself out

6    of jail so he could get back to the drug business,

7    correct?

8              MR. DUSZKIEWICZ:  Objection.

9              THE WITNESS:  That I don't know.

10             THE COURT:  Grounds?

11             MR. DUSZKIEWICZ:  Again, I'll accept the

12   answer.  How would he know?

13             THE COURT:  Okay.  Move on, please,

14   Mr. Musitano.

15             MR. MUSITANO:  Certainly.

16   BY MR. MUSITANO:

17   Q.  Now, Mr. Valerio was sentenced in New York

18   State after he was sentenced in Massachusetts,

19   correct?

20   A.  That's correct.

21   Q.  He was sentenced in about 2010 in

22   Massachusetts, correct?

23   A.  Yes, sir.

24   Q.  And then couple years later sentenced in New

25   York State?

1    A.   I'm not sure on the dates.  I know that we

2    couldn't sentence him in New York until he was done

3    in Massachusetts.  So New York was on hold until

4    that sentencing was done.

5    Q.   Okay.  And prior to being sentenced in New

6    York, you're aware that Mr. Valerio met with

7    Investigator Callahan -- or strike that --

8    Calloway?

9    A.   I knew he was going to meet with him.

10   Investigator Calloway was going to meet with him,

11   yes.

12   Q.   Okay.  And then after that meeting is when he's

13   sentenced, correct?

14   A.   If you say so.  I don't know the dates.

15   Q.   You're not aware of the date that Investigator

16   Callahan -- strike that -- Calloway went with to

17   talk --

18   A.   I was aware he went.  I was not aware of the

19   dates he went.

20   Q.   But you're aware that Mr. Valerio was sentenced

21   after that?

22   A.   Again, I'm not sure if it was before or after

23   talking to Investigator Calloway or not.

24   Q.   Okay.  Did you discuss the case with

25   Investigator Calloway?

1    A.   I gave him a -- prior to him going to meet with

2    Mr. Valerio, I told him what I knew of the case,

3    yes, any furtherance beyond the Buffalo area.

4    Q.   And you knew he was -- you knew Mr. Valerio was

5    sentenced to ten years in Massachusetts, correct?

6    A.   Yes, sir.

7    Q.   And he got a ten-year sentence in New York

8    State, right?

9    A.   That's correct.

10   Q.   To run concurrent with the sentence in

11   Massachusetts, right?

12   A.   Yes, sir.

13   Q.   So he's actually doing one sentence for all

14   this cocaine he was transporting, correct?

15   A.   Yes, sir.

16          MR. MUSITANO:  Could I have a moment,

17   Judge, please?

18          THE COURT:  Certainly.

19   BY MR. MUSITANO:

20   Q.   Judge, just a couple final questions,

21   Investigator.  I apologize.  Was Mr. Valerio ever

22   charged with a drug conspiracy in federal court?

23   A.   Not to my knowledge.  Actually, he may have

24   been.  I don't know.

25          MR. MUSITANO:  Thank you.  I have nothing

1    further.

2                THE COURT:  All right.

3         Anything, Mr. Duszkiewicz?

4                MR. DUSZKIEWICZ:  Yes, Judge, if I may.

5    REDIRECT EXAMINATION BY MR. DUSZKIEWICZ:

6    Q.  Investigator Davis, you indicated to

7    Mr. Musitano that Mr. Valerio got basically a

8    ten-year sentence for both cases, is that correct?

9    A.  Yes, sir.

10   Q.  The year and a half that Mr. Valerio was not

11   sentenced in New York, do you know if he gets

12   credit towards the New York sentence?

13   A.  No, he did not.

14   Q.  So, in fact, it's going to be more than ten

15   years.

16   A.  Total.  If he runs the full length, he'll end

17   up doing like 11 and a half, I would assume.

18   Q.  All right.  Now, Mr. Musitano also asked you

19   some questions about some promises and some

20   understandings that you had with Mr. Valerio when

21   he was released on his charges in Syracuse.  Do you

22   recall him asking you those questions?

23   A.  He wasn't promised anything.

24   Q.  Well, I guess he promised you, according to

25   Mr. Musitano, that he wasn't going to be selling

1    drugs.

2    A.   That's correct.

3    Q.   You specifically told him he's not going to be

4    selling drugs?

5    A.   That's correct.

6    Q.   You indicated also that there were some efforts

7    to further his cooperation, is that correct?

8    A.   Yes, sir.

9    Q.   Okay.  Did Mr. Valerio also cooperate for you

10   after this event?

11   A.   He cooperated with myself and DEA down in New

12   York City.

13   Q.   So when Mr. Musitano asked you if CNET ever

14   arrested anybody in New York City, that was a

15   correct answer?

16   A.   CNET did not, no, but --

17   Q.   Were there arrests made in New York City based

18   on Valerio's cooperation?

19   A.   Yes, there were.

20   Q.   Now, you also indicated that on the 13th of

21   March you had no intention of delivering any

22   cocaine?

23   A.   That's true.

24   Q.   Where was the cocaine that was located in

25   Mr. Valerio's vehicle?

1  A.   That was taken by our evidence technician and

2  put into evidence at CNET Central, eventually sent

3  to the lab for processing.

4  Q.   So it never came to Buffalo?

5  A.   No, sir.

6  Q.   Now, you told Mr. Musitano that you made notes

7  indicating that Mr. Knighton was going to be paying

8  $41,000 for a kilo of cocaine?

9  A.   That's correct.

10  Q.   And you said you made an assumption relative to

11  that particular amount, that is, one kilo to

12  Mr. Knighton, five kilos to Mr. Lemiel Jones?

13  A.   That's correct.

14  Q.   Okay.  Did you ever find out it was a -- a

15  different sequence or different amount?

16  A.   Yes, I did.

17  Q.   And the different amount was what, sir?

18  A.   The amount was still the same.  It 41,000 for a

19  kilo, but I had found out after that that

20  Mr. Valerio was going to front Mr. Knighton a

21  second kilo, and the other four were to went to

22  Lemiel Jones.  Originally I had assumed it was

23  five, but it was four.

24  Q.   It's still a crime to front drugs, isn't it?

25  A.   Most certainly it is.

1    Q.  You don't have to pay for them all the time

2    just to be guilty of possession or sale, do you?

