UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,


v.                                                          NOTICE OF MOTION

                                                            12-CR-56

STEVEN A. KNIGHTON,


                        Defendant
_____

   PLEASE TAKE NOTICE, that upon the annexed affidavit of Cheryl Meyers Buth, sworn

to on the 1st day of October, 2015, and all prior pleadings and proceedings herein, the

undersigned will move this Court on a date to be scheduled for an order vacating Defendant's

conviction, granting Defendant a new trial, and for such other and further relief as this Court

deems just and proper.


DATED:  October 1, 2015
     Orchard Park, New York


         /s/Cheryl Meyers Buth
         Cheryl Meyers Buth, Esq.
         Attorney for Defendant
         Steven A. Knighton
         MURPHY MEYERS LLP
         6506 East Quaker Street, Suite 200
         Orchard Park, New York 14127
         (716) 662-4186
         cmbuth@murphymeyers.com


TO:  Hon. Willliam M. Skretny
   United States District Court
   2 Niagara Square
   Buffalo, New York  14202

Thomas Duszkiewicz, Esq.
Assistant United States Attorney
138 Delaware Avenue
Buffalo, New York  14202

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

UNITED STATES OF AMERICA

vs

STEVEN A. KNIGHTON,

                       Defendant

_____

**AFFIDAVIT IN SUPPORT OF
DEFENDANT'S POST-TRIAL MOTIONS**

12-cr-56


| | |
|---|---|
| STATE OF NEW YORK | ) |
| COUNTY OF ERIE | )   ss: |
| TOWN OF ORCHARD PARK | ) |

      CHERYL MEYERS BUTH, ESQ., being duly sworn, deposes and says:

      Deponent is an attorney at law duly admitted to practice before the United States District Court for the Western District of New York and is a partner in the law firm MURPHY MEYERS LLP, 6506 East Quaker St, Suite 200, Orchard Park, New York  14127.


## <u>SUMMARY OF ARGUMENT</u>


      This Affidavit is submitted in support of Defendant Steven A. Knighton's post-trial motions pursuant to Federal Rules of Criminal Procedure 29(c) and 33 for a Judgment of Acquittal and/or an Order granting a new trial. The grounds for the motion are alternatively that the proof at trial was legally insufficient or that the conviction should be vacated because of  the Government's failure to provide the Defense with  the registered confidential informant's file before he testified.

# PROCEDURAL BACKGROUND

Steven Knighton was charged  in a 1-count indictment with Conspiracy to possess 500 grams or more of cocaine in violaton of 21 USC 846 (Dkt. #4, Indictment).

The Government alleged Mr. Knighton was meeting a cooperating source at the Galleria Mall on March 13, 2009 to purchase 2 kilograms of cocaine.  Mr. Knighton was detained for a couple of hours by law enforcement on that date but ultimately released after officers seized a package of currency from his vehicle.  A criminal complaint was not filed against him until **over two years later**, on April 18, 2011 (Dkt. 1).  Mr. Knighton was arrested on a warrant on November 29, 2011 (Dkt. #3).

On February 16, 2012, the District Court referred the case to Magistrate Judge H. Kenneth Schroeder to preside over pretrial matters.  Mr. Knighton was originally represented by attorneys Thomas Eoannou and Jeremy Schwartz.  Mr. Eoannou and Mr. Schwartz were permitted to withdraw from the case.  Attorneys Earl Key and Angelo Musitano were retained and appeared as substitute counsel on December 18, 2012. Mr. Musitano served as trial counsel. This Court presided over the trial from December 2, 2014 to December 8, 2014 when the jury voted to convict Mr. Knighton.

On December 22, 2014, Mr. Musitano moved for an extension of time to file post-trial motions (Dkt #102).  The affidavit in support of the motion indicated that counsel was preparing for a trial in another federal case and needed additional time to file motions pursuant to Fed.R.Crim.Pro. 29 and 33.  On December 24, 2014, the Court granted the defense motion (Dkt #103) with no objection from the Government.  Mr. Musitano moved for a further extension of time on January 30, 2015 (Dkt. #104) and the Court granted that motion on February 3, 2015

(Dkt.#105), again without objection from the Government.  On February 4, 2015, the

Government filed a motion for "determination of status of representation" when it learned Mr.

Musitano's immigration issues may prevent him from coming into the country from his native

Canada.  Post-trial motions at that time were due on February 20, 2015 but not filed.

    The Court held a pretrial conference on March 25, 2015 and the undersigned was

substituted as counsel for Mr. Knighton.  Counsel requested time to obtain the trial transcript and

an opportunity to file post-trial motions.

## DEFENDANT'S RULE 29(C) MOTION

    At the close of the Government's proof the defense reserved its right to make a Fed R.

Crim.Pro.Rule 29 motion to dismiss the charge against Mr. Knighton.  Rule 29(a) states that

> "After the Government closes its evidence or after the close of all evidence the Court, on Defendant's motion, must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."

Subdivision (c) of Rule 29 states:

> "[A] Defendant may move for a judgment of acquittal or renew such a motion within 14 days after a guilty verdict…"

    Pursuant to Rule 29(d)(1), if a court enters a judgment of acquittal after a guilty verdict,

the court must also conditionally determine whether any motion for a new trial should be granted

if the judgment of acquittal is later vacated or reversed, and the court must specify the reasons

for that determination.

    Defendant maintains that the proof at trial was legally insufficient to convict him of

conspiracy to possess and distribute narcotics.  The only witnesses at the trial were the

confidential informant and the law enforcement officers who took part in temporarily detaining Mr. Knighton and seizing money from him on March 13, 2009.  The informant's testimony about his alleged drug sales to Mr. Knighton prior to that date was uncorroborated.   There was no independent proof that Mr. Knighton purchased drugs from the informant, or anyone else, before March 13, 2009 or in the subsequent intervening period until his arrest in November 2011.

There was no proof offered of any law enforcement investigation or efforts to independently verify the informant's unsubstantiated claims that Mr. Knighton was involved in the illegal purchase or sale of narcotics. For example, in the two years between March 13, 2009 and the date of his arrest, there was no surveillance of Mr. Knighton; there was no proof that officers interviewed other witnesses, including the second alleged customer to whom the informant said he intended to deliver four kilograms of cocaine. There were no attempts to make controlled sales/buys from/to Mr. Knighton.  There was no undercover agent introduced or other cooperating sources used to provide information about his alleged drug activities.

Indeed, the informant who testified against Mr. Knighton and who was the sole witness at trial who attested to Mr. Knighton's drug activities prior to March 13, 2009, was quickly found to be unreliable after he continued to sell drugs once he was officially registered by the State Police as a cooperating source.  Thus the uncorroborated testimony of that witness is an insufficient basis upon which to convict Mr. Knighton and this Court should enter a judgment of acquittal.