3    A.  No, sir.

4    Q.  Now, you were asked by Mr. Musitano also

5    whether you had -- whether you knew about

6    Mr. Valerio's criminal history.  Do you recall him

7    asking you that question?

8    A.  Yes, sir.

9    Q.  And you said you had run his criminal history?

10   A.  I did.

11   Q.  That was based on information provided to you

12   by the informant in Syracuse?

13   A.  That's correct.

14   Q.  Did you have any time to run any data on Steven

15   Knighton or Lemiel Jones?

16   A.  No.

17   Q.  Now, Mr. Musitano also asked you whether there

18   were a number of phone calls between Mr. Knighton

19   and Mr. Valerio while you were traveling from

20   Syracuse to Buffalo, and I think you told him you

21   couldn't given an exact number?

22   A.  That's correct.

23   Q.  Did you keep notes containing a chronology with

24   respect to the times and the number of phone calls

25   that Mr. Valerio had with Mr. Knighton?

1    A.   Best I could, yes.

2    Q.   Would looking at those notes refresh your

3    recollection as to the times and the number of

4    calls that were between Mr. Knighton and

5    Mr. Valerio?

6    A.   Certainly.

7              MR. DUSZKIEWICZ:  May I, your Honor?

8              THE COURT:  Certainly.

9    BY MR. DUSZKIEWICZ:

10   Q.   Investigator Davis, I've handed you what's

11   marked Government Exhibit 16.  It is two stapled

12   pages, the first of which is written on both sides.

13   Do you recognize that item, sir?

14   A.   Yes, I do.

15   Q.   And what do you recognize that item to be?

16   A.   It's my handwritten notes from the date of

17   March the 13th, 2009.

18   Q.   Do those notes refresh your recollection as to

19   the number of times and the actual timing on the

20   clock that Mr. Valerio and Mr. Knighton were having

21   conversations?

22   A.   Yes, sir.

23   Q.   Okay.  And do those notes also reflect the

24   push-to-talk numbers for Mr. Knighton, for

25   Mr. Jones, or for other individuals that were

1   identified to you by Mr. Valerio or evident to you

2   by looking at Mr. Valerio's telephone?

3   A.  Yes, sir.

4   Q.  Okay.  Thank you.  Take just a moment to -- to

5   yourself -- determine how many times you recorded

6   notations indicating that there were conversations

7   between Mr. Valerio and Mr. Knighton?

8   A.  Looks like I made notes that there were nine

9   times.

10  Q.  And those calls -- those calls span the

11  duration of your travels from Syracuse to Buffalo?

12  A.  That's correct.

13  Q.  Now, you indicated that Mr. Valerio would relay

14  the information to you concerning the nature of the

15  conversations he had with Mr. Knighton?

16  A.  Yes, sir.

17  Q.  And how would you verify that he was talking to

18  Mr. Knighton?

19  A.  Well, some of the conversation he called him

20  Steve.  But I still wouldn't know it was

21  Mr. Knighton.  All I know he called him Steve.

22  Just by looking at his phone and the push-to-talk

23  sequence, I would know that that was Steve anyway.

24  Q.  So did you, in fact, look at calls relative

25  to -- look at the phone after each of these phone

1   conversations?

2   A.   I wouldn't say after each of them, but I did

3   look at some of them, yes.

4   Q.   To verify the sequence?

5   A.   Yes, sir.

6   Q.   Mr. Valerio -- excuse me.  Mr. Musitano also

7   asked you some questions about these

8   Spanish-speaking conversations that occurred during

9   the travels between Syracuse and Buffalo?

10   A.   Yes, sir.

11   Q.   Okay.  And you indicated to him that

12   Mr. Valerio spoke very well in English?

13   A.   Yes, sir.

14   Q.   Identified the two individuals that he was

15   intending to meet or identified to you as both

16   English-speaking individuals?

17   A.   That's correct.

18   Q.   It would be Steve and Lemiel.

19   A.   Yes, sir.

20   Q.   Did you ever employ a Spanish-speaking police

21   officer to ride with Mr. Valerio to interpret

22   conversations?

23   A.   Yes, I did.

24   Q.   Was that in the nature of his further

25   cooperation?

1    A.   Yes, sir.

2    Q.   Did you and a Spanish-speaking officer and

3    Mr. Valerio and perhaps another officer travel

4    somewhere?

5    A.   Yes, we did.

6    Q.   That's unrelated to the events on March 13th?

7    A.   That's correct.

8    Q.   Now, with respect to the other questions that

9    Mr. Musitano asked you relative to your

10   conversation with Mr. Knighton at the Cheektowaga

11   Police Department, you indicated that you made some

12   notes of that particular conversation?

13   A.   Yes, sir.

14   Q.   And did you intend -- did you in your notes

15   write down accurately what Mr. Knighton said to

16   you?

17   A.   Yes, sir.

18   Q.   Okay.  Are they also contained similarly in

19   Government's Exhibit 16, which you've identified as

20   your notes?

21   A.   I think they're contained on a separate list,

22   you know, says his name, date of birth, where he

23   lives, that kind of stuff.  I made a couple of

24   small notes on the bottom of that, that page.

25   Q.   So there are notes contained in --

1    A.   Yeah, and I additionally put some on my yellow

2    page notes also.

3    Q.   Okay.   Those are the words that Mr. Knighton

4    used?

5    A.   That's correct.

6    Q.   Not your interpretation of the words?

7    A.   That's true.

8              MR. DUSZKIEWICZ:   I have nothing further.

9    Thank you.

10             THE COURT:   Anything, Mr. Musitano?

11             MR. MUSITANO:   Just a couple of questions,

12   Judge.

13             THE COURT:   Okay.

14   RECROSS-EXAMINATION BY MR. MUSITANO:

15   Q.   Investigator Davis, you indicated that the last

16   page of your handwritten notes contained the

17   information you got from Mr. Knighton, correct?

18   A.   I believe I made notation on there about that,

19   yes.   If I could look at it again, I could verify

20   that.

21             MR. MUSITANO:   May I?

22             THE COURT:   Sure.

23   BY MR. MUSITANO:

24   Q.   I'm showing you, Investigator Davis, what's

25   been previously marked as Government 16 for

1    identification, and ask you does that purport to be

2    the handwritten notes that you made in your

3    discussions with Mr. Knighton?