## SUMMARY OF WITNESS TESTIMONY

After the confidential informant was intercepted on his way to sell cocaine to a customer

near Syracuse, New York, he agreed to cooperate with law enforcement.  He was permitted to make telephone calls to his source of supply in New York City with whom he spoke in Spanish. Investigators heard the informant's end of the conversations but they did not speak Spanish.  The informant also claimed to be speaking with Steven Knighton. The calls were not recorded.

Investigators were merely told by the CI that he would meet a customer at the Galleria Mall in Buffalo who would take two kilos of cocaine and the remaining four were designated for another customer in Buffalo.  The CI claimed the Defendant, Steven Knighton, was expecting delivery of two kilos. The CI directed law enforcement to the Galleria Mall where Mr. Knighton was located sitting in the drivers seat of an SUV.  Mr. Knighton was removed from the vehicle at gunpoint.  $41,000 was found banded and shrink-wrapped in the center console of his vehicle.

The following witnesses testified at the trial:  Jose Figueiredo, Patrick DiPirro, Ronald Yates, William Valerio, Douglas P. Davis and Clinton Calloway.

## Jose Figueiredo

- Figueiredo is a member of the New York State Police assigned to CNET (Community Narcotics Enforcement Team). (4)

- He had been a member of the New York State Police for 27 years and was a senior investigator in the unit. (4)

- He worked in Syracuse, New York and had been assigned to the CNET unit for approximately 20 years. (5)

- On Friday, March 13, 2009 he obtained information that quantities of cocaine where going to come into the Syracuse area. (6)

7

- The CNET team took steps to intercept the suspected cocaine arrival by setting up a detail in a rest area on the New York State Thruway to intercept it. (7)

- A blue Chevy minivan with Massachusetts plates was surveilled, ultimately stopped, and the individual operating it was arrested.(8)

- The driver was William Valerio.(8)

- Quantities of cocaine were located in a hydraulic trap in the front dash on the passenger side of the vehicle where the airbag would normally be found.  A second chamber was located in the rear of the vehicle where the jack would be kept for changing a tire. (9, 14)

- Figueiredo took a series of photographs to document where the suspected cocaine was found. (10)

- Figueiredo drove the minivan back to State Police, North Syracuse for processing. (19)

- A total of 7 packages of cocaine were secreted in the van. (20)

- After processing the minivan, Figueiredo left Syracuse with investigator Davis and headed to a mall in Buffalo where Valerio was supposed to be transporting the cocaine. (26)

- Valerio was being transported in a different State Police vehicle.

- They had notified other members of Western CNET about the operation. (26)

- He had a description prior to arriving at the mall of the vehicle Valerio was supposed to be meeting. (27)

- He had been told the subject vehicle was a black Chevrolet Tahoe. (28)

- When he arrived at the scene, members of the local police department already had the vehicle surrounded. (28)

- It was then driven to the local police department so that a search could be conducted. (29-30)

- Both investigator Ronald Yates and investigator Pat DiPirro were involved in searching the vehicle. (30)

- Pat DiPirro is an investigator with CNET central (30)

- Figueiredo saw a package of currency removed from the vehicle. (30)

- On April 2, 2009 the package of currency was taken by Figueiredo and State Police Asset Seizure Investigator Smith and transported to Keybank. (31)

- The procedure employed by CNET central is that they will not count any currency over $5,000.00.  The simply take it to the bank. (31)

- Figueiredo kept a constant visual on the money after they handed it over to the bank employee who took it to a counting machine. (32)

- They learned the total amount of money as well as  the specific denominations. (32)

- Investigator Smith then filled out a form contemporaneously noting the total amount and also the denomination of the bills. (34)

- The total was $41,000.00 exactly. (35)

- A bank receipt was given to Figueiredo and Smith by the bank teller after the deposit. (35)

- On cross-examination, Figueiredo testified that he does not speak Spanish but there are Spanish-speaking investigators in his unit that could be called into an investigation by a supervisor. (38)

- He did not believe that there was a hidden trap in the Chevy Tahoe. (41)

- The currency taken from Mr. Knighton was not located in a hidden compartment. (42)

- Mr. Valerio was ultimately taken back to Syracuse and charged in state court. (47)

- Figueiredo did not take any photographs of the currency being removed from the vehicle. (47)

- He does not know the origin of the money. (48)

- The currency was transported back to the CNET office in Syracuse after it was removed from the Chevy Tahoe. (49)

- No further analysis was done on it for the presence of controlled substances. (49)


**Patrick DiPirro**


- Mr. DiPirro has been investigator with State Police for 27 years. He is assigned to CNET and has been so assigned for the last 14 years. (52/53)

- On March 13, 2009 he was assigned as a surveillance team member. (53)

- After Mr. Valerio was taken into custody, investigator DiPirro responded to the Galleria Mall. (54)

- He was attempting to locate a vehicle which matched the description that Mr. Valerio had given. (55)

- His understanding was that Mr. Valerio was arrested in the Syracuse area and was being transported to Buffalo. (55)

- Investigator DiPirro went over to the western side of the mall near the thruway. (56)

- He observed a new-looking Chevrolet Yukon in the parking area in the western portion of the mall parked in a row. (56)

- Investigator DiPirro parked one row north of the Yukon. (57)

- He observed a black male in the vehicle who appeared to be reclined back almost like he was waiting for someone. (57)

- He maintained his position for less than 30 minutes before receiving communication from other members of State Police that they were in position. (57)

- Cheektowaga Police also participated in the take down of the vehicle. (58)

- Cheektowaga Police approached the vehicle and took the individual out, who he later learned to be Mr. Knighton. (59)

- Mr. Knighton was taken back to the Cheektowaga Police Department. His vehicle was driven to the Cheektowaga Police Department by senior investigator Ronald Yates, who was also part of the CNET unit in Syracuse. (60)

- Investigator DiPirro was assigned to take photographs of the vehicle and assist with the search. (60)

- He identified various photographs that he took, including the license plate of the black "Tahoe". (62)

- The registration indicated that the car was recently purchased because it had a temporary sticker that was only good for 45 days. (63)

- The date the temporary registration was issued was March 2, 2009 approximately 11 days prior to Mr. Knighton's arrest. (63).