4    A.   Yes, along with -- like I said, there was

5    another white sheet of paper that had all his

6    personal information.  I made pretty much the same

7    notes on the bottom of that one.

8    Q.   And did you make any notation on this page that

9    Mr. Knighton received Miranda?

10   A.   No.

11   Q.   And you indicated that before -- or strike

12   that -- before anyone's questioned who's in

13   custody, they have to receive Miranda, correct?

14   A.   If they're going to give statement, they should

15   be Mirandized, correct.

16   Q.   That's the law, correct?

17   A.   That's correct.

18   Q.   And you did that, correct?

19   A.   Yes, I did.

20   Q.   But you didn't put that in your notes, correct?

21   A.   That is correct.

22   Q.   Now, you indicated that there were about nine

23   phone calls between a Steve and Mr. Valerio, is

24   that correct?

25   A.   Push-to-talk, yes.

1    Q.  And again when I say conversations, I'm

2    referring to the push-to-talk.

3    A.  Yes, sir.

4    Q.  Okay.  And there's -- the name "Steve" appears

5    on your handwritten notes several times, correct?

6    A.  Yes, sir.

7    Q.  Do you recall how many times you put a

8    push-to-talk number beside them?

9    A.  I don't believe I did.

10   Q.  Okay.  Did you have any way -- or strike that.

11   You indicated that you had Mr. Valerio's cell

12   phones at the police station in Syracuse, and you

13   gave them back, correct?

14   A.  That's correct.

15   Q.  Did you yourself take Mr. Valerio's cell phone

16   and push-to-talk to contact Mr. Knighton's phone?

17   A.  No, I did not.

18   Q.  Vice versa.  You had Mr. Knighton's phone -- or

19   Mr. Knighton's phone was taken during the --

20          MR. DUSZKIEWICZ:  Judge, excuse me.  This

21   is outside the scope of any redirect

22   conversations -- or redirect questions, excuse me.

23          THE COURT:  Sustained.

24   Q.  Now Mr. Duszkiewicz asked you about a promise

25   that Mr. Valerio made to you after he was released

1    in Syracuse.  Do you recall that?

2    A.  Well, it's written in our -- our paperwork when

3    we sign up an informant that they agreed not to do

4    criminal activity without us being present.

5    Q.  There's an actual form that's signed?

6    A.  There's confidential forms that are signed,

7    yes.

8    Q.  That Mr. Valerio signed?

9    A.  Yes, sir.

10    Q.  Do you have a copy of it?

11    A.  Those are not -- those go to our lieutenant and

12    they get put into a file.  And then our informants

13    receive a number at that point.  It's basically

14    just their information and, you know, what they

15    agree not to do.

16          MR. MUSITANO:  Judge, I would request a

17    copy of it.

18          THE COURT:  You have the CI form,

19    Mr. Duszkiewicz?

20          MR. DUSZKIEWICZ:  No, Judge.  It's totally

21    unrelated to the subject matter of this lawsuit.

22          THE COURT:  No.  Can you obtain it?

23          MR. DUSZKIEWICZ:  I don't know.

24          THE COURT:  Okay.  Make a search for it.

25    If you need it, we'll get it.

1          MR. DUSZKIEWICZ:  Judge, again, if we ask

2     the officer when that form was executed, it's

3     certainly well after March the 13th, 2009.

4          THE COURT:  Okay.

5          MR. DUSZKIEWICZ:  It has nothing to do

6     with this activity, as I've indicated.

7          MR. MUSITANO:  Well, Judge, he just said

8     he was an informant, and he was signed up.  That,

9     to me, is Brady material.

10          THE COURT:  No, it's not Brady material.

11     But it may relate to the credibility of this

12     witness.

13          MR. MUSITANO:  Judge, it could also have

14     benefits in there too, right?  If it's got

15     benefits --

16          THE COURT:  Is it still doesn't make it

17     Brady.

18          MR. MUSITANO:  If a cooperator is getting

19     a benefit from law enforcement or the government,

20     it doesn't make it Brady?

21          THE COURT:  Not necessarily.

22          MR. MUSITANO:  That's why I say, we need

23     the form to see it.

24          THE COURT:  Mr. Duszkiewicz, make an

25     effort to get it.

1          MR. DUSZKIEWICZ:  Well, Judge, we're going

2     to need a brief continuance here.

3          THE COURT:  You don't have to do it right

4     now.  We'll wrap up this questioning, and then make

5     an effort to get it --

6          MR. DUSZKIEWICZ:  That's what I meant, we

7     need a break after his testimony is concluded.

8          THE COURT:  Okay.

9          MR. MUSITANO:  And that promise or

10    commitment or whatever you want to call it that

11    Mr. Valerio made to you on March the 20th --

12         MR. DUSZKIEWICZ:  Again, Judge, there's no

13    basis to believe it happened on March the 20th.

14         MR. MUSITANO:  I'll rephrase the question.

15         THE COURT:  Sustained.

16         MR. MUSITANO:  I'm sorry.

17         THE COURT:  Go ahead.

18    BY MR. MUSITANO:

19    Q.  After Mr. Valerio was released is when you had

20    this conversation about his further cooperation,

21    correct?

22    A.  It was actually during the rides to and from

23    Buffalo and after.  He had told me that he had

24    other contacts that he could help out the police in

25    efforts to continue more investigations.

1    Q.   Would you agree with me that he was released

2    March 20th from custody in Syracuse?

3    A.   Yes, sir.

4    Q.   Okay.  So after March 20th up until he was

5    arrested in August in Massachusetts with three keys

6    of cocaine, could you tell this honorable jury

7    whether or not he went out and committed other

8    crimes?

9    A.   Without my knowledge, I have no idea until he

10   got arrested.

11   Q.   Was there anybody monitoring him while he was

12   out?

13   A.   That would have been down in the New York City

14   area.  I would not know.  Other than phone calls to

15   me telling me what he was doing down there, I have

16   no idea.

17   Q.   Was he telling you that he was selling drugs

18   down there?

19   A.   No, sir.

20           MR. MUSITANO:  I have anything further.

21   Thanks, Judge.

22           THE COURT:  Okay.  Thank you.  Okay.

23       Investigator Davis, thank you.  You're excused.

24       We'll take 15 minutes, and we will be back and

25   we'll resume with the next witness.