- He noted a charging device in the center console with one or two phones attached. (64)

- Inside the center console was a cleaning cloth and a plastic bag with money and a white container. (67)

- The bag contained three bundles of money with rubber bands separating each bundle. (67)

- The plastic bag was heat sealed. (68)

- In his experience with State Police he has seen currency bundled in that way and it's generally drug money that is separated into certain amounts. (68)

- Someone would have had to cut into the package to remove the currency. (69)

- It was his opinion that "this was set up for one purchase". (69)

- On cross-examination, he admitted testifying on direct that the vehicle was a Yukon, not a Tahoe, but he maintained it was the same type of vehicle, "It's just made by GMC".  (70)

- He does not know when the SUV arrived at the Galleria Mall or who drove it there. (72)

- In his experience as an investigator within the drug unit, he sees denominations bundled so "they can grab either $50.00 bundles, $100.00 bundles, 1,000." (73/74)

12

## Ronald Yates

- He has been a senior investigator with the New York State Police for 28 years, assigned to CNET central for the past 20 years. (76)

- On March 13, 2009 he was assigned to assist investigator Douglas Davis. (77)

- He was assigned to a surveillance detail at the first rest area heading westbound on the thruway just beyond the City of Syracuse. (78)

- He subsequently went to the Buffalo area where Mr. Valerio was supposed to meet with another subject to sell cocaine. (78)

- The Galleria Mall operation involved half a dozen people from CNET central, CNET western and Cheektowaga Police. (79)

- Valerio was driving to the Galleria Mall in a vehicle with investigator Keith Fox and Doug Davis. (80)

- They were looking for a black Chevy Tahoe and were told that Steven Knighton may be utilizing the Tahoe. (81)

- After the vehicle was located and Mr. Knighton was removed from it, investigator Yates drove that vehicle to the Cheektowaga Police Dapartment. (83)

- He identified various photographs of the vehicle.  He stated that in the dashboard cigarette lighter, there was a cellphone charger and cellphones. (86)

- He noted a green cloth rag that was in the center console covering a quantity of U.S. currency that was contained in a heat-sealed or vacuum-sealed bag within the center console. (87)

- The money was wrapped in bundles with rubber bands around different quantities of currency. (88)

- He turned the currency and phones over to the evidence technician, investigator Jack Weinerth.  (89)

- He did not have any contact with Mr. Knighton. (90)

- He testified that in the rear seat, there were 2 big plastic bags. (92)

- The bags did not contain contraband but rather items that could have been purchased from Macy's. (93)

- He testified that he did not move the position of the seat when he drove the vehicle. (94)

- He did not find any hidden compartments in the vehicle. (96)

- The evidence technician took the packaged currency to their office in Syracuse. Investigator Yates could not tell what type of currency was in there until such time it was opened and counted. (98)

- He testified that it appeared to be in excess of $5,000 so he knew their procedure involved taking the package to the bank. (99)


**William Valerio**


- Mr. Valerio testified that he is currently in jail in Massachusetts serving 10 years. (106-107)

- In addition to his Massachusetts sentence, he has also been sentenced in Syrcause, New York regarding events that occurred on March 13, 2009. (107)

- He was arrested that day and ultimately pled guilty to charges relating to those events. (107)

- He testified he got caught with drugs on the highway at a service center close to Syracuse. (108)

- On March 13, 2009, he was caught with 7 kilograms of cocaine. (109)

- He had the cocaine in 2 concealed compartments; one in the dashboard and the second in the back of the vehicle. (110)

- The front compartment had 3 kilos and the back compartment had 4 kilos.  (110)

- He was driving a Chevy Uplander. (110)

- He had owned the vehicle for 5 or 6 months. (110)

- Previous to that, he had owned a BMW 525 (1995) that also had a trap or a sealed compartment to conceal drugs. (111)

- He had been in the drug business for "Probably over 2 decades". (111)

- He was originally from New York City, the Bronx. (112).

- He first came to Niagara Falls in 1987 when he was approximately 15 years old in order to make money selling drugs. (112)

- He stayed in the Niagara Falls area for a few years. (112)

- At some point while he was living in Niagara Falls he met Steven Knighton. (113)

- On March 13, 2009 he was coming from his New York City source of supply and heading to Syracuse and Buffalo where he was going to distribute the cocaine. (114)

- He was supposed to give one kilo to an individual in Syracuse.  (115)

- He was not able to make that delivery because the individual was the one who set him up and that is how he got arrested on the highway. (115)

- The other 6 kilos were going to Buffalo; four were going to Lemuel Jones and two were going to Steven Knighton. (116)

- He had conducted drug business with Mr. Knighton prior to March 13th for approximately10-12 months. (116)

- He spoke to him every week in person or by phone. (116)

- He would either drive the cocaine to Buffalo or Mr. Knighton would come to New York City. (117)

- He would see Mr. Knighton twice a week face to face but also talk on the telephone with him. (117)

- Valerio would get the drugs in New York City and sell to Knighton. (117)

- At first, Valerio could only get 2 ½ kilos. (118)

- While Valerio was visiting friends Niagara Falls in 2007, he happened to come upon Mr. Knighton and they exchanged phone numbers. (118)

- Prior to that, he had not seen him in years. (119)

- They had been involved together in the drug business from 1987-1989 in Niagara Falls in the same manner, smaller scale. (119)

- Valerio would provide the drugs and Knighton would pay for them. (120)

- A month after they ran into each other in 2007, Valerio came back to the area and contacted Knighton. (120)

- They talked about starting up their drug business again. (121)

- Valerio said he had not been dealing for a while and that he did not have money to front any drugs. (122)

- Valerio had been in prison for selling drugs for some time. (122)

- They talked about prices and the cost of a kilo of cocaine. (123)

- Knighton asked him how much it would take to get things started and Valerio told him $65,000.00. (123)

- Knighton provided the money and Valerio took it back to New York City and purchased drugs. (123)

- He purchased 2 ½ kilos (123)

- Valerio said that in New York City the 2 ½ kilos cost him around $60,00.00. (124)

- He made $5,000.00 profit on each kilo. (124)

- After Knighton gave him the money, Valerio obtained the drugs and delivered the cocaine to Knighton. (124)

- Two days later, he said he was finished and needed some more. (124)

- He provided additional money which Valerio picked up from Knighton.  He then went back to New York City and then returned to Niagara Falls. (125)

- Knighton lived in Niagara Falls and later moved to Buffalo. (126)

- Eventually Valerio was able to get the drugs on consignment.  That occurred probably 2-3 months after the first time they did business. (129)

- Getting the drugs fronted eliminated the necessity for multiple trips back and forth between New York City and Niagara Falls/Buffalo. (130)

- Prior to March 13, 2009 he had seen Mr. Knighton earlier that week and had provided him with cocaine. (130)

- The amount of cocaine varied and could be from 2 kilos to 6 kilos. (131)

- When Knighton needed more, he would just call Valerio. (131)

- Valerio would usually see Knighton on the weekdays. (131)

- In a given week, he could be delivering 10 kilos and the next week he could be delivering 20 kilos. (132)

- He knew that  Steven Knighton and Lemuel Jones knew each other. (133)

- Valerio and Knighton used walkie-talkie type cellphones which he referred to as beep-phones. (133)

- There is a memory card with a number that is programmed into the phone.  They switch memory cards frequently. (134)

- Over the time that they did business, the prices of cocaine changed. (136)

- The least that Valerio ever paid for a kilo in New York City was $24,000 to $26,000. (136)

- In 2009 the cost had gone up significantly to $38,000 to $40,000 per kilo. (137)

- When he would deliver a single kilo of cocaine, he would "put some points on it". Each point was considered a $1,000 and he would put 3 or 4 points on as a mark up. (137)

- When he was arrested, he agreed to cooperate with the State Police and primarily work with investigator Doug Davis. (138)

- He provided the police with information that he was bringing the cocaine to Lemuel Jones and Steven Knighton and agreed to take the investigator to the pre-arranged destination. (139)