1          (Jury excused from the courtroom.)

2          (Short recess was taken.)

3          (Jury not present in the courtroom.)

4          THE COURT:  Mr. Duszkiewicz, you have a

5    matter you want to make for the record?

6          MR. DUSZKIEWICZ:  Well, no, Judge.  When I

7    was asking the Court -- or indicating that it's

8    going to take some time to locate a form, what I

9    meant, it was going to take some time.  The form

10   that Investigator Davis talked about is something

11   that the state police intend to keep confidential.

12   What I have done is Investigator Calloway is going

13   to over to his office to obtain a copy of a

14   document -- a copy of the form, but it's an

15   unfilled out form, so that counsel can examine it

16   to see whether it contains the alleged promise that

17   he baited, I guess, Investigator Davis into saying

18   he obtained from Mr. Valerio.  Again, I'm waiting

19   for Investigator Calloway to come back.  I didn't

20   want the jury to come out.

21         THE COURT:  Who's your next witness?

22         MR. DUSZKIEWICZ:  My next witness would be

23   Investigator Calloway.

24         MR. MUSITANO:  Judge, maybe I'm missing

25   something here.  I don't know.  But a blank form is

1    going to tell me what?  Nothing dealing with

2    Mr. Valerio.

3              THE COURT:  Well, I mean, to the extent

4    that, one, it's the standard form, I guess that's a

5    step that you're familiar with, because you've

6    probably seen those forms before.

7              MR. MUSITANO:  I've never seen a form,

8    Judge.  As an officer of your court, I can tell you

9    I've never seen a New York State Police

10   confidential informant form.

11             THE COURT:  Okay.

12             MR. MUSITANO:  That's number one.  Number

13   two, if there's boxes that are checked off or

14   information that's included on Mr. Valerio, how is

15   a blank form going to tell me what's on

16   Mr. Valerio's?

17             THE COURT:  I understand that.  But how

18   long is it going to take Mr. Calloway to get back

19   here?

20             MR. DUSZKIEWICZ:  Judge, I can call.  He

21   just went up the street.  I don't know if he's --

22   if there is a copy of a blank form sitting right on

23   his desk or not.  He just said he can go over to

24   the office and get one.  He walked out as soon

25   as -- as soon as the Court dismissed the jury.

1              THE COURT:  Where is his office?

2              MR. DUSZKIEWICZ:  He's over in DEA at

3    Washington Street.

4              THE COURT:  At the Electric Building?

5              MR. DUSZKIEWICZ:  Yeah.

6              THE COURT:  Okay.  But where is the

7    original form?

8              MR. DUSZKIEWICZ:  That's on file in

9    Albany, I believe.

10             INVESTIGATOR DAVIS:  That's maintained by

11   our lieutenant in a confidential informant file at

12   our office.  That would have personal information

13   about the informant, their family, that type of

14   stuff on there.  That's why it's basically kept

15   confidential so cooperating witnesses aren't

16   subject to harassment or injury or whatever.

17      They are issued a number, then from any time

18   they work with those informants from then on, we

19   refer to the number rather than the person.

20             MR. MUSITANO:  Judge, I'm not looking for

21   the man's personal family history.

22             INVESTIGATOR DAVIS:  That's what it is.

23             MR. MUSITANO:  I just want to know what it

24   does and says regarding his relationship with

25   whether it's the New York State Police, whether

1    it's DEA.  I mean, I don't know, Judge.  If there's

2    conditions on it that have to be followed, what are

3    those conditions?  I mean, I just don't know until

4    I see it.

5            THE COURT:  Well, here's what we're going

6    to do.  We'll get the form, get the original one.

7            MR. DUSZKIEWICZ:  Judge, what I just

8    understood Investigator Davis to say is the state

9    police will not turn over the original form.

10           THE COURT:  Well, I'll direct that they do

11   it.

12           MR. DUSZKIEWICZ:  Well, again, Judge --

13           THE COURT:  But I want to see it.  You can

14   do it to me in camera.

15           MR. DUSZKIEWICZ:  Judge, again, that's

16   going to require the state police counsel to --

17           THE COURT:  So be it.

18           MR. DUSZKIEWICZ:  Well --

19           THE COURT:  No.  If that form was signed

20   by this informant, then it should be produced.

21           MR. DUSZKIEWICZ:  But again my point,

22   Judge, and I made it in front of the jury, it is an

23   informant beyond this case.  It is not related to

24   this case.  It's related to other investigations,

25   and not this -- the subject matter of this lawsuit,

1    which is Mr. Knighton's involvement with

2    Mr. Valerio.  It makes no reference and would make

3    no reference to the activities involving

4    Mr. Knighton on or about the 13th of March.

5              THE COURT:  You tell me then if I'm

6    missing the mark here.  But if there is an ongoing

7    relationship with the informant, and the informant

8    is benefiting from his relationship with a law

9    enforcement body, such as the state police, that

10   could affect the credibility of the witness and the

11   interest of the witness in the outcome of the case

12   it's not necessarily Brady, but it may well relate

13   to the matter of credibility, whether it's

14   specifically this case or not, because there is

15   that relationship or has been that relationship.

16   I'm not making Mr. Musitano's argument for him, but

17   seems to me that common sense would tell you that

18   that's a possibility.

19             MR. DUSZKIEWICZ:  Well, Judge, the

20   information that Mr. Valerio conveys relative to

21   this case is conveyed well in advance of the

22   execution of any form.  The predicate for getting

23   to this particular form is Investigator Davis.  Did

24   you tell him he couldn't sell drugs?  The answer to

25   the question was yes.  And did he promise you he

1    wouldn't sell drugs?  And whether it's an implicit

2    promise, an explicit promise, a written promise,

3    again has nothing to do with his pre-activities,

4    that is, his cooperation instantaneously upon his

5    arrest.

6             THE COURT:  No.  But it may apply to his

7    testimony in court today, because he may have

8    different issues that relate to what he expects or

9    doesn't expect from his cooperation here in this

10   case.