- He told police the sequence that was needed to open and close the trap compartment in his vehicle. (140)

- While he was in the state police vehicle on his way from Syracuse to Buffalo, he was communicating with Steven Knighton. (142)

- The trip was pre-arranged and they usually would meet at a gas station or the mall because it was next to the highway and he could just make a U-turn and head right back to New York City. (142)

- He referred to the mall near Macy's as "our usual place".  (143)

- Prior to March 13, 2009 he had sold his BMW to Steven Knighton. (144)

- Knighton told him that he needed a vehicle with a trap in it. (144)

- He thinks he sold the car to Knighton in the Fall of 2008. (144)

- Prior to using the Uplander, he used to use the BMW himself to transport drugs to Buffalo. (145)

- The trap was operated using a button under the steering console and the button for the passenger side window. (145)

- Knighton did not register the BMW in his own name, he registered it in his brother's name. (145-146)

- Prior to March 13, 2009, Knighton had just purchased a brand new truck. A black Chevy Tahoe. (146)

- Before that he had used a black pick up truck. (146)

19

- Valerio was delivering 2 kilos to Knighton. (146)

- The kilos cost him $40,000 and he was charging Knighton $41,000 to $42,000 and he provided that information to investigator Davis.  (147)

- He communicated back and forth with Knighton on the way to Buffalo so everything would "seem normal". (147)

- In his phone conversations, Knighton confirmed that he was waiting in the same place. There were approximately 15 to 20 calls back and forth between Valerio and Knighton during the ride from Syracuse to Buffalo. (148)

- He tried to call Lemuel Jones as well, but Jones would not pick up the phone. (149)

- The source of supply in New York came from Hispanic speaking individuals. Although Valerio's English is very good, he spoke Spanish to the source of supply. (149)

- He was conveying information that he received from Mr. Knighton to investigator Davis and he also at times had the phone on speaker. (150)

- When they got to the mall, they drove by Knighton's truck and Valerio identified it.  They then turned around and by that time, other law enforcement agents had Mr. Knighton out of the truck and Valerio identified him. (151)

- State Police took Valerio back to Syracuse and booked him on state drug charges. (152-153)

- Ultimately, he pled guilty to those charges and received a 10 year sentence. (153)

- He identified various photographs of the cocaine as well as the Uplander and black BMW.  (154-155)

- The trap in the BMW could hold 10-12 kilos. (156)

- In 2012 the BMW sequence to open the trap was provided by Valerio to investigator Clint Calloway while Valerio was incarcerated in Massachusetts. (158)

- After 2007 Valerio would sometimes go to Knighton's house and would also go out to nightclubs and socialize with him. (160)

- They did the same things when Knighton came from Buffalo to New York City. (160)

- When the money was received by Valerio, it was vacuum sealed to disguise the smell and to compress it so that it would easily fit into one of the traps. (161)

- The vacuum sealed package was the manner in which Mr. Knighton would usually provide the money to him in return for the cocaine. (162)

- On cross examination, Valerio stated he was arrested on August 21, 2009 in Massachusetts for possession of 3 kilograms of cocaine after his arrest in New York State on March 13, 2009 with 7 kilograms of cocaine. (165)

- He is serving his sentence in Massachusetts concurrently with his sentence in New York (168)

- In November 2010 he met with federal agents Clint Calloway and Gene Nanna who came to see him while he was in jail in Massachusetts. (167)

- After he was charged in Syracuse, he was bailed out and given his Uplander to drive back to New York City. (172)

- He was also given four telephones and began cooperating with investigator Davis. (173)

- Although investigator Davis told him that he had to lead a law abiding life, he soon returned to selling drugs. (174)

- At the time he was arrested on March 13, 2009 he was on parole. (174)

- No parole violation was filed. (175)

- He was not supposed to be traveling outside New York City without the permission of his parole officer.  (175)

- While he was on parole, he also owned the BMW with the trap compartment. (177)

- He did not disclose the fact to his parole officer that the vehicle could be used to transport drugs. (178)

- He had been incarcerated in October 1997 and was released not too long prior to becoming re-acquainted with Mr. Knighton in 2008.(178-179)

- Prior to 2008 he had been convicted of transporting 8 kilos of cocaine on the New York State Thruway and was sentenced to 25 years to life as a A-1 felon. (179)

- While he was on parole, he continue to deal drugs. (179)

- He was first arrested for drug dealing in 1990. (181)

- In 1991, he placed on 5 years probation. (182)

- The probation sentence was revoked in 1991. (182)

- From 1990 to 2009 his associates knew that he dealt drugs. (183)

- He did not generally tell people what he did because he did not want to get arrested.  (183)

- He does not know whether the Chevy Tahoe had a trap compartment in it.(186)

- He does not know when Mr. Knighton received the vehicle from the dealership, but believes it may have been a week before his arrest. (187)

- A month before this trial in November 2014 he was brought to the Western District of New York and housed at the Niagara County Jail. (187)

- His lawyer informed him that he would be brought in to testify. (188)

- Between 2009 and 2010 when he was out on bail, he spoke to investigator Davis several times (194), possibly once a week (195), mostly on the telephone, including talking about this case. (195)

- He was not asked to testify before a federal grand jury. (196)

- In the vehicle on the way from Syracuse to Buffalo investigator Davis was taking notes. (196)

- He believes he met with investigator Davis during the week that he was in the Syracuse area after being charged (197) and they talked about the case. (198)

- Investigator Davis asked him questions about his relationship with Steven Knighton. (199).

- He denies telling investigator Davis that he was going to deliver just one kilo cocaine to Steven Knighton. (199)

- He met with Mr. Knighton approximately twice a week over the course of 8 months. (200)

- At the time that they got re-acquainted in the fall of 2007, Mr. Valerio was working a construction job.  Eventually as the drug business became more profitable, he stopped working in order to come to Buffalo twice a week. (201)

- He never told investigator Davis on March 13, 2009 that Knighton gave him $65,000 to get back into the drug business. (202)

- He never uses landline phones or cellphones that could be recorded. (203)

- There were no itemized calls or billing statements for the beep-phones. (203)

- He believes investigator Davis wrote down the numbers that were in his phone. (204)

- Investigator Davis also took the phone from him and verified the cell numbers and who he was talking to while they were in the car. (207)

- When he was speaking on the phone to the people from New York, he never put it on speaker because they were paranoid about hearing echoing and wanted the speaker to be off.  He carried on conversations with those individuals while he was in the car.  He was speaking to them in Spanish.  There was no Spanish law enforcement agent in the vehicle.  (210)

- Of the 15 to 20 conversations on the phone between Syracuse and Buffalo that Valerio had with Knighton he had him on the speaker "probably a majority of the time". (19)

- Investigator Davis gave him his phone and memory card back. (212)

- He told investigator Davis that Knighton had paid for one of the kilos. (215-216)

- One kilo was being fronted. (216)

- He was going to give him two kilos and only take money for one. (218)

- Knighton would have had a balance owing of $41,000. (218)

- He did not mention cocaine or $41,000 in his discussion with Knighton on the phone. (226)

24

- He met with the Government the day before he testified at this trial. (227)

- "Now, isn't it true that after that meeting with them yesterday, today was the first time that you said Mr. Knighton gave you $65,000 to get you started back in the business?.