11            MR. DUSZKIEWICZ:  Judge, he has -- again,

12   that question was never asked.  He has no

13   expectation.  He's been a sentenced prisoner

14   vis-a-vis a Syracuse charge and vis-a-vis a

15   Massachusetts charge.

16            THE COURT:  Here's what we're going to do:

17   If you have a legal position that you think is

18   sustainable that the document is privileged or you

19   refuse to turn it over, give me the authority on

20   that.

21        We're going to proceed with Calloway.  And if

22   you have authority that indicates that you're

23   entitled to that information, get it to me, and,

24   you know, we're not going to wait today to get it

25   resolved.  You work on it over the weekend

1   likewise, and we'll address it first thing on

2   Monday.

3           MR. MUSITANO:  Judge, for example, if this

4   individual signs that cooperation agreement in May,

5   and then goes out -- and on this agreement it tells

6   you what your activities are, what you have to do

7   and all this stuff here -- three months later goes

8   out and commits crimes, how is that not, first of

9   all, impeachment material, number one, that he

10  makes a contract with the government that he's

11  breaking.  I mean, how is that -- number one.

12  Number two, if he's getting benefits that are

13  contained in there, how is that not Brady?

14          THE COURT:  It's not Brady.  If you think

15  it is, I'll take your authority on it.  But I'll

16  take a look at it.  I'm not precluding you from

17  getting that.  I want to get this in motion.  The

18  government's position is you're not entitled to it,

19  I guess.  Your position is that you are on two

20  grounds, one, it relates to the matter of

21  credibility, and secondly, you claim it's Brady.

22  If that's the case, I'll take a look at it.  But

23  obviously I don't have either of your authority on

24  this.

25          MR. DUSZKIEWICZ:  Judge, in all due

1    respect, counsel just said that, you know, it is

2    something he could use for impeachment.  He has

3    been impeached.  We had two hours of

4    cross-examination about you got such a deal.

5    Mr. Musitano opened to the jury saying you walked

6    away from this case all together with nothing.

7    He's implicitly impeached him.  He explicitly

8    impeached on the record relative to his committing

9    crimes on parole, his committing crimes while on

10   release or while being bailed out by the state

11   police on this charge.  He's already been examined,

12   that is Mr. Valerio, relative to those things.  So

13   to say here's a form where you promised to it is

14   redundant.

15            THE COURT:  Well, I mean, at first blush

16   that argument doesn't impress me, and I think I've

17   stated why.  Because while there may have been

18   attempts at impeachment, if you believe it's

19   impeaching it may well be from the jury's

20   standpoint.  But it still doesn't fully disclose

21   what the full relationship is of this witness to

22   law enforcement, and that, I think, may properly be

23   considered by the jury.  Whether that particular

24   document was executed pre-testimony or post-arrest

25   I don't think necessarily that's determinative.  I

1     think it's -- the jury has the right to know

2     everything about the relationship with law

3     enforcement to assess properly the credibility of

4     this witness, if there's any interest that he might

5     have in the outcome of this case.

6              MR. DUSZKIEWICZ:  But in all due respect,

7     Judge, he's been examined about that.  He's been

8     examined, and he has testified before this jury

9     relative to his efforts to cooperate even beyond

10    this case, and that's exactly what Investigator

11    Davis testified about.  So it's clear that the

12    ten-year sentence, if that's the benefit that he

13    received, is as result of his efforts.  Whether he

14    signed a form to do it or not -- it's irrespective

15    of the form.  My point is simple.

16             THE COURT:  Well, I mean, there's like

17    Rule 35 situations where --

18             MR. DUSZKIEWICZ:  These are state

19    sentences, Judge.

20             THE COURT:  I said like Rule 35

21    situations, right?

22             MR. DUSZKIEWICZ:  Yeah.

23             THE COURT:  Where there may be the

24    possibility of some impact on sentence based on

25    continuing cooperation.  I don't know that.  I

1    mean, I don't know.  I mean, if that's your

2    position and there's authority for it,

3    Mr. Duszkiewicz, I'll accept it.  But I want you to

4    take a look at it and let me know what your

5    position is.  In the meantime I'll do some work on

6    it as well.  But don't wait until Monday morning to

7    request that file.  Get it in the works, and then

8    if it's privileged, I'll respect that privilege.

9    But I think it's right now at issue.

10        Mr. Musitano?  I know you have a heavy

11   afternoon today, and you may not be able to get

12   everything done, but probably, you know, if things

13   go well this afternoon, you'll have some additional

14   time on Saturday and Sunday to take a look at this.

15            MR. MUSITANO:  Not looking good, Judge,

16   but I think there is a case of United States versus

17   Monteleone where the defendant asked for an

18   informant's -- I don't remember if it was a DEA or

19   whatever, and the court ordered it produced.  In

20   United States versus Cotto, a case I tried with

21   Mr. Duszkiewicz in front of you, Judge, their

22   informant signed an agreement with Drug Enforcement

23   Administration.  You ordered them to turn it over.

24   This is not earth-shattering.

25            THE COURT:  It's not.  It comes up -- I'm

1    not sure that I've had it in the context, at least

2    recently, with respect to a state police agreement.

3    But usually the DEA agreements.  And then as you

4    know, Mr. Duszkiewicz, witnesses usually, when

5    post-sentence, need court approval to cooperate,

6    and your office makes applications to the judge

7    who's handled that particular defendant to allow

8    him pending sentence or her to cooperate as a

9    witness.  So we have that all the time.  You know,

10   I'm not intimately familiar with what the state

11   police forms are.

12            MR. DUSZKIEWICZ:  Well, Judge,

13   Mr. Musitano stated the chronology.  He was

14   arrested on the 13th.  He was bailed out on the

15   20th.  He was later arrested couple of months later

16   in Massachusetts.  The extent and the duration of

17   any agreement is between the 20th, perhaps the

18   13th, and the date he's arrested, when, of course,

19   nobody's going to continue to work with him for two

20   reasons, one, he's in jail; and two, he's violated

21   the agreement.  He wasn't pled and sentenced in

22   Syracuse for a year and a half thereafter.

23            THE COURT:  I mean, I'm not -- I have

24   difficulty accepting your timeline, because it can

25   extend beyond that.  It can extend while he's in

1    custody.  It can extend while he's pending

2    sentence, like, for example, in the Syracuse case,

3    because he can still have an ongoing relationship.

4    It's not necessarily precluded in all respects

5    until we see the documentation.