  The answer today?

  Question:  Yes, sir.

   Answer:   No, sir...

  Question:  Tell this honorable jury when it was prior to that.

  Answer:  Maybe a week or probably like a week from today. (229)

  He had 2 meetings, one yesterday and one a week prior to that during the end of November. (230)

- He met with the prosecutors as well as the agents.  They wanted to know the chain of events and asked him some additional questions including on how he got started back in the business. (231)

- He was never charged with any conspiracy involving Mr. Knighton. (234/235)

- He was never charged federally. (235)

- He was never charged with agreeing to possess cocaine with Mr. Knighton. (238)

- In 2008 he sold his BMW to Mr. Knighton. (239) but he never saw Knighton driving it. (241)

- He believes the purpose was so that Knighton could do his "local business with it". (242)

- Valerio used the compartments to hide currency. (243)

- He does not think any of the other vehicles Knighton drove had traps in them. (244)

- Valerio had a source of supply in the Bronx (17) as well as a source of supply in Manhattan. (17)

- He did not cooperate against either of those individuals. (17)


**Douglas Davis, New York State Police – Task Force Agent (DEA)**


- Is his current assignment.  He has been with State Police 27 years. (21)

- He has been involved with the DEA Tax Force for the past 20 months and has been with CNET since 1996. (22)

- He had an informant in a case giving him information that his supplier was William Valerio. (22)

- A detail was put together to assist in an attempt to arrest William Valerio. (23)

- A take down detail was set up at the Warner's rest area on the westbound thruway. (23)

- He arrested Valerio and found a trap in the vehicle that contained three kilos of cocaine. (24)

- Valerio told him that there was additional cocaine in another compartment of the vehicle. (24)

- An additional four kilos were found in the back compartment where the jack is kept. (25)

- Valerio was allowed to make a phone call and called his wife after he was arrested. (26)

- His attorney then called investigator Davis. (26)

- He agreed to cooperate. (26)

- As a result of the information he provided, Davis and investigator Fox took Valerio to Buffalo. (27)

- Valerio gave them specific information regarding the location and the name of the individual who he was to meet in Buffalo. (27)

- He gave two names and told the police that a quantity of the money would be transacted with one of the individuals in Buffalo. (28)

- Valerio made telephone contact with the individual that he expected to meet in Buffalo. (29)

- Davis was in the front passenger seat and could hear "bits and pieces" of the conversations. (29)

- There were conversations with multiple people and Davis was being advised with whom the conversation was occurring and the nature of the conversation. (30)

- He made contemporaneous notes. (30)

- The majority of the conversations were with Steven Knighton. Some were with Hispanics in New York City. There was an attempted conversation with Lemuel Jones. (30)

- He understood Steven Knighton and Lemuel Jones both resided in the Buffalo area. (31)

- When they got to the Macy's parking lot in the Galleria Mall, he was told that the police had located the vehicle in question, matching the vehicle information provided by Mr. Valerio. (31)

- Davis, investigator Fox and Valerio went two rows past the location.  Valerio then confirmed they had the right vehicle surveillance moved in and police took custody of Mr. Knighton. (32).

- They then took Valerio on a drive by telling him to crouch down and asking him to identify Mr. Knighton as the individual he was going to Buffalo to meet. (32-33)

- Davis and Fox then took Valerio over to the local Police Department, keeping him out of sight from Knighton. (33)

- Davis had a conversation with Knighton in which he got basic background information.  He asked Knighton about the money that was found in the car and Knighton responded that it was $41,000 and that he didn't believe in banks.  He said he was on disability and collected $1400 a month is disability and that he had "due cause" for the money.  He then said he wanted an attorney so the conversation stopped. (35)

- Knighton was driving a Chevrolet SUV 4 door black. (36)

- He was given a receipt for the currency that was taken out of the vehicle and the phones which were kept by State Police, but the vehicle was returned to him. (37)

- The amount of money Valerio said he was expecting matched the amount of money that Knighton had in his possession exactly. (39)

28

- Valerio did not provide much additional information about Knighton beyond his working relationship with him and how long he had known him. (40)

- They returned to Syracuse and arrested Valerio for possession of seven kilos of cocaine and filled out arrest paperwork. (41)

- He was taken to court and arraigned.  Later that week, Davis requested that Valerio get bailed out to assist with other investigations (42)

- Valerio cooperated in other investigations and ultimately, pled guilty to the charges in Syracuse. (42)

- On cross-examination, Investigator Davis stated that Knighton was removed from the vehicle at gunpoint by several officers, handcuffed and placed near the vehicle so that Davis could do a drive by with Valerio to identify Knighton. (45)

- He did not record the conversation that he had with Knighton. (45)

- Knighton was in custody for approximately 30 minutes. (47)

- He was not placed under arrest or charged with conspiracy. (47)

- He later learned that the Chevy Tahoe was leased. (47)

- He did no investigation whatsoever regarding Mr. Knighton's finances. (48)

- He has no idea whether he received a settlement. (48)

- During the trip from Syracuse to Buffalo, Valerio was sitting in the backseat and no investigator was sitting beside him.  (48-49)

- Valerio's phones were returned to him. (49).

- In the car, investigator Davis was handling multiple phone calls and jotting down notes and also monitoring Mr. Valerio's phone calls. (50)

- He does not recall hearing Steven Knighton's voice. He recalls Valerio telling him it was Steven Knighton on his phone and he had "Steven" listed with the push to talk number. (51)

- He had 3 or 4 numbers listed in the phone which he wrote down in his notes. (51)

- He has no way of knowing whether Valerio was really talking to Steven Knighton. (52)

- He does not understand Spanish. (52)

- He never met Valerio before that day, had not worked with him and didn't know if he was reliable. (53)

- He did not personally contact Valerio's parole officer. (54)

- Valerio told Davis that Knighton owed him for one kilo of cocaine. Davis asked him where the rest was going and he told me it was going to Lemuel Jones.  Davis "assumed that it was one kilo going to Mr. Knighton and five going to Mr. Jones". (54)

- No attempt was made to record any of the conversations Valerio was having. (56)

- When Valerio left Syracuse, Davis told him to lead a law abiding life if he wanted to cooperate. (59)

- He told him he couldn't sell drugs and Valerio agreed. (59)

- Valerio actually signed a form agreeing not to engage in criminal activity without the State Police being present. (75)

- Five months later, Valerio was caught with three kilos of cocaine in direct contradiction to Davis' instructions. (60)

- Valerio lied to him. (61)

- On re-direct, Investigator Davis testified that Valerio cooperated with Davis and DEA in New York City and that arrests were made based on his cooperation. (65)

- He later learned that the assumption he made about one kilo going to Mr. Knighton was incorrect.  He learned that $41,000 was for one kilo, but Valerio was going to front Mr. Knighton the second kilo and the other four kilos were going to Lemuel Jones. (66)