6         MR. DUSZKIEWICZ:  Well, again, in an

7    agreement it's not going to say this agreement is

8    in full force and effect until you get arrested

9    again in the state of Massachusetts.

10        THE COURT:  Well, let's -- I think it will

11   be all obviated if we saw the documents, or if

12   there's going to be, you know, opposition to that

13   by the state police, then I'll entertain argument

14   on it.

15        MR. DUSZKIEWICZ:  I understand there's

16   going to be opposition.

17        THE COURT:  Okay.

18        MR. MUSITANO:  Well, Judge, I think

19   there's something called a supremacy clause.  I'm

20   not sure what that really means.  But we're federal

21   court here, Judge, and if we want that document, I

22   can't believe that there's a state privilege that's

23   going to preempt the supremacy clause.

24        THE COURT:  Well, if over the weekend you

25   find out what the clause means and whether there's

1    a relationship here, I'll listen to that on Monday.

2    Okay?

3         All right.  Why don't you try to track down

4    Calloway, please, so we can get started.

5              MR. DUSZKIEWICZ:  Investigator Davis is

6    trying to contact him.

7              THE COURT:  Okay.  All right.  I mean, the

8    issue is really Calloway now, and then we'll get to

9    the issue of the form -- the cooperating individual

10   form at a later point in time.

11             MR. DUSZKIEWICZ:  I had two options,

12   Judge.  Investigator Davis said, "There may be one

13   in my truck."  And rather than go with the maybe,

14   Investigator Calloway said, "There should be one in

15   my office."  So rather than having both run out and

16   try to look, I said go with the there should be

17   versus the maybe.

18             THE COURT:  And now we're missing both.

19   It was a valiant effort I think, Mr. Duszkiewicz.

20        All right.  Chris, would you let the jury know

21   it's going to be a few minutes until we're up and

22   running again?

23             COURT SECURITY OFFICER:  Sure.

24             THE COURT:  Thank you.

25             (Short recess was taken.)

1              (Jury not present in the courtroom.)

2              THE COURT:  Okay.  We're resumed in the

3      case of United States versus Steven Knighton.  And

4      I was provided with a copy of what has been

5      represented to be the standard informant file

6      utilized by the state police.

7          I understand you've been given a copy of a

8      blank form, Mr. Musitano?

9              MR. MUSITANO:  Yes, your Honor.

10             THE COURT:  Okay.  Is there anything

11     additional that we have to discuss?

12             MR. MUSITANO:  No, Judge.

13             THE COURT:  Okay.  So we're on track

14     though, consistent with our earlier discussions,

15     you're going to make an effort to obtain --

16             MR. DUSZKIEWICZ:  Well, Judge,

17     Investigator Davis is outside in the hall.  He's

18     contacting back to his unit in Syracuse.  What he

19     has been advised is that state police policy is

20     that confidential informant files and agreements

21     are discarded after five years.  They're shredded

22     five years after the person either is deactivated

23     or has his or her last contact with a member of the

24     state police.

25         Investigator Yates is now checking to see if

1    this file, in fact, has been purged.  So it may not

2    exist is what I'm trying to advise the Court.  It's

3    been more than five years.

4            THE COURT:  Okay.  You still have the

5    obligation to run the search --

6            MR. DUSZKIEWICZ:  It's being done.

7            THE COURT:  Make that determination.  If

8    there is a position that you're going to maintain,

9    whatever authority you have on it, please get that

10   to me.  Likewise, Mr. Musitano, and if you want to

11   make your argument on the supremacy clause, you

12   know, I'll do some independent work on that as

13   well.

14        Okay.  I guess, Investigator Calloway, you're

15   next.  All right.  We're going to get the jury out

16   first though I think.

17            (Jury seated.)

18            THE COURT:  Where have you been?  Please

19   have a seat.  Okay.  Sorry for the delay.  We've

20   been working through an issue.  We don't have it

21   resolved, but I didn't want to keep you waiting any

22   longer, so we're going to proceed with the next

23   witness.

24        And, again, we're reassembled, for the record,

25   with my apologies that it took a little bit longer.

1    But it was, I think, productive for us to get what

2    we needed to get addressed and to work on it after

3    our testimony of this witness.

4        The jury is back, roll call waived.  The

5    attorneys and parties are back, present, and we are

6    resuming in the case of United States versus Steven

7    Knighton.  This is the government's case.  It has

8    the burden of proof beyond a reasonable doubt.  The

9    presumption of innocence is with Mr. Knighton in

10   this case.

11       Mr. Duszkiewicz, your next witness, please.

12           MR. DUSZKIEWICZ:  The government would

13   call Clinton Calloway.

14           THE COURT:  Okay.

15   C L I N T O N   C A L L O W A Y, having been duly

16   sworn as a witness, testified as follows:

17           THE COURT:  Okay.  Investigator, you have

18   been here throughout the entire trial, so you know

19   what my instructions are to the witnesses.  They

20   apply equally to you.  Basically do your best to

21   address your responses to the ladies and gentlemen

22   of the jury.  If you don't understand a question,

23   please don't answer the question.  Just ask the

24   attorney to repeat the question.  If I ask you a

25   question, you don't understand it, let me know.

1    With your answers, be as succinct as possible.  If

2    you can answer a question yes or no, that's

3    probably preferable.

4         If there's an objection, wait until I rule on

5    the objection, then I'll give you specific

6    instructions, for example, continue with your

7    answer, start it again, wait till the next

8    question, something along those lines.  Do you

9    understand?

10             THE WITNESS:  Yes, I do.

11             THE COURT:  If you speak at the

12    microphone -- again, it's friendly -- state your

13    full name, spell your last name, please.

14             THE WITNESS:  Clinton Calloway,

15    C-A-L-L-O-W-A-Y.

16             THE COURT:  Okay.  Your witness,

17    Mr. Duszkiewicz.

18             MR. DUSZKIEWICZ:  Thank you, Judge.

19    DIRECT EXAMINATION BY MR. DUSZKIEWICZ:

20    Q.   Mr. Calloway, how are you employed, sir?

21    A.   With the New York State Police.

22    Q.   And how long have you been with the New York

23    State Police?

24    A.   Little over 27 years.

25    Q.   And what is your rank with the state police?

1    A.   I'm an investigator.

2    Q.   And are you currently assigned to assist any

3    other agencies?