- He did not have any time before the take down to run criminal history data on Steven Knighton or Lemuel Jones. (67)

- They used a Spanish speaking officer in relation to Valerio's continued cooperation after this date, but not in relation to the events of March 13, 2009. (71)

### Clinton Calloway

- At the time of his testimony, Clinton Calloway was an investigator with the New York State Police, having been employed by them for 27 years.  (95)

- He was currently assigned to the drug enforcement task force in Buffalo, New York.  (96)

- On November 9, 2010, he traveled to a correctional facility in Massachusetts to interview William Valerio. (96)

- Calloway had information that Valerio knew about a particular BMW (97). He also wanted to discuss Valerio's relationship with Steven Knighton. (97)  He was accompanied by DEA special agent Gene Nanna.  (97)

- During the interview, Mr. Valerio discussed his activities on March 13, 2009. (98)

- Calloway testified that he understood the BMW to be Steven Knighton's, although it was seized from Knighton's brother. (99)

- Valerio told the witness there was a trap in the BMW vehicle. (99)

- He discussed how to activate the trap in the vehicle. (101)

- On cross-examination, Calloway testified that they searched the vehicle for the presence of cocaine and also used a K-9 team.  The result was negative for the presence of cocaine or other controlled substance. (104)

## LEGAL STANDARD

The standard on a motion for a judgment of acquittal is stringent, and a defendant claiming that he was convicted based on insufficient evidence "bears a very heavy burden." *United States v. Blackwood,* 366 F. App'x 207, 209 (2d Cir.2010) (quoting *United States v. Desena,* 287 F.3d 170, 177 (2d Cir.2002)). "In considering a motion for judgment of acquittal, the court must view the evidence presented in the light most favorable to the government." *United States v. Guadagna,* 183 F.3d 122, 129 (2d Cir.1999). "If *any* rational trier of fact could have found the essential elements of the crime, the conviction must stand." *See also United States v. Puzzo,* 928 F.2d 1356, 1361 (2d Cir.1991) ("The test is whether the jury, drawing reasonable inferences from the evidence, may fairly and logically have concluded that the defendant was guilty beyond a reasonable doubt."); *United States v. Huezo,* 546 F.3d 174, 178 (2d Cir.2008) ("The evidence must be viewed "in its totality, not in isolation")

 "A jury's verdict will be sustained if there is substantial evidence, taking the view most favorable to the government, to support it." *United States v. Nersesian,* 824 F.2d 1294, 1324 (2d

Cir.1987). The government is not required "to preclude every reasonable hypothesis which is consistent with innocence" *United States v. Chang An–Lo,* 851 F.2d 547, 554 (2d Cir.1988) (citing *United States v. Fiore,* 821 F.2d 127, 128 (2d Cir.1987)). Further, a jury's verdict may be based entirely on circumstantial evidence. *See United States v. Martinez,* 54 F.3d 1040, 1043 (2d Cir.1995).

## ARGUMENT FOR ENTERING A JUDGMENT OF ACQUITTAL BASED ON LEGALLY INSUFFICIENT EVIDENCE

Mr. Knighton's possession of $41,000 is not sufficient proof of his participation in a conspiracy. Much of the trial testimony is inconsistent. The entire case hinges on the credibility of the confidential informant. The amount involved in the transaction was never mentioned over the phone by the confidential informant, Mr. Valerio, when he was arranging to meet Mr. Knighton at the Galleria Mall. Investigator Davis who was the lead law enforcement officer and drove Mr. Valerio to Buffalo to meet Mr. Knighton on March 13, 2009. Investigator Davis never heard Mr. Knighton's voice and Valerio simply told him that he was speaking to Knighton.

Mr. Valerio testified at trial that he expected payment from Mr. Knighton for one kilogram of cocaine and was "fronting" the other kilogram. Mr. Valerio previously told Inv. Davis Mr. Knighton had paid for one kilogram. No price was discussed over the phone. Based on the "bits and pieces" of Valerio's phone conversations that he overheard, Davis believed Mr. Knighton would be expecting one kilogram of cocaine and the other five kilos would go to Lemeul Jones. Investigators told the informant the amount of currency that was found in Mr. Knighton's vehicle. It was only <u>after </u>that the informant confirmed that was the amount he was charging Mr. Knighton.

The affidavit of agent Clint Calloway in support of the criminal complaint, sworn to under oath on April 18, 2011, two years after the controlled delivery, alleges that "The CI reported that four of the kilograms of cocaine were pre-paid by one customer and that a second Buffalo-area customer owed the CI a balance of $41,000 for the remaining two kilograms of cocaine." In other words, the Criminal Complaint alleged $41,000 as the price for two kilograms of cocaine. Agent Calloway's affidavit in support of the Complaint was based on information from the confidential informant that was provided prior to March 13, 2009. At trial, the CI testified he was only expecting payment for one kilogram of cocaine but that the price for one kilo was $41,000.

Despite presumably being told by the CI about the extent of his prior drug activity with Mr. Knighton (the presentence report estimates that based on the CI's testimony about the amount of drugs sold to Mr. Knighton, the transactions prior to March 13, 2009, amounted to $8 million) law enforcement allowed Mr. Knighton to remain free, un-surveilled, and conducted no investigation (at least there was no proof at trial offered) in the intervening two years. A multi-million dollar drug dealer left alone to continue carrying on business.

The law of conspiracy is well established within our Circuit. To sustain a conspiracy conviction, "the government must present some evidence from which it can reasonably be inferred that the person charged with conspiracy knew of the existence of the scheme alleged in the indictment and knowingly joined and participated in it." *Hassan,* 578 F.3d at 123.

The government may prove the Defendant's knowing participation in a conspiracy through circumstantial evidence. *Huezo,* 546 F.3d at 180; *United States v. Gordon,* 987 F.2d 902, 906–07 (2d Cir.1993). Circumstantial evidence probative of a conspiracy may include, for example, a defendant's association with conspirators "in furtherance of the conspiracy," *United*

*States v. Aleskerova,* 300 F.3d 286, 292–93 (2d Cir.2002); his presence at "critical stages of the conspiracy that cannot be explained by mere coincidence. United States v. Anderson, 747 F.3d 51, 60 (2d Cir.) cert. denied sub nom. Hakimi v. United States, 135 S. Ct. 122, 190 L. Ed. 2d 93 (2014)

Mr. Knighton recognizes that "a federal conviction may be supported "by the uncorroborated testimony' of even a single accomplice witness "if that testimony is not incredible on its face and is capable of establishing guilt beyond a reasonable doubt." *United States v. Florez,* 447 F.3d 145, 155 (2d Cir.2006) (quoting *United States v. Parker,* 903 F.2d 91, 97 (2d Cir.1990)).