4    A.   Yes.   I'm currently assigned to the Drug

5    Enforcement Task Force in Buffalo, New York.

6    Q.   How long have you been assigned to that task

7    force?

8    A.   Since the fall of 2001.

9    Q.   All right.   And are there other local law

10   enforcement officers in addition to state police

11   officers assigned to that task force to assist

12   federal agents?

13   A.   Yes, there are.

14   Q.   And you are deputized as a federal agent, is

15   that correct?

16   A.   That is correct.

17   Q.   Okay.   On the 9th of November 2010, did you

18   have occasion to visit with an individual by the

19   name of William Valerio?

20   A.   Yes, I did.

21   Q.   Okay.   And Mr. Valerio was located where at

22   that time?

23   A.   In a correctional facility in Massachusetts.

24   Q.   Okay.   Were you pursuing separate

25   investigations at that particular time?

1    A.   That is correct.

2    Q.   And did Mr. Valerio agree to talk to you at

3    that particular time?

4    A.   Yes, he did.

5    Q.   Did you receive information from Mr. Valerio

6    about a BMW vehicle?

7    A.   Yes, I did.

8    Q.   In the course of discussing other individuals

9    with Mr. Valerio, did he discuss his relationship

10   with a fellow by the name of Steven Knighton?

11   A.   Yes, I did.

12          THE COURT:   Mr. Duszkiewicz, move the

13   microphone closer to you, please.   Thank you.

14   BY MR. MUSITANO:

15   Q.   Did he discuss a relationship with an

16   individual by the name of Steven Knighton?

17   A.   Yes, he did.

18   Q.   Were you alone in that interview?

19   A.   No, I was not.

20   Q.   Who were you with?

21   A.   Special Agent Gene Nana.

22   Q.   He's from the Drug Enforcement Administration?

23   A.   Yes, that's correct.

24   Q.   During the course of that interview, were you

25   provided information by Mr. Valerio concerning his

1    activities on March 13th, 2009?

2    A.  Yes, we were.

3    Q.  Okay.  And in the context of that information,

4    did he advise you additional details, in

5    particular, about a BMW vehicle?

6    A.  Yes, he did.

7    Q.  And relative to that BMW vehicle, did there

8    come a point in time that you had a seizure warrant

9    to seize that particular vehicle?

10   A.  That's correct.

11           MR. MUSITANO:  Objection.

12           THE COURT:  Grounds?

13           MR. MUSITANO:  Relevance.

14           THE COURT:  Can you connect it up?

15           MR. MUSITANO:  What's the relevance of

16   this?

17           THE COURT:  Are you going to connect up it

18   up?

19           MR. DUSZKIEWICZ:  The next question,

20   Judge.

21           THE COURT:  Well, it calls for a yes or

22   no.

23           MR. DUSZKIEWICZ:  Yes, Judge.

24           THE COURT:  Thank you.  Overruled.  You

25   may continue.

1           MR. DUSZKIEWICZ:  Whose vehicle did you

2    understand it to be?

3           MR. MUSITANO:  Objection.

4           THE COURT:  Grounds?

5           MR. MUSITANO:  It either is or isn't

6    someone's vehicle, Judge.

7           THE COURT:  I'm sorry?

8           MR. MUSITANO:  It is someone's vehicle or

9    it isn't.  What's his understanding is calling for

10   speculation on the part of the witness.

11          THE COURT:  Overruled.  Do you understand

12   the question?

13          THE WITNESS:  Yes, I do.

14          THE COURT:  All right.  Answer it, please.

15          THE WITNESS:  I understood the vehicle to

16   be Steven Knighton's.

17   BY MR. DUSZKIEWICZ:

18   Q.  Okay.  And was it seized from Steven Knighton?

19   A.  It was seized from his brother.

20   Q.  And in the course of obtaining information from

21   Mr. Valerio, was there information conveyed

22   relative to a trap in that particular vehicle?

23          MR. MUSITANO:  Judge, I'm going to object

24   to these conversations with Mr. Valerio.  It's

25   hearsay.

 1            THE COURT:  It calls for an yes or a no.

 2    I'll permit it in that fashion.  I won't allow the

 3    substance of the conversation, though, at this

 4    point without more.  Objection overruled.  You may

 5    continue.

 6    BY MR. DUSZKIEWICZ:

 7    Q.  Was there information conveyed to you about

 8    there being a trap in that vehicle?

 9    A.  Yes, there was.

10    Q.  Okay.  And after that vehicle was seized, were

11    you able to access the trap compartment in that

12    vehicle?

13    A.  Yes, we were able to.

14    Q.  How were you able to do that?

15    A.  Originally we went to the vehicle and were

16    unable to access the trap, at which time I

17    contacted Mr. Valerio's attorney to have him get in

18    touch with me.  Him being Mr. Valerio.

19    Q.  And did you, in fact, speak again with

20    Mr. Valerio?

21    A.  Yes.

22            MR. MUSITANO:  Objection.

23            THE COURT:  Overruled.  You may continue.

24            THE WITNESS:  Yes, I did.

25    BY MR. DUSZKIEWICZ:

1  Q.  Was that by telephone?

2  A.  That is correct.

3  Q.  Did you receive information from Mr. Valerio

4  how to activate the trap in that vehicle?

5  A.  Yes, I did.

6  Q.  Okay.  And after receiving that information

7  from Mr. Valerio about the activating the trap in

8  the vehicle, did you again attempt to operate the

9  trap?

10  A.  Yes, I did.

11  Q.  And were you successful?

12  A.  Yes, I was.

13  Q.  Okay.  And did you convey that information to

14  other law enforcement agents?

15  A.  Yes.

16  Q.  Okay.  Has there been a video prepared with

17  respect to someone going through the sequence and

18  opening the trap in that vehicle?

19  A.  Yes, there was.

20  Q.  And that video was Government Exhibit 2, which

21  is in evidence?

22  A.  That is correct.

23  Q.  Okay.  Is that the same manner displayed in the

24  video, was that the same manner that you used to

25  activate the trap in the vehicle?