The Second Circuit has often observed, however, that a defendant's mere presence at the scene of a crime, his general knowledge of criminal activity, or his simple association with others engaged in a crime are not, in themselves, sufficient to prove the defendant's criminal liability for conspiracy. *United States v. Ogando,* 547 F.3d 102, 107 (2d Cir.2008); *Lorenzo,* 534 F.3d at 159–60.

In *United States v. Nusraty,* 867 F.2d 759 (2d Cir.1989).the Second Circuit reversed the drug conspiracy conviction on insufficiency of evidence grounds of a taxi driver who was arrested in connection with a "controlled delivery" of drugs by a passenger at JFK Airport. The passenger arrived in the United States from India, and was apprehended at Customs in possession of a suit of clothing in which packets of heroin had been secreted. The passenger advised law enforcement officers that he was unaware of the hidden heroin, and that when in India he had been directed by the cab driver's brother (who gave him the suit for transport) to deliver the suit to Nusraty upon arrival. The passenger gave Nusraty's name and physical

description, and, scanning the airport arrival area, the agents identified Nusraty, who had parked his cab and entered the airport.

But the "controlled delivery" did not occur: the passenger did most of the talking, and Nusraty denied to the passenger that he was expecting a delivery of any suit; denied other aspects of the transaction that his brother had purportedly described to the apprehended passenger; and declined either to accept the suit or to give the passenger a ride. When arrested, "Nusraty claimed that ... it was purely a coincidence that he was in the airport when [the passenger] emerged from Customs." 867 F.2d at 761. The passenger himself was acquitted of conspiracy. *Id.* at 762.

On review of Nusraty's conviction, the court held the evidence insufficient to support the jury's verdict, characterizing the government's case as establishing only Nusraty's "mere presence at the scene of an aborted drug transfer" and "mere association with those implicated in an unlawful undertaking." *Id.* at 764. "Simply waiting for someone at an airport," the court said, was "not enough." *Id.* The court contrasted the case against Nusraty with cases in which there was a pattern of acts, inculpatory conversations, or possession, either actual or constructive, of the illegal drugs. And the court emphasized that Nusraty actively declined to accept the drug-laden suit that the passenger pressed on him, and otherwise behaved in ways seemingly inconsistent with the passenger's inculpatory account.

Here, the conversation between CI and allegedly Knighton was not recorded and only a portion was overheard by Investigator Davis.  Inv. Davis did not take notes of the substance of the conversation.  There was no direct contact between the CI and Knighton at the Galleria Mall. There were no circumstances surrounding the attempted transaction that would give the CI's testimony indicia of reliability such as positive testing or a drug dog alert to the presence of cocaine in the vehicle or on the currency.  The currency was not secreted in a hidden

compartment.  Beyond mere speculation, there is no proof that the CI actually spoke to Mr.

Knighton, whether they spoke about drugs, and whether Mr. Knighton agreed to purchase drugs.

The facts here are less persuasive than in *Nusraty* where the Second Circuit vacated the

conviction for lack of sufficient proof.

Since there is insufficient proof of the existence of a conspiracy and Mr. Knighton's

participation in it, the Court is respectfully requested to enter a judgment of acquittal on the only

count of conviction.


## DEFENDANT'S RULE 33 MOTION


Fed.R.Crim.P. 33 allows a court to vacate a judgment and grant a new trial "if the interest

of justice so requires." Fed.R.Crim.P. 33(a). "The ultimate test on a Rule 33 motion is whether

letting a guilty verdict stand would be a manifest injustice." *Id* . "The defendant bears the burden

of proving that he is entitled to a new trial under Rule 33 ... *United States v. McCourty,* 562 F.3d

458, 475 (2d Cir.2009).  "[M]otions for a new trial are disfavored in this Circuit," due to the

strictness of this standard. *United States v. Gambino,* 59 F.3d 353, 364 (2d Cir.1995). A court

will grant a new trial only "in the most extraordinary circumstances." *United States v Locascio,* 6

F.3d 924, 949 (2d Cir.1993). Indeed, to justify the granting of a Rule 33 motion, "a district court

must find that there is a real concern that an innocent person may have been convicted."

*McCourty,* 562 F.3d at 475.

## ARGUMENT FOR VACATING THE JUDGMENT AND GRANTING
## A NEW TRIAL

During the examination of the last Government witness, it came to light that Mr. Valerio was a registered informant.  The Defense, which had not been provided with the confidential informant file that was in the possession of law enforcement, argued that the file should have been provided as Brady/Giglio/Jencks impeachment material prior to trial.  (tr. 83-107).  In conjunction with Mr. Knighton's arrest, Mr. Valerio, who was never charged with a federal crime, agreed to cooperate.  Approximately one month after that, Mr. Valerio was arrested for possession with intent to sell seven kilograms of cocaine. Agent Calloway testified that if Valerio had been de-activated as an informant at any point after March 13, 2009, there would be a form to document that fact.

The Court succinctly stated the point:

"But if there is an ongoing relationship with the informant, and the informant is benefiting from his relationship with a law enforcement body, such as the state police, that could affect the credibility of the witness and the interest of the witness in the outcome of the case its not necessarily *Brady* but it may well relate to the matter of credibility, whether it's specifically this case or not, because there is that relationship or has been that relationship."(tr 83)

The credibility of the informant, Mr. Valerio, was the key to this case.  Trial counsel for the Defendant should have been given all impeachment material prior to cross-examining him.  The informant file was not produced during discovery but should have been preserved, especially once Mr. Knighton was charged. Moreover, whether the nondisclosure was inadvertent or not, it is the responsibility of the prosecutor.

*Giglio* itself makes the Government's obligation clear:

"Here the Government's case depended almost entirely on Taliento's testimony; without it there could have been no indictment and no evidence to carry the case to the jury. Taliento's credibility as a witness was therefore an important issue in

> the case, and evidence of any understanding or agreement as to a future prosecution would be relevant to his credibility and the jury was entitled to know of it."

*Giglio v. United States,* 92 S.Ct. 763 (1972).

The Second Circuit has held that the first component of a *Brady* claim is that the evidence is favorable to the accused if it either "tends to show that the accused is not guilty" or "impeaches a government witness." *United States v. Jackson,* 345 F.3d 59 (2d Cir. 2003). The government's undisclosed file concerning Valerio was incrementally favorable to the defense in several ways. First, as noted above, testimony by Valerio at trial was "at odds" with information previously disclosed to law enforcement regarding the number and price of the kilos allegedly going to Mr. Knighton.  The Defendant might have been able to use the confidential informant file to impeach Valerio's credibility, including any references to the price his New York source of supply was charging him for cocaine at that time.  The file could also be expected to contain information about the termination of Valerio's services based on his subsequent drug offense; this information suggests that Valerio lied to law enforcement while working as an informant. The undisclosed informant materials therefore satisfy the first component of a *Brady* claim.

The second component under *Brady* is that "[t]he individual prosecutor is presumed to have knowledge of all information gathered in connection with the government's investigation," and "the prosecutor's good faith or lack of bad faith is irrelevant." *United States v. Payne,* 63 F.3d 1200, 1208 (2d Cir.1995) (citing *Kyles v. Whitley,* 514 U.S. 419, 437-38, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995)); *see also Giglio,* 405 U.S. at 154, 92 S.Ct. 763. The confidential informant file falls within this category, whether or not the Assistant United States Attorney was actually aware of its existence prior to trial.