1    A.  Yes, it was.

2              MR. DUSZKIEWICZ:  I have nothing further.

3              THE COURT:  Okay.  Mr. Musitano.

4         Thank you, Mr. Duszkiewicz.

5    CROSS-EXAMINATION BY MR. MUSITANO:

6    Q.  Good afternoon, Investigator.

7    A.  Good afternoon.

8              THE COURT:  Good morning.

9    BY MR. MUSITANO:

10   Q.  Good morning, Investigator.  I shouldn't wish

11   my life away.  I'm sorry.

12        Investigator Calloway, you indicated that you

13   ultimately were able to operate the trap, correct?

14   A.  That is correct.

15   Q.  And you've seen traps like that or similar to

16   that?

17   A.  Yes, I have.

18   Q.  Used to transport cocaine in other controlled

19   substances?

20   A.  That is correct.

21   Q.  Or currency?

22   A.  Yes, sir.

23   Q.  Okay.  Did you do anything in this particular

24   case to determine whether or not cocaine had ever

25   been placed in that trap?

1    A.   We just opened the trap.  There was no cocaine,

2    there was no contraband in the trap.

3    Q.   Well, you've seen cocaine a million times in

4    your long career, is that fair to say?

5    A.   Yes.

6    Q.   Okay.  You know it's a powdery substance?

7    A.   Yes.

8    Q.   And it leaves a residue, correct?

9    A.   That's correct.

10   Q.   In fact, the law enforcement community has K-9s

11   that help detect the presence of cocaine or other

12   controlled substances, correct?

13   A.   That's correct.

14   Q.   You can dust for the presence of cocaine, is

15   that fair to say?

16   A.   Yes, it is.

17   Q.   Did you do either a dusting or use a K-9 or any

18   other type of an investigative technique to

19   determine whether or not cocaine had been present

20   in that trap?

21   A.   We did run a K-9 around the vehicle at one

22   point.

23   Q.   And what was the result?

24   A.   That was negative.

25   Q.   Negative meaning what?

1    A.   Or it was inconclusive.

2    Q.   First you said negative, correct?

3    A.   That is correct.

4    Q.   Okay.  That means that there's -- there is no

5    presence for cocaine or controlled substance.

6    A.   There was no hit for cocaine.

7    Q.   Thank you.  And in addition to that, there was

8    also K-9 with respect to currency, correct?

9    A.   Yes, sir.

10   Q.   Did you -- was there -- strike that.  If there

11   is currency in a trap, is it fair to say that there

12   would be or possibly be cocaine residue on the

13   currency?

14   A.   Possibly.

15   Q.   Okay.  Could you also do a K-9 with respect to

16   currency?

17   A.   Yes, you can.

18   Q.   Okay.  And if I understood you correctly, you

19   went to see Mr. Valerio on November the 9th, 2010,

20   is that correct?

21   A.   Yes, sir.

22   Q.   He was already in custody, correct?

23   A.   Yes, he was.

24   Q.   That was in Massachusetts?

25   A.   That's correct.

1    Q.   Had not been sentenced in New York State,

2    correct?

3    A.   No, he had not.

4    Q.   And as you understand it, there was an

5    agreement between Mr. Valerio and the state police,

6    correct?

7    A.   Yes, sir.

8    Q.   That was signed?

9    A.   I understood that to be the case.

10   Q.   Pursuant to that agreement, Mr. Valerio was

11   advised he may have to provide information in the

12   future, correct?

13   A.   I would think so.   That's correct.

14           MR. MUSITANO:   Thank you.   I have nothing

15   further, Judge.

16           THE COURT:   Okay.   Thank you.

17       Anything additional, Mr. Duszkiewicz?

18   REDIRECT EXAMINATION BY MR. DUSZKIEWICZ:

19   Q.   When you -- Investigator Calloway, when you say

20   that you were advised that there was an agreement,

21   how were you advised?

22   A.   From Investigator Davis that he had become a

23   confidential source.

24   Q.   Okay.   And was he an active confidential source

25   when you went to see him?

1    A.   You know, it's unknown whether or not he had

2    been deactivated.  I'm going by originally when I

3    spoke to Investigator Davis that he, at the time,

4    was a confidential source.

5    Q.   But in November of 2010 did you know whether or

6    not he was confidential source?

7    A.   Then I would not have known.

8    Q.   And he was incarcerated?

9    A.   That's correct.

10   Q.   Serving a sentence?

11   A.   That's correct.

12           MR. MUSITANO:  Just two questions, Judge.

13           THE COURT:  Sure.

14   RECROSS-EXAMINATION BY MR. MUSITANO:

15   Q.   I believe I heard you say, Investigator

16   Calloway, that you had no idea whether or not he

17   was deactivated as an informant, correct?

18   A.   That is correct.

19   Q.   Is there an actual form or something that's

20   documented to show a person's deactivated?

21   A.   Yes, there would be.

22           MR. MUSITANO:  Thank you.  I have nothing

23   further.  I would also ask for that too, Judge.

24           THE COURT:  All right.  Anything further,

25   Mr. Duszkiewicz?

1            MR. DUSZKIEWICZ:  No, your Honor.  Thank

2     you.

3            THE COURT:  Okay.  Investigator Calloway,

4     you're excused.  Thank you.

5        Anything additional?

6            MR. DUSZKIEWICZ:  No, your Honor.  The

7     government has no further witnesses.

8            THE COURT:  Okay.  All right.  So the

9     government rests subject to resolving any issues

10    relating to exhibits and closure of the record?

11           MR. DUSZKIEWICZ:  Yes.

12           MR. MUSITANO:  Judge, I would like to

13    reserve until we resolve that issue with respect to

14    any motion.

15           THE COURT:  All right.  Ladies and

16    gentlemen, I'm going to ask you to take an

17    adjournment for a couple of minutes.  I'll have you

18    back here by 11:30.  And I need to know where we're

19    going to go with the case from here.  Thank you.

20           (Jury excused from the courtroom.)

21           (End of requested excerpt.)

22        *       *       *       *       *       *

23

24

25

1                          CERTIFICATION

2

3            I certify that the foregoing is a

4      Correct transcription of the proceedings

5      Recorded by me in this matter.

6

7

8                      s/Michelle L. McLaughlin
                       Michelle L. McLaughlin, RPR
9                           Official Reporter
                           U.S.D.C., W.D.N.Y.
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25