The *Brady* claim here satisfies the third component of the Supreme Court's test for a violation,  "whether petitioner has established the prejudice necessary to satisfy the 'materiality'

inquiry." *Strickler,* 527 U.S. at 282, 119 S.Ct. 1936. The "touchstone of materiality is a

'reasonable probability' of a different result." *Kyles,* 514 U.S. at 434, 115 S.Ct. 1555.  This is not

a test for sufficiency of evidence; the defendant must show that the "evidence could reasonably

be taken to put the whole case in such a different light as to undermine confidence in the

verdict." *Id.* at 434-35, 115 S.Ct. 1555; *see also In re United States,* 267 F.3d at 141-44

(discussing evolution of the materiality component of *Brady/Giglio* claims). It is "the cumulative

effect of suppression" in light of the evidence as a whole, *Kyles,* 514 U.S. at 436-37, 115 S.Ct.

1555, and the court should conduct its "own independent examination of the record in

determining whether the suppressed evidence is material." *Orena,* 145 F.3d at 558.

Since the informant's credibility was a central issue in the trial AND the informant was

found to be not credible by his handlers because he continued to commit drug offenses AND the

informant file would contain documentation regarding the handlers' assessment of the

informant's credibility and other facts related thereto, the file should have been disclosed to the

Defendant.

For these reasons, due process requirements require that Mr. Knighton be granted a new

trial.

## **TIMELINESS OF DEFENDANT'S POST-TRIAL MOTIONS**

The Defense anticipates that the Government will argue that the jurisdictional 14-day

time limits of Fed.R.Crim.Pro. 33 & 29(c) were not met so the instant motions should be denied

on procedural grounds.  If trial counsel neglected or was unable to meet the statutory deadlines

then Mr. Knighton would have a claim of ineffective assistance of counsel.

The Second Circuit has held since 2010 that a District Court may, and often should, consider the issue of ineffective assistance of counsel if raised <u>prior to entry of the judgment of conviction</u>. Mr. Knighton was convicted after jury trial but has not yet been sentenced and no judgment of conviction has been entered.

The two most frequently cited cases from our circuit are *United States v. Brown, 623 F.3d 104 (2d Cir. 2010)* and *United States v. Rivera, 09-CR-619, 2013 WL 2627184 (EDNY June 11, 2013) (see also United States v. Thomas,* 11-CR-200, 2014 WL 702107 (WDNY Feb. 24, 2014).

*Brown* was a case presided over by Judge Larimer. Attorney Donald Thompson represented a defendant in the case named Marks. Marks was found guilty after a jury trial of drug trafficking and firearms crimes. Six months after the verdict but before he was sentenced, the Government filed an affidavit in relation to Defendant's post-conviction motion to enforce a plea agreement. In the affidavit, the Government stated that it had offered to allow the defendant to plead guilty to an offense with a 20-year sentence. The defendant claimed the offer was never conveyed to him by Mr. Thompson.1  Defendant Marks then filed a 28 USC 2241 motion with the District Court raising an ineffective assistance of counsel claim. Judge Larimer ruled that sentencing was a prerequisite to hearing the claim and denied the motion. The Second Circuit ruled that the District Court should have considered the motion prior to sentencing and denominated it a Rule 33 motion. Further, that the District Court should have deemed the motion timely based on "excusable neglect"(see Fed.R.Crim.P.45(b)(2)); specifically that the defendant did not find out about the basis for the ineffectiveness claim until 6 months after the verdict was rendered. *Id.*

---

1 Defendant Marks was convicted in June 2006; he learned in November 2006 that a certain plea offer had been extended prior to trial; in February 2007 while still represented by counsel he filed a pro se motion with the District Court pursuant to 28 USC 2241 alleging ineffective assistance of counsel.

In *Rivera,* a case from the Eastern District, two defendants who were convicted but not yet sentenced filed 2255 motions alleging ineffective assistance.  The Court, following *Brown,* treated the motions as Rule 33 motions.  However, the Court dismissed the motions as untimely finding that there was no "excusable neglect".  The Court relied on the fact that prior to and during the trial the defendants sought to have their lawyers replaced claiming they were ineffective; that after the verdict the lawyers moved to extend the time to file the Rule 33 motions and the Court granted the motions such that the defendants were aware of the deadline by which to file motions challenging their convictions.  *Rivera, Id.*

In Mr. Knighton's case, his lawyer did not file a Rule 29 or 33 motion but he request that the deadline for filing be extended.  If that request was based upon the lawyer's own ignorance of the jurisdictional nature of the time frame for filing motions then Mr. Knighton would have an ineffective assistance claim.  The latter delay was due to the lawyer's inability to come back into the United States from Canada and therefore Mr. Knighton was denied counsel altogether for a period of time.  Certainly an unforeseen circumstance such as existed here should not be held against Mr. Knighton. The District Court granted the defendant an extension of time to file the post-trial motions. Due to an immigration issue, trial counsel was thereafter prevented from coming back to practice law in the United States.  The Defendant, not a lawyer himself, had no idea how to comply with the Court's deadline by filing motions.  Substitute counsel was appointed under the CJA Plan only after the deadline set by the Court had expired.  Therefore, unlike the defendants in *Rivera,* knowledge of the procedure or time limitations for challenging his conviction or raising an ineffective assistance of counsel claim cannot be imputed to Mr. Knighton..

Based on the foregoing, the Defendant's motion to vacate his conviction and for a

new trial is properly before this Court; and this Court has the discretion to find that Mr. Knighton

has made a sufficient showing of "good cause" for failing to file post-trial motions within the

applicable time period; further that any untimeliness was the result of "excusable neglect" for

purposes of extending his time to file.  Therefore, we respectfully urge this Court to grant

Defendant's requested relief.

/s/ Cheryl Meyers Buth
Cheryl Meyers Buth, Esq.
Attorney for Defendant Steven A. Knighton
MURPHY MEYERS LLP
6506 East Quaker Street, Suite 200
Orchard Park, New York  14127
(716) 662-4186
cmbuth@murphymeyers.com

Sworn to before me this
1st day of October, 2015.

/s/ Cindy M. Raab
Notary Public, State of New York
Qualified in Erie County
My Commission Expires May 31, 2018

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA

v.                                                          12-CR-56

STEVEN A. KNIGHTON,

                         Defendant
_____

## CERTIFICATE OF SERVICE

      I, CINDY M. RAAB, hereby certify that on October 1, 2015, I electronically filed the

foregoing Notice of Motion with the Clerk of the District Court using the CM/ECF system,

which sent notification of such filing to the following:


                Thomas Duszkiewicz
                Assistant United States Attorney
                138 Delaware Avenue
                Buffalo, New York 14202


                                        /s/Cindy M. Raab
                                        Cindy M. Raab